## ORAL ARGUMENT NOT YET SCHEDULED
## No. 13-5370

---

### UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CANONSBURG GENERAL HOSPITAL,
*Plaintiff-Appellant,*

*v.*

KATHLEEN SEBELIUS, SECRETARY,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Columbia, No. 09-cv-2385 (Howell, B.)

---

## BRIEF FOR PLAINTIFF-APPELLANT

---

STEPHEN P. NASH
SVEN C. COLLINS
Patton Boggs LLP
1801 California St. Suite 4900
Denver, CO 80202
Tel: (303) 894-6173
Fax: (303) 894-9239
snash@pattonboggs.com
*Attorneys for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), appellant Canonsburg General Hospital (the "Appellant"), by and through its undersigned attorneys, hereby certify the following as to Parties, Rulings, and Related Cases.

### A. Parties and Amici

Pursuant to Circuit Rule 26.1, the undersigned certify that the Appellant, plaintiff below, is a hospital that participates in the Medicare program. Attachment A to this certificate shows the parent companies of the Appellant. No publicly-held company has a 10 percent or greater ownership interest in the Appellant.

Appellee, defendant below, is the Secretary of the United States Department of Health and Human Services, now Kathleen Sebelius.

There are no intervenors or amici in this action.

### B. Ruling Under Review

Appellant seeks review of the Memorandum Opinion and Order entered in *Canonsburg General Hospital v. Sebelius*, Civil Action No. 09-2385 (BAH), by the Honorable Beryl A. Howell on October 17, 2013. No official citation exists for the Memorandum Opinion and the Order.

### C. Related Cases

The case on review was before the United States District Court for the District of Columbia, under Civil Action No. 09-2385 (BAH). The case was not

4824-5929-6537.1.

previously before this Court or any other court.  Counsel for Appellant is not aware of any other related cases currently pending in this Court or in any other court, "involving substantially the same parties and the same or similar issues," as defined in Circuit Rule 28(a)(1)(C).

Dated: April 1, 2014

Respectfully submitted,

/s/ Stephen P. Nash
Stephen P. Nash (D.C. Bar No. PA0037)
Sven Collins*
*Admitted Pro Hac Vice
Patton Boggs LLP
1801 California St., Ste 4900
Denver, CO 80202
Tel: (303) 894-6173
Fax: (303) 894-9239
E-mail: snash@pattonboggs.com

Attorneys for Appellant

4824-5929-6537.1.

## <u>ATTACHMENT A</u>

First tier parent: Highmark, Inc.

Second tier parent: Allegheny Health Network

Third tier parent:  West Penn Allegheny Health System, Inc.

4824-5929-6537.1.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

TABLE OF CONTENTS..........................................................................iv

TABLE OF AUTHORITIES ...................................................................vi

I.     JURISDICTIONAL STATEMENT ..............................................1

II.    STATEMENT OF ISSUES ..........................................................1

III.   STATUTES AND REGULATIONS ............................................3

IV.    STATEMENT OF THE CASE ....................................................4

      A.     Statutory and Regulatory Scheme ...................................4

      B.     Medicare Appeals Scheme ............................................11

      C.     The Proceedings Below.................................................12

V.     SUMMARY OF ARGUMENT.....................................................16

VI.    STANDARD OF REVIEW ..........................................................20

VII.   ARGUMENT.................................................................................20

      A.     The district court erred in applying the defense of issue
           preclusion, which HHS waived by failing to assert the defense
           during the trial phase of the case before the agency ...........................20

      B.     The district court below also erred in going beyond the
           administrative record, by deciding the instant case based on the
           defense of issue preclusion which was neither argued nor
           considered during HHS's adjudication or during its subsequent
           administrative review and reversal.......................................................28

      C.     The district court's decision cuts against the policy
           considerations underlying the use of issue preclusion ........................33

      D.     The district court below erred in applying issue preclusion
           where the legal landscape had changed materially since the
           *2001 Canonsburg Case* ......................................................................36

E.      The district court below erred in concluding that a report issued in 1985 was relevant legislative history for DEFRA, an act passed the previous year ......................................................................44

VIII.   CONCLUSION.................................................................................46

CERTIFICATE OF COMPLIANCE.......................................................48

CERTIFICATE OF SERVICE ................................................................49

ADDENDUM ..........................................................................................50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alaska Professional Hunters Association, Inc. v. FAA*,
    177 F.3d 1030 (D.C. Cir. 1999) ..........................................................9, 16, 40, 44

*American Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001)...........................................................................22

*Baltimore & Annapolis R.R. v. WMAT*,
    642 F.2d 1365 (D.C. Cir. 1980).....................................................................25, 33

*Canonsburg Gen. Hosp. v. Thompson*,
    No. 00-284,
    2001 WL 36339671 (W.D. Pa. Feb. 28, 2001)...........................................12, 43

*Commodity Futures Trading Com v. Schor*,
    478 U.S. 833 (1986)............................................................................................27

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................................................40

*Fort Bend Cmty. Hosp. v. Thompson*,
    2002 U.S. Dist. LEXIS 28512 (S.D. Tex. Mar. 21, 2002) ................................10

*Graphic Comm. Intn'l. Union v.*
    *Salem-Gravure Div. of World Color Press, Inc.*,
    843 F.2d 1490 (D.C. Cir. 1988).........................................................................36

*Holland v. Nat'l Mining Ass'n*,
    309 F.3d 808 (D.C. Cir. 2002). Mem. Op. at 13-14 ..........................................36

*Howmet Corp. v. EPA*,
    614 F.3d 544 (D.C. Cir. 2010)...........................................................................20

*Manin v. National Transportation Safety Board*,
    627 F.3d 1239 (D.C. Cir. 2011).....................................................................28, 29

*Marshall County Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993).........................................................................22

vi

*Mercy Med. Skilled Nursing Facility v. Thompson,
    2004 U.S. Dist. LEXIS 27365,
    2004 WL 3541332 (D.D.C. May 14, 2004) ................... 9, 10, 16, 35, 39, 43, 44

*Montefiore Med. Ctr. v. Leavitt,
    578 F. Supp. 2d 129 (D.D.C. 2008) ................................. 7, 8, 10, 16, 35, 39, 43

Mortgage Bankers Ass'n v. Harris,
    720 F.3d 966 (D.C. Cir. 2013)....................................................9, 40, 44

National Treasury Employees Union v. I.R.S.,
    765 F.2d 1174 (D.C. Cir. 1985) .......................................................27

*Paralyzed Veterans of America v. D.C. Arena, L.P.,
    117 F.3d 579 (D.C. Cir. 1997) ............... 9, 16, 19, 37, 38, 39, 40, 41, 42, 43, 44

Perley by Perley v. Palmer,
    157 F.R.D. 452 (N.D. Iowa, Apr. 1994)............................................32

Perry v. Brakke,
    826 F.2d 740 (8th Cir. 1987) .........................................................32

Pharmaceutical Care Management Assoc. v. Dist. Of Columbia,
    522 F.3d 443 (D.C. Cir. 2008) .......................................................36

Plaut v. Spendthrift Farm,
    514 U.S. 211 (1995)...................................................................27

*Poulin v. Bowen,
    817 F.2d 865 (D.C. Cir. 1987) ...................................... 17, 21, 22, 23, 24, 25, 26

Pub. Citizen v. Dep't. of State,
    276 F.3d 634 (D.C. Cir. 2002).......................................................44

Riffin v. Surface Transportation Board,
    592 F.3d 195 (D.C. Cir. 2010)....................................................28, 29

San Joaquin Cmty. Hosp. v. Thompson,
    No. 01-5733, 2002 WL 34596496,
    2002 U.S. Dist. LEXIS 28513 (E.D. Ca. Aug. 13, 2002)................10, 19, 43, 46

*SBC Inc. v. FCC,
    414 F.3d 486 (3rd Cir. 2005) .......................................................39, 40, 41, 42

vii

*Sea-land Serv. Inc. v. Dep't. of Transportation*,
    137 F.3d 640 (D.C. Cir. 1998)............................................................32

\*SEC v. Chenery Corp.,
    332 U.S. 194 (1947) .......................................... 15, 18, 28, 29, 31, 32

*St. Elizabeth's Med. Ctr. of Bos., Inc. v. Thompson*,
    396 F.3d 1228 (D.C. Cir. 2005)..........................................................4

\*St. Francis Health Care Center v. Shalala,
    205 F.3d 937 (6th Cir. 2000)........................ 9, 10, 16, 19, 38, 39, 43, 44, 45, 46

\*St. Luke's Methodist Hosp. v. Thompson,
    315 F.3d 984 (8th Cir. 2003)............................................6, 8, 9, 39, 44

*Stanton v. District of Columbia Court of Appeals*,
    127 F.3d 72 (D.C. Cir. 1997)................................................17, 26, 27

*Steele v. Schafer*,
    535 F.3d 689 (D.C. Cir. 2008)........................................................20

*Toyon v. Blue Cross BlueShield Ass'n*,
    CMS Adm'r Decision (Aug. 2, 2010) .......................................10, 35

\*Transaero, Inc. v. LA Fuerza Aerea Boliviana,
    30 F.3d 148 (D.C. Cir. 1994) .......................................................17, 26

*United States v. 5 Unlabeled Boxes*,
    572 F.3d 169 (3d Cir. 2009) ..........................................................36

*Univ. of Tenn. v. Elliott*,
    478 U.S. 788 (1986)......................................................................32

*UPMC Mercy v. Sebelius*,
    793 F. Supp. 2d 62 (D.D.C. 2011)..................................................18

*Whiting v. AARP*,
    637 F.3d 355 (D.C. Cir. 2011)........................................................44

## STATUTES

28 U.S.C. § 1291 ................................................................................1

42 U.S.C. §§ 1395c-1395i(5)...........................................................1, 4

viii

42 U.S.C. § 1395h ............................................................................11

*42 U.S.C. § 1395oo .............................. 1, 10, 11, 12, 25, 30, 36

42 U.S.C. § 1395x(v)(1)(A) ..........................................................4

*42 U.S.C. § 1395yy ....................................................................4, 6

Balanced Budget Act of 1997, Pub. L. no. 105-33, § 4432(a) 111 Stat. 251 ............4

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169 (1984) .................................................3, 7

**OTHER AUTHORITIES**

20 C.F.R. § 404.957(c)(1) ............................................................25

42 C.F.R. § 405.1803 ....................................................................11

*42 C.F.R. § 413.30 ..........................................................1, 5, 12, 13

39 Fed. Reg. 10,260 (Mar. 19, 1974) ...........................................5

39 Fed. Reg. 20,164 (June 6, 1974) ..............................................5

44 Fed. Reg. 31802, 31804 (June 1, 1979) .................................6

45 Fed. Reg. 58,700 (Sept. 4, 1980) ............................................6

*Restatement (Second) of J.* § 28 (1982) ....................................37

*PRM § 2534.5 ................................... 7, 8, 9, 10, 13, 14, 15, 43

* *Chief Authorities are Designated by an Asterisk*

## <u>GLOSSARY OF ABBREVIATIONS AND ACRONYMS</u>

| | | |
|---|---|---|
| Administrator | — | Administrator, Centers for Medicare and Medicaid Services |
| APA | — | Administrative Procedure Act |
| AR | — | Administrative Record |
| Canonsburg Hospital | — | Canonsburg General Hospital |
| CMS | — | Centers for Medicare and Medicaid Services |
| DEFRA | — | Deficit Reduction Act of 1984 |
| FY | — | Fiscal Year |
| HHS | — | Department of Health and Human Services |
| Intermediaries | — | Medicare administrative contractors, fiscal intermediaries |
| NPR | — | Notice of Program Reimbursement |
| PRM | — | Provider Reimbursement Manual |
| PRRB | — | Provider Reimbursement Review Board |
| RCLs | — | Reasonable Cost Limits |
| RCL Exception Reg | — | 42 C.F.R. § 413.30(e)(1) |
| Secretary | — | Secretary, U.S. Department of Health and Human Services |
| SNF | — | Skilled Nursing Facility |

4824-5929-6537.1.

# I.    JURISDICTIONAL STATEMENT

Plaintiff/Appellant Canonsburg General Hospital ("Canonsburg Hospital") invoked the jurisdiction of the district court under 42 U.S.C. § 1395oo(f)(1). Canonsburg Hospital sought judicial review before the court below of the final decision of Defendant/Appellee Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("HHS"), which denied Canonsburg Hospital's request for additional Medicare reimbursement under 42 U.S.C. § 1395oo(a).  The district court below did not review Canonsburg Hospital's challenge to HHS's final decision, but granted the Secretary's cross-motion for summary judgment, on the ground of issue preclusion, in an order dated October 17, 2013.  Canonsburg Hospital timely filed a notice of appeal to this Court on December 16, 2013.  This Court has jurisdiction under 28 U.S.C. § 1291.

# II.    STATEMENT OF ISSUES

This case involves Canonsburg Hospital's challenge to the amount of its Medicare reimbursement due for services provided during its fiscal year ("FY") 1996 at its hospital-based skilled nursing facility ("SNF").  Canonsburg Hospital claims that it is due additional payments, beyond then-applicable reasonable cost limits ("RCLs"), for providing "atypical services" under an exception allowing for same as set forth in the Medicare statute and in HHS's regulations.  42 U.S.C. §§ 1395c-1395i(5); 1395x(v); 1395yy; 42 C.F.R. § 413.30.  Canonsburg Hospital

1

demonstrated that it qualified for exception relief for all of its claimed costs above the RCLs.  HHS, however, applied a new -- and dramatically changed -- interpretation of the relevant provisions of the Medicare statute and its own regulations to categorically deny all costs that were above the RCLs but below 112% of the facility's peer group mean costs.  This created a reimbursement "gap," the resulting underpayments from which Canonsburg Hospital appealed to the Provider Reimbursement Review Board ("PRRB").  The PRRB ruled on the merits in favor of Canonsburg Hospital, but the Administrator of the Centers for Medicare and Medicaid Services ("CMS") took the PRRB's decision under review and reversed on the merits.

On timely appeal of HHS's final decision to the district court, HHS, for the first time, asserted the affirmative defense of collateral estoppel (or issue preclusion) based on an earlier appeal Canonsburg Hospital had filed in the District Court for the Western District of Pennsylvania, challenging its SNF reimbursement for different fiscal years, but had lost ("the *2001 Canonsburg Case*").  The district court below rejected Canonsburg Hospital's cross-motion for summary judgment on HHS's affirmative defense of issue preclusion and granted HHS's cross-motion based on same, without reviewing HHS's final determination on the merits.

At issue on review before this Court is whether the lower court erred in dismissing this action based on issue preclusion.  More specifically Canonsburg

2

Hospital asks this Court to decide:  (a) whether the district court, which sits as an appellate tribunal in Medicare reimbursement appeals, erred in concluding that HHS was permitted to assert the affirmative defense of issue preclusion for the first time on appeal before the district court and had not, instead, waived that defense, even though the agency had failed to assert the defense during both the adjudicatory and initial review phases of the case before the PRRB and the CMS Administrator; (b) whether the district court erred in affirming HHS's action on a ground (issue preclusion) which HHS had not invoked in support of its final decision; (c) whether the district court erred in finding that permitting HHS to assert issue preclusion for the first time on appeal was consistent with the policy underpinnings of the defense; and (d) whether a change in the legal landscape makes it unfair to apply issue preclusion.  In addition, this appeal presents an issue relating to the merits which should be addressed in connection with reversing the dismissal based on preclusion:  whether the district court erred in holding that a 1985 report comprised relevant legislative history for the Deficit Reduction Act of 1984 ("DEFRA").

## III.   STATUTES AND REGULATIONS

The relevant statute and rules are set forth in an addendum to this brief.

3

# IV.  STATEMENT OF THE CASE[1]

## A.  Statutory and Regulatory Scheme

Under Part A of the Medicare program, hospital-based and freestanding SNFs are entitled to payments for institutional care.  *See* 42 U.S.C. §§ 1395c-1395i(5).  The Medicare Act further provided (during all times relevant to this appeal) that SNFs would be reimbursed for their "actual" "reasonable cost" of covered services provided to Medicare patients.  42 U.S.C. § 1395x(v)(1)(A) (1996).[2]  "Reasonable cost" is defined as any cost "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  *Id.*

"Congress has instructed the Secretary . . . to cap payments under these programs at what [s]he determines to be reasonable cost limits ('RCLs') and apply statutory norms in the determination."  *St. Elizabeth's Med. Ctr. of Bos., Inc. v.*

---

[1] Canonsburg Hospital has only set forth facts necessary for the context underlying the issues that arise from the district court's grant of summary judgment on issue preclusion, as the court below did not reach the merits.  Should HHS argue the merits in its response brief, Canonsburg Hospital would potentially need to present additional facts relating to the merits that it presented to the district court.

[2] Congress amended the Medicare Act to replace the cost-based reimbursement scheme for SNFs with a prospective payment system, under which SNFs are paid at a per diem rate.  *See* Balanced Budget Act of 1997, Pub. L. no. 105-33, § 4432(a) 111 Stat. 251, 414 (codified at 42 U.S.C. § 1395yy(e).  As this new reimbursement system applies to cost reporting periods starting only on or after July 1, 1998, it has no effect on this case.

*Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005) (citing 42 U.S.C. §§ 1395f(b), 1395x(v), 1395yy).  Accordingly, HHS promulgated regulations pertaining to RCLs and also set forth certain exemptions and exceptions where these cost limits may be adjusted.  *See* 39 Fed. Reg. 20,164 (June 6, 1974); 39 Fed. Reg. 10,260 (Mar. 19, 1974); *see also* 42 C.F.R. § 413.30.  At issue in this case is the "atypical service" exception, which states, in relevant part, as follows:

> (f)     Exceptions.  Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the Intermediary.
>
> > (1)     Atypical services.  The provider can show that the --
> >
> > > (i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and
> > >
> > > (ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

42 C.F.R. § 413.30(f)(1) (1996) (the "<u>RCL Exception Reg</u>").[3]

The Secretary set separate limits for hospital-based SNFs (such as Canonsburg Hospital's SNF) and freestanding SNFs that are not a part of a

---

[3] The RCL Exception has been revised since 1996 and exists in its current form at 42 C.F.R. § 413.30(e)(1) (2014).

4824-5929-6537.1.

hospital. For each type of SNF, the respective RCL was set at 112% of the SNF-type's peer group mean. 45 Fed. Reg. 58,700 (Sept. 4, 1980). The precise language of the RCL Exception Reg quoted above was issued as an amended regulation effective July 1, 1979. 44 Fed. Reg. 31802, 31804 (June 1, 1979).

In 1984, Congress, as part of DEFRA, amended the statute to lower the RCL for hospital-based SNFs relative to the RCL for freestanding SNFs. 42 U.S.C. § 1395yy. Although the RCL for freestanding SNFs remained at 112% of the mean group costs for freestanding SNFs, the RCL for hospital-based SNFs was lowered to "the sum of [a], the limit for freestanding skilled nursing facilities . . . , plus [b], 50% of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities . . . exceeds the limit for freestanding skilled nursing facilities." 42 U.S.C. § 1395yy(a)(3)-(4). For example, if the RCL for free-standing SNFs were $80, and 112% of the mean per diem cost for hospital-based SNFs were $120, then the RCL for hospital-based SNFs would be $100. *See* Mem. Op., *Canonsburg Gen. Hosp. v. Sebelius*, No. 1:09-cv-02385 (BAH),at 5 n.4 (D.D.C. Oct. 17, 2013) (Dkt. # 35); *see also St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 986 (8th Cir. 2003) ("*St. Luke's*").

Although the RCL was lowered, DEFRA's legislative history states:

Under this provision, both hospital-based and freestanding facilities could continue to apply for and receive exceptions from the cost limits

6

> in circumstances where high costs result from more severe than
> average case mix or circumstances beyond the control of the facility. .
> . . <u>Facilities eligible for exceptions could receive, where justified, up
> to all of their reasonable costs.</u>

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the

Committee on March 21, 1984, Committee on Finance, United States Senate,

Senate Print 98-169, v.1 at 948 (1984) (emphasis added).

"It is undisputed that for 15 years [*i.e.*, for approximately 5 years before, and

for 10 years after, DEFRA], [HHS] interpreted the [RCL Exception Reg] as

permitting a provider to recover all reasonable costs that exceeded the limits if it

was demonstrated that it met the exception requirements." Mem. Op. at 5 (quoting

Administrative Record (the "AR") at 8, *Canonsburg*, No. 1:09-cv-02385 (Apr. 12,

2010) (Dkt. # 9) (PRRB Decision)).

In 1994, however, HHS introduced a new interpretation of the RCL

Exception Reg which substantively changed rights of hospital-based SNFs to

reimbursement for reasonable and necessary services recognized as atypical – and,

did so without issuing an amended or new regulation and without any notice or

opportunity for comment. *Montefiore Med. Ctr. v. Leavitt*, 578 F. Supp. 2d 129,

131-132 (D.D.C. 2008); *see also* AR at 41-43 (PRRB Decision at 6-8); Mem. Op.

at 5-6. Instead, HHS added a new section to the agency's Medicare Provider

Reimbursement Manual ("PRM"), § 2534.5. *See id.*; *see also* PRM § 2534.5, Pl.'s

Mem. of P. & A. in Supp. of Cross-Motion for Summ. J. ("Cross-Mot."), Ex. A,

7

*Canonsburg*, No. 1:09-cv-02385, (Feb. 15, 2011) (Dkt. # 30).  This new PRM §

2534.5 states that when "determining reasonable cost, the provider's per diem costs

in excess of the cost limits are . . . compared to per diem costs of a peer group of

similarly classified providers."  PRM § 2534.5 at 9.  For hospital-based SNFs, the

amount qualifying for reimbursement under an exception was suddenly to be

measured from 112 percent of the SNF's peer group mean per diem cost and not

from the SNF's significantly lower peer group RCL, as had been the case for the

previous 15 years.  *Id.* at 10; Mem. Op. at 6; *see also* PRRB Decision at 6-8, AR at

41-43; *Montefiore*, 578 F. Supp. 2d at 131-132.

Consequently, with PRM § 2534.5, HHS began denying "hospital-based

SNFs an upward adjustment for all costs between the RCL and 112% of the peer

group mean. Therefore, using the example . . . used earlier . . . [HHS] would deny

reimbursement for actual costs expended by the hospital-based SNF that exceeded

$100 (the RCL) but did not exceed $120 (112% of the peer group mean) even if

those costs resulted from the provision of atypical services."  *St. Luke's*, 315 F.3d

at 986.  The effect of this was to reduce significantly the amount of exception relief

available to hospital-based SNFs:  PRM §2534.5 established a *per se* rule denying

all costs (for atypical services) that were above the RCL, but below 112 percent of

the mean *per diem* costs for hospital-based SNFs, thus creating a reimbursement

"gap" as a result of which hospital-based SNFs could never recover all of their

8

reasonable costs even when they qualified for exception relief.  *See id.* at 987;
Mem. Op. at 6.  When PRM § 2534.5 was issued, HHS provided no explanation
for its new provisions creating the reimbursement gap.  *See* Cross-Mot. Ex. 1 at 9-
10.

 A number of providers have challenged HHS's new gap methodology.
Initially, in 2000, it was upheld by the Sixth Circuit in *St. Francis Health Care
Center v. Shalala*, 205 F.3d 937 (6th Cir. 2000) ("*St. Francis*"), and then followed
closely by the Western District of Pennsylvania in the *2001 Canonsburg Case*,
relying exclusively on the reasoning of the Sixth Circuit.[4]  After the *2001
Canonsburg Case* was decided, however, HHS's gap methodology was invalidated
by the Eighth Circuit, *St. Luke's*, 315 F.3d at 988, and by two separate decisions of
the district court in this District.  *Mercy Med. Skilled Nursing Facility v.*

---

[4] Neither the Sixth Circuit nor the *2001 Canonsburg Case* applied or even
acknowledged the principles established by this Court in *Paralyzed Veterans of
America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) and *Alaska
Professional Hunters Association, Inc. v. FAA*, 177 F.3d 1030, 1030 (D.C. Cir.
1999) (these cases are referred to henceforth in this brief together as "*Paralyzed
Veterans*").  Since that time, however, the teachings of *Paralyzed Veterans* have
been adopted by the Third Circuit and, despite attacks from federal agencies, have
been reaffirmed within this Circuit as recently as 2013.  *See, e.g., Mortgage
Bankers Ass'n v. Harris*, 720 F.3d 966, 968-969 (D.C. Cir. 2013) (holding that
agency's interpretation of its regulation was invalid under *Paralyzed Veterans* as it
conflicted with a prior definitive interpretation of the same regulation and was
issued without notice and comment).

*Thompson*, 2004 U.S. Dist. LEXIS 27365, 2004 WL 3541332, at *2 (D.D.C. May 14, 2004) ("*Mercy*"); and *Montefiore*, 578 F. Supp. 2d 129 ("*Montefiore*").[5]

HHS appealed *Mercy*, but then settled and withdrew the appeal. Cross-Mot. at 20-21; *see also*, Settlement Agreement and Mutual Release, Def.'s Opp'n to Pl.'s Mot. for Summ. J. and Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Def.'s Opp'n), at Ex. 1, *Canonsburg*, No. 1:09-cv-02385 (March 25, 2011) (Dkt. #32). Similarly, HHS appealed *Montefiore*, but withdrew its appeal following oral argument before this Court and paid the plaintiff therein several million dollars in settlement. *See* Cross-Mot. at  20-21; *see also*, Settlement Agreement and Mutual Release, Cross-Mot, Ex. B. After settling *Montefiore*, HHS continued to apply its gap methodology to hospital appeals, thus perpetuating the disputes as to its validity. Cross-Mot. at 21; *see also, Toyon v. Blue Cross BlueShield Ass'n*, CMS Adm'r Decision (Aug. 2, 2010), Cross-Mot. Ex. C.[6]

---

[5] Shortly after the *2001 Canonsburg Case*, two other district courts, following the lead of *St. Francis*, also upheld the gap methodology. *Fort Bend Cmty. Hosp. v. Thompson*, 2002 U.S. Dist. LEXIS 28512 (S.D. Tex. Mar. 21, 2002); *San Joaquin Cmty. Hosp. v. Thompson*, No. 01-5733, 2002 WL 34596496, 2002 U.S. Dist. LEXIS 28513 (E.D. Ca. Aug. 13, 2002)).

[6] Because HHS's new rule was invalidated in the 8th Circuit in 2003, hospital-based SNFs located within the 8th Circuit are not penalized by PRM § 2534.5. However, even though two district courts within this district have invalidated PRM § 2534.5, HHS continues to enforce it within the D.C. Circuit and does so even though the agency appealed, but subsequently voluntarily dismissed and settled, each of those cases. Because every Medicare Part A provider may appeal adverse PRRB (or CMS Administrator) decisions to the D.C. Circuit, 42 U.S.C. §

**B.** **Medicare Appeals Scheme**

The Medicare statute provides for administrative and judicial review of reimbursement determinations. 42 U.S.C. §§ 1395oo(a), (f). To receive Medicare reimbursement, SNFs are required to submit a cost report, for each fiscal year, to private "Medicare administrative contractors" who serve as fiscal intermediaries ("Intermediaries"). *See* 42 U.S.C. § 1395h (1996). The Intermediary audits the cost report in accordance with HHS's regulations and policies and issues its determination of the reimbursement due to the provider for services rendered to Medicare beneficiaries, called a Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803 (1996).

If a SNF is dissatisfied with its final determination as to the amount of its total program reimbursement, as set forth in its NPR, the Medicare statute permits the hospital to file an appeal with the PRRB, subject to specified amount in controversy and timing requirements. The PRRB is authorized to affirm, modify, or reverse intermediary decisions, based on the record facts and arguments presented at the PRRB hearing. 42 U.S.C. § 1395oo(d). The Secretary, via the CMS Administrator, may review and reverse the PRRB's decision. If the hospital remains dissatisfied with a final decision of the PRRB or the CMS Administrator,

---

1395oo(f), HHS's decisions not to obtain a definitive ruling from this Court seem telling.

4824-5929-6537.1.

it may seek review in the United States District Court, either in the district in which the hospital is located or in the District of Columbia.  42 U.S.C. §1395oo(f).

## C.     __The Proceedings Below__

Canonsburg Hospital is a hospital located in Pennsylvania that participated in the Medicare program during all years relevant to the instant case.  Canonsburg Hospital also owned and operated a hospital-based SNF which was reimbursed on a reasonable cost basis, subject to RCLs promulgated by CMS.  *See* Mem. Op. at 6. Since FY 1986, including and through FY 1996, Canonsburg Hospital exceeded the RCLs for hospital based SNFs and sought RCL exceptions for each of these years.  *Id.*[7]

After receiving the Intermediary's reimbursement determination with respect to its FY 1996, Canonsburg Hospital timely appealed to the PRRB the methodology used by the Intermediary to determine the amount of exception relief due under 42 C.F.R. § 413.30(f)(1), pursuant to HHS's regulations governing appeals.  *See* Mem. Op. at 8; *see also*, Administrator Decision at 5, AR at 6.  The

---

[7] With respect to its five FYs ending June 3, 1987 through 1990, and June 30, 1993, Canonsburg Hospital filed PRRB appeals and then an appeal in Western District of Pennsylvania "challeng[ing] the methodology used by the Secretary in calculating the amount of its reimbursement for atypical services" provided by its SNF.  *See Canonsburg Gen. Hosp. v. Thompson*, No. 00-284, 2001 WL 36339671, at *1 (W.D. Pa. Feb. 28, 2001).  This was the *2001 Canonsburg Case*, in which the Western District of Pennsylvania affirmed HHS's denial of Canonsburg Hospital's claim for additional reimbursement.

Intermediary and Canonsburg Hospital stipulated to facts establishing that Canonsburg Hospital's SNF furnished the requisite atypical services in FY 1996 and the costs at issue related directly to necessary services furnished by the SNF. *See* AR at 5-6; 38-39, 45-47.  The stipulated facts also established that the Intermediary determined that Canonsburg Hospital qualified for exception relief for furnishing atypical services, thus entitling Canonsburg Hospital to the RCL exception available under 42 C.F.R. § 413.30(f).  *Id.*  Further, but for the gap reimbursement methodology set forth in PRM § 2534.5, Canonsburg Hospital would have received an additional $526,293 in payment for providing atypical services.  *Id.*

On August 20, 2009, the PRRB issued its order in this case, finding that Canonsburg Hospital was entitled to reimbursement for <u>all</u> of its atypical costs in excess of the RCL.  PRRB Decision, AR at 36-44.  The PRRB determined that HHS's gap methodology was invalid for multiple reasons, including that it comprised a change to the agency's definitive longstanding interpretation of the RCL Exception Reg without notice and comment.  *Id.* at 7-9 AR at 42-44.  On October 14, 2009, the CMS Administrator issued a decision reversing the PRRB.  Administrator Decision at 1-17, AR at 2-18.  The CMS Administrator did not dispute the findings of both the Intermediary and the PRRB that Canonsburg Hospital's specific atypical costs claimed in excess of the RCL were both

13

reasonable and necessary.  *See id* at 4-6, AR at 5-7.  Rather, the Administrator took the position that <u>all</u> hospital-based SNF costs that fall between the RCL and 112 percent of the mean per diem costs are, *per se*, unreasonable.  *Id.* at 15, AR at 16. The Administrator found that the gap methodology introduced in PRM § 2534.5 was a "reasonable and appropriate" application of the reasonable cost requirements. *Id.* at 12, AR at 13.  The Administrator also found that PRM § 2534.5 did not represent a change in CMS policy and, thus, CMS was not required to engage in notice and comment rulemaking before promulgating same.  *Id.* at 14-15, AR at 15-16.

Canonsburg Hospital timely appealed the CMS Administrator's decision to the United States District Court for the District of Columbia on December 17, 2009.  Compl. ¶ 48, *Canonsburg*, No. 1:09-cv-02385 (Dec. 17, 2009) (Dkt. #1); Answer ¶ 48, *Canonsburg*, No. 1:09-cv-02385 (Apr. 12, 2010) (Dkt. #10).  On October 17, 2013, the district court issued an order granting HHS's cross-motion for summary judgment on the basis of HHS's defense of issue preclusion holding that the defense applied for several reasons.[8]  First, the district court held that applying issue preclusion would not work the type of compelling unfairness

---

[8] The instant case was filed in December of 2009 and originally assigned to the Honorable Richard W. Roberts.  In January of 2011, it was reassigned to the Honorable Beryl A. Howell, shortly after her appointment to the bench and after the start of the parties' summary judgment briefing, which was completed by April of 2011.

warranting avoidance of the doctrine. Mem. Op. at 16. Second, the district court found that no consensus has been reached amongst the circuits about the validity of PRM § 2534.5 and the *2001 Canonsburg Case* had not been overruled in the Third Circuit. *Id.* at 24. Thus, the district court held there had not been a critical change in controlling law where the current legal landscape would make the application of the issue preclusion doctrine unfair. *Id.* Third, the district court held that HHS did not waive the affirmative defense of issue preclusion, even after failing to raise it during the administrative proceedings. *Id.* at 27. Fourth, the district court held that the doctrine of *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) – that courts are to review agency determinations solely on the grounds invoked by the agency in the administrative record – did not prevent the court from affirming on the basis of issue preclusion. *Id.* at 30. Finally, the district court rejected Canonsburg Hospital's policy rationale that it would be fundamentally unfair to apply issue preclusion to the instant case. *Id.* at 32.

Further, as a part their analysis relating to the merits, the parties disagreed about whether Congress, when it passed DEFRA in 1984, had considered a report issued in 1985. The district court stated that Congress had several reports at its disposal when it passed the DEFRA, including a "preview" of the 1985 report. *Id.* at 4-5 n.3. Even though neither the 1985 report nor a "preview" of same was part of the administrative record or reflected in DEFRA's legislative history, the district

15

court apparently took judicial notice of same based on certain information set forth in the *St. Francis* case and in a decision from the United States District Court for the Eastern District of California. *Id.* (quoting *San Joaquin Cmty. Hosp. v. Thompson*, No. 01-5733, 2002 WL 34596496, at * 16, 2002 U.S. Dist. LEXIS 28513 at *46 (E.D. Ca. Aug. 13, 2002)).

## V.      SUMMARY OF ARGUMENT

This case involves HHS's third successive attempt to shield from this Court's scrutiny the legality of HHS's gap methodology, which comprised a change to its definitive interpretation of its regulations in a manner that was contrary to the Medicare statute, the agency's regulations and this Court's decisions in the *Paralyzed Veterans* and *Alaska Professional Hunters*. HHS avoided this Court's review twice previously when the agency voluntarily dismissed its successive appeals of each of two district court decisions that were adverse to the agency in *Mercy* 2004 U.S. Dist. LEXIS 27365 and *Montefiore*, 578 F. Supp 2d 129. In this third effort, HHS convinced the district court below to permit it to raise the defense of issue preclusion for the first time on appeal before the district court, following both the administrative trial and the initial review phase of the case before the agency, in which HHS had not asserted the defense but, instead, had twice issued a merits decision on Canonsburg Hospital's claims.

16

The district court's decision allowing HHS's untimely assertion of issue preclusion constitutes reversible error for multiple reasons.

First, the district court failed to recognize that HHS had waived its defense of issue preclusion by failing to assert it until after the case had been fully adjudicated on the merits at both levels of agency review. *See Poulin v. Bowen*, 817 F.2d 865, 868-69 (D.C. Cir. 1987) (holding HHS had waived defense of *res judicata* where the agency had expressly declined to apply that defense during the agency adjudication). The district court's holding that issue preclusion could nonetheless be applied appears to have stemmed from its misapprehension as to the nature and relevance of the prior proceedings that occurred before the agency. Where, such as here, the agency is the arbiter of the claims and has made a decision on the merits, the district court sits in the role of an appellate tribunal. In such settings (*i.e.*, appellate review of a final adjudicatory decision on the merits), this Court has "generally refused" to apply preclusion defenses, *Transaero, Inc. v. LA Fuerza Aerea Boliviana*, 30 F.3d 148, 150 n.1 (D.C. Cir. 1994), and has only done so where there had, in fact, been no trial below and the defense could have been asserted on remand. *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997). In the instant case, the district court did not identify any circumstances that justified excusing HHS's failure to assert issue preclusion during the trial phase of the case. Thus, the defense was waived under *Poulin*.

17

Second, the district court below erred in affirming HHS's administrative decision based on grounds (issue preclusion) which HHS had not invoked or relied upon in either of its two earlier administrative adjudications.  By doing so, the district court again failed to recognize that it sat in an appellate role, reviewing the decision of the agency on the basis of the administrative record the agency had compiled.  Courts reviewing agency decisions under the APA are not permitted to supplement the reasons for an agency decision with those that the agency itself has not given.  *SEC v. Chenery*, 332 U.S. at 196.  Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *UPMC Mercy v. Sebelius*, 793 F. Supp.2d 62 at 67(D.D.C. 2011) (internal quotes omitted).

Third, the court erred in applying issue preclusion where doing so failed to serve (and was, in fact, contrary to) the policy underpinnings for the doctrine.  The district court improperly disregarded the fact that allowing HHS to first assert issue preclusion at the third level of review would result in the waste of the resources expended in trying and determining the validity of the gap methodology, on the merits, before the agency.  Moreover, in its discussion of policy, the district court failed to recognize that there was no risk of inconsistent decisions, given that the issue had been tried on the merits and that at least three courts have already reached the opposite conclusion to that of the *2001 Canonsburg Case*, holding

18

HHS's gap methodology invalid, including two of those holding it invalid under *Paralyzed Veterans*.

Fourth, the district court erred in concluding that it was fair to give the *2001 Canonsburg Case* preclusive effect even though the law relevant to the holding of that case had changed in material respects in the intervening years. Specifically, in 2001, the *Paralyzed Veterans* analytical framework had neither been acknowledged by the Third Circuit nor expressly considered by any court that had reviewed HHS's gap methodology. Further, the district court that decided the *2001 Canonsburg Case* expressly relied exclusively on *St. Francis*, which was silent as to *Paralyzed Veterans*, and simply did not address that case or its holding. In the instant case, however, by the time the district court below issued its decision, the Third Circuit had adopted the principles of *Paralyzed Veterans* and three courts (the Eighth Circuit and two district courts in this Circuit) had invalidated HHS's gap methodology, the latter two expressly relying on *Paralyzed Veterans*. Had these developments in the legal landscape existed in 2001, the court that decided the *2001 Canonsburg Case* would, at a minimum, have had to consider the gap methodology under the analytical framework of *Paralyzed Veterans* – and no court that has done so has upheld HHS's gap methodology.[9]

---

[9]One district court, in the Ninth Circuit, declined to apply the *Paralyzed Veterans* analytical framework, citing that circuit's rejection of the doctrine. *San Joaquin*

Finally, the district court erred in holding that a 1985 report relating to SNF costs, which was not completed or provided to Congress until after the 1984 passage of DEFRA, comprised relevant legislative history for same.  The district court did not have a basis in the record or otherwise to reach this conclusion. Although immaterial to the district court's disposition of the case on preclusion grounds, this portion of its holding must nevertheless be set aside so as to avoid this erroneous conclusion from becoming law of the case on remand.

For any or all the foregoing reasons, the judgment of the district court below applying HHS's affirmative defense of issue preclusion must be reversed and the case should be remanded to the district court for a determination of Canonsburg Hospital's appeal on the merits.

## VI.    <u>STANDARD OF REVIEW</u>

This Court reviews the district court's grant of summary judgment *de novo*. *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008); *see also, Howmet Corp. v. EPA*, 614 F.3d 544, 549 (D.C. Cir. 2010).

## VII.   <u>ARGUMENT</u>

**A.    <u>The district court erred in applying the defense of issue preclusion, which HHS waived by failing to assert the defense during the trial phase of the case before the agency</u>**

---

*Cmty. Hosp. v. Thompson*, No. 01-5733, 2002 U.S. Dist. LEXIS 28513, **53-54 (E.D. Ca. Aug. 13, 2002).

This case presents the issue of whether an agency should be permitted to deploy the defense of issue preclusion for the first time – on appeal before the district court – even though the agency failed to raise the defense during adversarial administrative proceeding before its tribunal (here, the PRRB) and then again during agency review of the PRRB's decision (here, by the CMS Administrator). Although it has not addressed the precise waiver circumstances presented by the instant case,[10] this Court's precedent nonetheless militates in favor of a finding of waiver. The district court below erred in ruling to the contrary.

*Poulin v. Bowen* illustrates that an agency waives the affirmative defense of *res judicata* (*e.g.*, issue preclusion) if it does not assert the defense during the administrative trial phase of the case, choosing instead to determine the case on the merits. 817 F.2d at 868-69. *Poulin* involved an appeal of a claim for Social Security disability benefits. The plaintiff made a claim for benefits, which HHS denied. *Id.* at 868. The plaintiff did not appeal the denial of his first claim and it, thus, became a final order. Nevertheless, several years later, the plaintiff made a second claim for disability benefits. *Id.* Although the ALJ noted that the claim was potentially subject to dismissal on the basis of *res judicata*, as was permitted

---

[10] Canonsburg Hospital was unable to locate any opinion of this Court addressing the circumstances where the agency waived application of the defense at the administrative trial phase and first asserted the defense during the "appellate" court phase.

under the agency's regulations, the ALJ heard and denied the claim on the merits. *Id.* at 869. On appeal in court, HHS first asserted *res judicata* in its motion for judgment affirming the agency's final decision. This Court held that HHS had waived the affirmative defense of *res judicata* for two separate reasons.

First, by adjudicating the plaintiff's claim on the merits, "the agency expressly waived applicability of administrative *res judicata*." *Id.* Second, this Court held that "any *res judicata* defense was <u>also</u> waived by the Secretary's failure to raise it in his answer to appellant's complaint. . . . The Secretary did not first present the *res judicata* defense until his post-answer motion for judgment of affirmance." *Id.* at 868-869 (emphasis added). Thus, an agency waives the defense of *res judicata* either by failing to assert the defense during the administrative trial phase of the case or by subsequently failing to assert the defense in its court pleadings.

In the statutory scheme for Medicare provider appeals, PRRB hearings are the trial phase of the appeal, as supplemented by CMS Administrator's subsequent review, if any. On appeal, the district court reviews the agency's final decision, under the APA, based on the administrative record, and thus serves in a role analogous to that of an appellate tribunal. *E.g., Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1225 (D.C. Cir. 1993) (holding that "the district court sits as an appellate tribunal" when it reviews agency action); *American*

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (same). Thus, under the statutory scheme for Medicare provider reimbursement appeals, the time to assert a defense of issue preclusion is during the proceedings before the agency.[11]

Here, however, HHS adjudicated Canonsburg Hospital's Medicare appeal on the merits without ever raising the defense of issue preclusion. HHS did so twice, first during the initial adversarial hearing before the PRRB (with HHS's fiscal intermediary serving as its agent and represented by counsel) and then upon reconsideration and reversal by the CMS Administrator of the PRRB's favorable order. In each of those agency adjudications, HHS failed to assert the defense that Canonsburg Hospital's claims were barred by issue preclusion. Thus, based on *Poulin*, HHS waived the defense of issue preclusion.

The district court, however, treated HHS's delay in asserting the defense as inconsequential and held that "*Poulin* is distinguishable from the instant case for three critical reasons." The district court's analysis attempting to distinguish *Poulin* is, with all respect, incorrect.

The district court first relied on the fact that here, unlike *Poulin*, HHS asserted the defense of issue preclusion in its answer to Canonsburg Hospital's

---

[11] Neither HHS nor the district court below denied that issue preclusion could have been, but was not, raised before the PRRB or the CMS Administrator – a fact which Canonsburg Hospital established. *See* Cross-Mot. at 16.

complaint.  Yet *Poulin* did not hold that raising the affirmative defense in court

pleadings alone is sufficient.  To the contrary, if doing so were sufficient, there

would have been no need for this Court to identify and address the waiver that

occurred during the administrative phase of the case.  Moreover, this Court's

description of the agency's actions at the administrative level in *Poulin* indicated

that this Court viewed them as independent grounds for waiver.  Thus, *Poulin* is

properly read as setting forth dual requirements – that the defense be asserted first

at the administrative level and subsequently in court.  The district court's contrary

reading of *Poulin* below was in error.

     The reading of *Poulin* advanced by Canonsburg Hospital is consistent with

the adversarial nature of hospital Medicare reimbursement appeals and the policy

underpinnings for issue preclusion (*i.e.*, avoiding duplicative litigation and

potentially inconsistent decisions).  The interpretation of *Poulin* announced by the

district court below, on the other hand, leads to a waste of adjudicatory resources

before the agency and completely overlooks the fact that the adversarial trial of

Medicare hospital appeals comprises the agency adjudication.

     Second, the district court relied on the fact that, in *Poulin*, the agency sought

to give preclusive effect to "a *prior agency* decision," whereas here HHS has

asserted preclusion based on "a *prior judicial* decision."  Mem. Op. at 25

(emphasis original).  That is a distinction without a difference.  Administrative *res*

*judicata* simply applies the usual concepts of judicial *res judicata* to final

adjudicatory determinations made by agencies.  *See, e.g., Baltimore & Annapolis*

*R.R. v. WMAT*, 642 F.2d 1365, 1369 (D.C. Cir. 1980) ("The Commission

concedes, as it must, that the doctrine of *res judicata* is applicable to administrative

agencies in appropriate situations") (Internal citations omitted).  As set forth in the

regulation that permitted the "administrative *res judicata*" at issue in *Poulin*, the

key feature of a prior decision is not its judicial or administrative pedigree but its

finality.[12]  Decisions that become final as a result of either agency or judicial action

may qualify for *res judicata*.  Final agency actions share at least one important

characteristic with final judicial decisions – they are both final – and the question

of which arbiter made the final decision should not alter the Court's analysis set

forth in *Poulin*.[13]  In either case, the agency's final decision not to dismiss the

---

[12] The regulation applicable in *Poulin* provides that an ALJ "may dismiss a request for a [disability benefits] hearing" where "[t]he doctrine of *res judicata* applies in that we have made a previous determination or decision . . . , and this previous determination or decision has become final by either administrative or judicial action."  20 C.F.R. § 404.957(c)(1) (emph. supplied).  HHS did not dispute below that the PRRB and the CMS Administrator may also apply *res judicata* to hospital reimbursement appeals.  *See* Cross-Mot. at 16; Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Reply"), at 4, *Canonsburg*, No. 1:09-cv-02385, (Apr. 22, 2011) (Dkt. 34).

[13] In hospital appeals of reimbursement decisions under the Medicare statute, the final decision may be made by the agency (either the PRRB or the CMS Administrator) or by the federal courts upon subsequent appeal through affirmance or reversal of the agency's final decision.  *See* 42 U.S.C. § 1395oo(f).

4824-5929-6537.1.

claim based on the preclusive effect of a previous final determination results in waiver.

As a third ground for declining to find waiver in accordance with *Poulin*, the district court held that "'*res judicata* also belongs to the courts as well as to litigants, [and] even a party's forfeiture of the right to assert it' does not 'destroy the court's ability to consider the issue *sua sponte*.'" Mem. Op. at 26 (*quoting Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997)). Once again, however, the district court below overlooks the fact that its role in Medicare appeals (such as the instant case) is that of an appellate tribunal and that, when exercising appellate jurisdiction, this Court has "generally refused to raise the question sua sponte." *Transaero, Inc. v. LA Fuerza Aerea Boliviana*, 30 F.3d 148, 150 n.1 (D.C. Cir. 1994). Application of the general rule stated in *Transaero* to the instant case is not contradicted by the unique circumstances which justified *sua sponte* application of issue preclusion in *Stanton v. District of Columbia Court of Appeals*, on which the district court below relied.

In *Stanton*, the district court had neither addressed the merits nor conducted a trial, but had instead granted the defendant's pre-answer motion to dismiss for lack of jurisdiction. *See Stanton*, 127 F.3d at 76-77. This Court reversed, finding there was jurisdiction, and further finding that, because the defendant would have been free to assert the preclusion defense on remand, it was logical to apply the

26

defense *sua sponte*. *Id.* ("[W]e conceive of no reason for such judicial volleyball.").[14]

     Suffice it to say, the instant case does not present the unique circumstances of *Stanton*. The district court below again failed to appreciate that HHS did not assert the preclusion defense during the trial phase of the case (before the PRRB) or during administrative review (by the CMS Administrator). Instead, HHS issued a decision on the merits. Thus, there would be no basis for the district court to apply a preclusion defense *sua sponte*.

---

[14] *Stanton* was the only reported decision of this Court that Canonsburg Hospital could find in which this Court considered the preclusion defense, *sua sponte*, on appeal, even though the defense had not been asserted below during the trial phase of the case. This Court's decision in *National Treasury Employees Union v. I.R.S.*, 765 F.2d 1174 (D.C. Cir. 1985), also involved application of issue preclusion *sua sponte*, but is procedurally distinguishable. There, the defendant expressly pleaded the defense of issue preclusion during the trial phase of the case. *Id.* at 1176. This Court "note[d] that where a party properly pleads and does not waive a preclusion defense in the district court, a court of appeals may recognize and rule upon the defense even though the district court did not rule on the issue and the parties have not pressed it on appeal." *Id.* at 1176. The predicate act justifying *sua sponte* application of the defense, set forth in *National Treasury Employees Union*, is missing here. HHS failed to assert the defense during the trial phase of the case, which occurred before the agency below, and during its review, *sua sponte*, of the PRRB's adjudication. Finally, in support of its position that *sua sponte* application of issue preclusion would have been appropriate, the district court cited two Supreme Court decisions – *Plaut v. Spendthrift Farm*, 514 U.S. 211, 231 (1995) and *Commodity Futures Trading Com v. Schor*, 478 U.S. 833, 851 (1986). Neither of those cases, however, analyzes the grounds for application of the defense on appeal *sua sponte*.

4824-5929-6537.1.

Accordingly, the district court's holding on waiver is contrary to this Court's

precedent and must be set aside as contrary to the principle that a party waives the

defense of *res judicata* (including issue preclusion) when it fails to assert the

defense until appeal from a decision on the merits.  Having failed to assert issue

preclusion, either during the trial phase of this case or during subsequent

administrative review and reversal, HHS has waived the defense.[15]

**B.      The district court below also erred in going beyond the administrative record, by deciding the instant case based on the defense of issue preclusion which was neither argued nor considered during HHS's adjudication or during its subsequent administrative review and reversal**

In its Cross-Motion for Summary Judgment, Canonsburg Hospital argued

not only that HHS had waived the defense of issue preclusion, but that under the

APA the defense was beyond the district court's purview as it formed no part of

HHS's adjudication under review.  In support of this argument, Canonsburg

Hospital relied on *SEC v. Chenery Corporation*, 332 U.S. at 196, *Riffin v. Surface

Transportation Board*, 592 F.3d 195, 198 (D.C. Cir. 2010) and *Manin v. National

Transportation Safety Board*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).  These cases

stand for the bedrock principle that judicial review, under the APA, of the

---

[15] Indeed, as discussed below, HHS cannot lay claim to one of the principal policies underlying estoppel – the avoidance of litigation costs – where the adjudication has already taken place and, as such, both parties have already incurred the expenses of the litigation.

28

propriety of an agency's action must be judged solely on grounds that the record

establishes were invoked by the agency. The corollary is equally important -- that

the court is not to substitute its judgment for that of the agency as set forth in the

record. The district court below, however, misapplied the law of this Circuit, as

announced in *SEC v. Chenery Corporation*, again reflecting a misunderstanding of

the district court's proper role in review of agency action such as the Medicare

payment determinations here at issue.[16]

The district court below acknowledged that "the *Chenery* doctrine requires

courts 'in dealing with a determination or judgment which an administrative

agency alone is authorized to make' to 'judge the propriety of [agency] action

solely by the grounds invoked by the agency.'" Mem. Op. at 28 (*quoting SEC v.*

*Chenery Corp.*, 332 U.S. at 196). In applying *Chenery*, however, the district court

appears to have misunderstood the nature of the "determination or judgment"

which HHS "alone is authorized to make."

---

[16] The district court found this Circuit's decisions in *Riffin* and *Manin* (which apply the principle enunciated in *Chenery*) to be "wholly inapposite," because they did not address "whether the agency had waived an otherwise available preclusion defense." Mem. Op. at 29. Canonsburg Hospital was not able to find a case addressing *Chenery* in the precise circumstances presented by the instant case. Nevertheless, both *Riffin* and *Manin* provide additional support for the argument that an agency is not permitted to defend its administrative determination on appeal to court, based on grounds on which the agency did not rely in reaching its final decision.

29

Here, that determination was the amount of payment due Canonsburg Hospital under the Medicare Act for its FY 1996. *See* 42 U.S.C. § 1395oo(a)(1) ("Any provider of services which has filed a required cost report … may obtain a hearing with respect to such cost report . . . if . . . such provider . . . is dissatisfied with a final determination of . . . its fiscal intermediary . . . as to the amount of total program reimbursement due the provider [for services provided under the cost report]"). Further, the decision of the PRRB (if not reviewed by the CMS Administrator) or of the CMS Administrator (upon review) is the "final determination or judgment" of HHS as to the amount of payment due Canonsburg Hospital that HHS alone was authorized to make. *See* 42 U.S.C. § 1395oo(f) ("A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision."). This reimbursement determination is subject to judicial review. *Id.* Thus, the grounds invoked by the CMS Administrator in its final decision denying Canonsburg Hospital's appeal on the merits comprise the sole grounds on which HHS may now rely in defending its decision on appeal.[17] Because the CMS Administrator did not invoke issue preclusion, that legal theory -- as an alternative potential ground in support of its

---

[17] That determination, of course, encompasses all necessary factual and legal predicates for same.

30

decision denying Canonsburg Hospital's claim for additional payment -- is beyond the district court's purview.

The district court rejected this conclusion, based on an incorrect reading of what *Chenery* meant by "determination or judgment."  The district court below did not read "determination or judgment" as referring to the decision of HHS on a claim for reimbursement that the agency alone is authorized to make.  Instead, the district court took "determination or judgment" to mean a determination of a particular legal issue, such as issue preclusion, rather than of a claim.  Following this incorrect interpretation of *Chenery*, the district court reasoned that "application of issue preclusion based upon a prior judicial decision is not a 'determination or judgment which an administrative agency alone is authorized to make'" and "fall[s] squarely within the expertise of Article III courts rather than agency administrators."  Mem. Op. at 28 & n. 15.  This is a misreading of *Chenery.*

Under the APA, the district court was only authorized to review the final decision that HHS made, based on the grounds that HHS had articulated on the record.  Neither the Medicare statute nor the APA affords the district court authority to substitute its own judgment for that of the agency, based on grounds

31

the agency did not advance.  *See SEC v. Chenery*, 332 U.S. at196.[18]

In summary, the agency's adjudication (by the PRRB) in this case in favor of Canonsburg Hospital was based on consideration of the merits, as was the CMS Administrator's review and reversal.  Neither was based on issue preclusion.  Thus, because it was not part of the reasons set forth on the record for its decision, HHS's belated assertion of issue preclusion was not properly within the scope of the district court's review.

---

[18] The district court's misapprehension of its role is also reflected in its discussion (on pages 28 and 29 of the Memorandum Opinion) of authority supporting the proposition that agency legal conclusions sometimes may not be entitled to a preclusive effect.  That discussion is not on point.  None of the authorities discussed involves the circumstances of the instant case -- review of final agency action on direct appeal.  They instead analyze the preclusive impact of a prior agency decision collaterally on separate court proceedings.  *See, Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (discussing the impact of state agency's fact findings applying state law on factually related civil rights action, filed in federal court); *Perry v. Brakke*, 826 F.2d 740, 742 (8th Cir. 1987) (holding that the state administrative agency's factual finding was different from the legal issue presented in separate § 1983 action filed in federal district court); *Perley by Perley v. Palmer*, 157 F.R.D. 452, 455 (N.D. Iowa, Apr. 1994) (discussing the preclusive impact of state administrative proceeding's final decision on a later federal court action where plaintiffs sought class certification); *Sea-land Serv. Inc. v. Dep. of Transportation*, 137 F.3d 640, 641-2 (D.C. Cir. 1998) (discussing potential preclusive impact of decision by one federal agency, the Federal Maritime Commission, on the court's review of orders issued by another federal agency, the U.S. Maritime Administration).

**C.      The district court's decision cuts against the policy considerations underlying the use of issue preclusion**

The district court's order allowing HHS's belated assertion of the affirmative defense of issue preclusion was also contrary to each of the three principal policy underpinnings of the defense (*i.e.*, conserving adjudicatory resources, avoiding repeat litigation, and fostering reliance on judicial decisions by minimizing the possibility of inconsistent decisions).

As to conserving adjudicatory resources, the district court incorrectly limited this policy consideration solely to saving judicial resources, "regardless of the administrative resources expended in adjudicating the underlying disputes." Memo. Op. at 30-31.  The district court's statement again improperly overlooks the fact that the administrative phase of Medicare reimbursement appeals (before the PRRB and then the CMS Administrator) is the trial phase of the appeal.  Moreover, due to the statutory authority granted to the CMS Administrator to reverse, affirm or modify, that second phase of the agency's adjudicative process is uniquely within the control of the agency – *i.e.*, the CMS Administrator reviews an otherwise final determination as to whether CMS owes additional reimbursement to the provider.  During this review, the Administrator is able to choose the rationale for its decision – including any available affirmative defense.  Thus, the adjudication occurs before the agency, which is one of the reasons why issue preclusion has been recognized to apply to administrative decisions.  *See Baltimore*

33

*& Annapolis R.R.*, 642 F.2d at 1369.  The resources expended by the agency and

the parties in trying the facts and determining the Medicare appeal are wasted if, as

here, an issue preclusion defense which could have been raised before the PRRB,

or upon review by the CMS Administrator, may be held in reserve and trotted out

for the first time on appeal before the district court.

The district court's decision to permit post-trial assertion of the issue

preclusion defense is also inconsistent with the goal of avoiding duplicative

litigation.  Memo. Op. at 31.  HHS's gap methodology has already been fully

litigated on the merits, and the effect of the district court's order is to treat the

product of those efforts as a nullity.  Further, as demonstrated in Canonsburg

Hospital's summary judgment papers, the history of HHS's strategy in litigating its

gap methodology before this Court undercuts its present claim that application of

issue preclusion is justified to avoid duplicative litigation.  HHS's own actions are

responsible for repeat litigation of its gap methodology in this Circuit by way of

(1) repeatedly applying the gap methodology to disallow reasonable and necessary

atypical costs, (2) losing before the PRRB, (3) reversing the PRRB by decision of

the CMS Administrator, (4) losing again on appeal in the district court, (5)

appealing and then dismissing appeals in this Court (sometimes following oral

argument and involving payment of settlement payments of close to full value), all

the while (6) continuing to apply its gap methodology to new hospital-based SNF

cost reports and appeals.[19]  The district court was unwilling even to consider the impact of HHS's "ping pong" strategy, in recognition of the policy favoring settlements.  *See id.* at 31-32.  However, the district court's focus on the policy favoring settlements misses the point.  HHS should not be rewarded with issue preclusion to shield it from litigation of an issue while it is simultaneously, and it appears intentionally, generating repeat litigation on that same issue.

Finally, as the district court acknowledged, inconsistent court decisions already exist as to the validity of HHS's gap methodology.  *Id.* at 22-23.  Thus, deciding Canonsburg Hospital's claims on its merits, regardless of the outcome, will not contribute to the risk of inconsistent decisions.  *Id.* at 32.  If, on the other hand, this case proceeds to the merits, this Court may finally be presented with the opportunity to issue a definitive decision on the validity of HHS's gap

---

[19] In 2004, the United States District Court for the District of Columbia invalidated HHS's gap methodology in *Mercy Medical Skilled Nursing Facility v. Thompson, 2004 U.S. Dist. LEXIS 27365 (D.D.C. May 4, 2004)*.  HHS initially appealed that decision, but then withdrew its appeal.  *See* Cross-Mot. at 21; Pl.'s Reply at 10-11.  Then, HHS applied its gap methodology to another administrative appeal, only to have that decision invalidated again by the United States District Court for the District of Columbia.  *Montefiore Med. Ctr. v. Leavitt*, 578 F. Supp 2d 129 (D.D.C. 2008) ("*Montefiore*").  HHS withdrew its appeal of *Montefiore*, after the case had been fully briefed and this Court heard oral argument, electing instead to pay the plaintiff $2.6 million.  *See* Cross-Mot. at  20-21; *see also*, Settlement Agreement and Mutual Release, Cross-Mot, Ex. B.  Then, after HHS settled *Montefiore*, it applied the gap methodology to again deny the RCL Exception claims of yet another group of providers.  *See Toyon v. Blue Cross BlueShield Ass'n, CMS Administrator Decision* (August 2, 2010).

methodology.  That decision, unless appealed to the Supreme Court, would

effectively resolve the matter nationwide.[20]

**D.  The district court below erred in applying issue preclusion where the legal landscape had changed materially since the *2001 Canonsburg Case***

This Court has held that "[c]ollateral estoppel is generally inappropriate

when the issue is one of law and there has been a change in the legal context after

the first decision."  *Pharmaceutical Care Management Assoc. v. Dist. Of*

*Columbia*, 522 F.3d 443, 447 (D.C. Cir. 2008)*; see also Graphic Comm. Intn'l.*

*Union v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493

---

[20] This is due to the fact that every provider has a statutory right to appeal adverse decisions of HHS's either within the United States District for the District of Columbia or within the provider's home district.  42 U.S.C. § 1395oo(f).  The district court appears to have responded to this point, at least implicitly, by stating that the "preclusion doctrine trumps" the concerns about "squelching" circuit disagreements.  Mem. Op. at 13.  That statement, however, relies on two cases that are inapposite because neither involved a regulated industry, such as the one here at issue, which is simultaneously governed by a circuit whose decisions are binding only within that circuit and by another circuit whose laws provide nationwide precedent.  The district court first relied on *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002).  Mem. Op. at 13-14.  There, the parties against whom preclusion was sought were not subject to the jurisdiction where the first decision was rendered (nor were they parties to that adjudication).  Thus, this Court rejected the agency's attempt to justify its re-interpretation of a statute based on the order entered in the first case.  Here, in contrast, Canonsburg Hospital contends it is unfair to apply the decision of *2001 Canonsburg Case*, in the interest of repose, where HHS has acted to perpetuate the controversy through its litigation strategy in this Circuit.  Similarly, the second case on which the district court relied, *United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009), does not involve circumstances where the agency claims estoppel to block repeat litigation while acting in a manner that, predictably, results in repeat litigation.

36

(D.C. Cir. 1988) ("[I]ssue preclusion does not apply when there has been an intervening change in legal principal."); *Restatement (Second) of J.* § 28 (1982) ("[R]elitigation of [an] issue in a subsequent action between the parties is not precluded [where] . . . the issue is one of law and . . . a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.").  The district court below erred in failing to recognize that the legal principles that informed the *2001 Canonsburg Case* have changed in material respects since that decision was issued.[21]

Specifically, the district court failed to acknowledge a relevant development in the law of the Third Circuit concerning an agency's ability to change a longstanding interpretation of its regulation, without following notice and comment procedures.  In the *2001 Canonsburg Case*, Canonsburg Hospital argued, amongst other things, that HHS's gap reimbursement methodology violated the rule set forth in this Court's *Paralyzed Veterans* line of authority.  The agency's

---

[21] The district court correctly observed that the instant case presents circumstances relating to developments in the law that have not previously been held to comprise a changed landscape making issue preclusion unfair.  *See* Mem. Op. , pp. 20-23. Canonsburg Hospital, however, submits that the changes in the law that have occurred in the Third Circuit (with respect to *Paralyzed Veterans*) and the multiple courts that, since 2002, have invalidated HHS's gap methodology, as discussed in this section of the brief, comprise relevant circumstances making it unfair give the *2001 Canonsburg Case* preclusive effect.

37

gap methodology comprised a substantial change in HHS's long-standing interpretation of the RCL Exception Reg,[22] thus requiring notice and comment under *Paralyzed Veterans*.

When the *2001 Canonsburg Case* was decided, however, the Third Circuit had not yet issued a decision indicating whether the *Paralyzed Veterans* line of authority would be applied in that Circuit. Further, at that time, no court had considered whether the agency's gap methodology was subject to invalidation under the analytical principle announced in *Paralyzed Veterans*. There was only one case which addressed the validity of the gap reimbursement methodology, and that case (1) did not analyze HHS's interpretation under *Paralyzed Veterans* and (2) ruled in favor of HHS. *See St. Francis Health Care Center v. Shalala*, 205 F.3d 937 (6th Cir. 2000). In the very next case, the *2001 Canonsburg Case*, the court expressly, and entirely, relied on the reasoning of the Sixth Circuit in *St. Francis*. Thus, the district court that decided the *2001 Canonsburg Case* simply ignored the *Paralyzed Veterans* issue, which is perhaps unsurprising given that it lacked any guidance from its own Circuit or from other courts as to its application in reviewing HHS's gap methodology.

---

[22] Originally, and for almost 15 years, HHS interpreted the RCL Exception Reg as affording full reimbursement of atypical costs above the RCL; then, starting in 1994, HHS interpreted the Reg as affording reimbursement only for costs that exceeding the peer group mean, which was above the RCL, and which interpretation created the reimbursement "gap." *See supra*, Section IV(A).

38

During the next 10 years, several developments in the law occurred both within and outside the Third Circuit which brought *Paralyzed Veterans* to the forefront with respect to HHS's gap methodology. In 2005, the Third Circuit adopted the *Paralyzed Veterans* analytical framework in its determination of whether an agency's new interpretation of its regulation was a substantial change to a prior interpretation, thus requiring notice and comment. *See SBC Inc. v. FCC*, 414 F.3d 486, 497-498 (3rd Cir. 2005) ("*SBC*"). In addition there was significant case law development on APA review of HHS's gap methodology. Specifically, this gap methodology was invalidated by the Eighth Circuit and by two different decisions of the district court in this Circuit, both applying *Paralyzed Veterans*.[23] These developments in the legal landscape, had they existed in 2001, at a minimum, would have required the court in the *2001 Canonsburg Case* to consider whether the gap methodology survived scrutiny under the analytical framework of *Paralyzed Veterans*.

---

[23] After the *2001 Canonsburg Case* was decided, the rationale of *St. Francis* was rejected by the Eighth Circuit, in *St. Luke's*, 315 F.3d at 988. *St. Luke's* ruled that the Secretary's "gap" methodology is both substantively and procedurally invalid. In addition, two decisions from the U.S. District Court for the District of Columbia also considered the validity of HHS's gap methodology, under the *Paralyzed Veterans* framework, and both held it invalid because HHS had abruptly changed its 15-year interpretation of the RCL Exception Reg without notice and comment. *Mercy*, 2004 U.S. Dist. LEXIS 27365, 2004 WL 3541332, at *2, & *Montefiore*, 578 F. Supp. 2d 129.

The district court below, however, disagreed based on several erroneous conclusions. First, the district court suggested that *Paralyzed Veterans* may no longer be good law in this circuit. Mem. Op. at 17 n.7 (stating that "in the wake of *FCC v. Fox Television Stations, Inc*., 556 U.S. 502 (2009), the extent to which *Paralyzed Veterans* remains good law is decidedly unclear."). However, as this Court knows, the rumors of *Paralyzed Veterans*' demise are, to say the least, premature. Canonsburg Hospital demonstrated as much in its briefs before the district court, and recent decisions of this Court continue to apply the principles enunciated in *Paralyzed Veterans* (and *Alaska Professional Hunters*) when judging the validity of an alleged interpretive rule, such as is at issue in the instant case. *See, e.g., Mortgage Bankers Ass'n*, 720 F.3d at 968-969 (holding that agency's interpretation of its regulation was invalid under *Paralyzed Veterans* as it conflicted with a prior definitive interpretation of the same regulation and was issued without notice and comment).[24]

Second, the district court below incorrectly read the Third Circuit's opinion in *SBC* as having not actually adopted the *Paralyzed Veterans* analytic framework. See Mem. Op. at 17 & n.8. The Third Circuit, however, directly analyzed whether

---

[24] In the summary judgment pleadings below, Canonsburg Hospital presented additional authority and argument challenging HHS's contention that *Paralyzed Veterans* was implicitly overruled by *Fox*. *See* Cross-Mot., at 37-38; Pl.'s Reply., at 23-24.

the agency's "present interpretation of a regulation is a fundamental modification of a previous interpretation, [requiring that] the modification . . . be made in accordance with the notice and comment rulemaking of the APA. *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997)." *SBC*, 414 F.3d at 498. The plaintiff in *SBC* contended that the agency had "changed [its] prior interpretation." *Id.* (citing, again, *Paralyzed Veterans*). The Third Circuit, in reaching its holding, then undertook a detailed comparison of the agency's interpretation under review (asserted to be a changed interpretation) with, among other things, the agency's prior interpretation. Applying that analysis, *SBC* expressly held that "the [agency's current interpretation] did not modify or substantively change the [agency's] prior interpretation or impose new duties on regulated parties, and therefore the APA's notice and comment requirements do not apply." *Id.* at 501. Thus, the Third Circuit applied, as part of its holding, the rule articulated in *Paralyzed Veterans*, even though it found that the agency's interpretation in question had not violated that rule.[25]

---

[25] The district court below also suggested that *SBC* may not have broken new ground in the Third Circuit in its application of the *Paralyzed Veterans* analytical framework. *See* Mem. Op. at 17-18 n.8. However, *SBC* is the first time the Third Circuit ever cited *Paralyzed Veterans* (for its rule regarding changes in longstanding administrative interpretations) and the *SBC* court applied the analytical framework of *Paralyzed Veterans*, even if it ultimately decided that the facts at issue did not satisfy the elements of same.

Third, the district court below mistakenly concluded that *SBC's* separate analysis, finding that the interpretation there in question comprised an interpretive rule, somehow undercuts the claim that HHS's gap methodology runs afoul of *Paralyzed Veterans*. *See* Mem. Op. at 18. The district court appears to have conflated the question of whether a rule is substantive or interpretive with the question of whether a rule comprises a change in a prior definitive interpretation of a regulation under *Paralyzed Veterans*. Here, it is clear that HHS's gap methodology, unlike the interpretation at issue in *SBC*, comprised a significant change to HHS's prior definitive interpretation of the RCL Exceptions Reg.[26]

Finally, the district court below incorrectly concluded that *SBC* would have had no impact on the *2001 Canonsburg Case* even if it had it been binding precedent at the time. The district court reached this conclusion based on two incorrect premises. The district court stated that the court in the *2001 Canonsburg Case* "simply did not find [Canonsburg Hospital's] argument [pertaining to *Paralyzed Veterans*] persuasive." Mem. Op. at 19. However, the court in the *2001*

---

[26] HHS replaced its long-standing interpretation of the RCL Exception Reg which, until 1994, the agency had construed to afford SNFs exception relief for all of their "atypical services" costs above the RCLs established to be necessary and reasonable, with the new "per se" determination that such costs were not reasonable, until they exceeded a new threshold, significantly higher than the RCL. With this new interpretation HHS introduced the reimbursement gap within which no SNF would be paid for its atypical services, no matter how necessary and reasonable.

42

*Canonsburg Case* did not address Canonsburg Hospital's *Paralyzed Veterans* argument at all, choosing instead to adopt wholesale the Sixth Circuit's analysis in *St. Francis*. *See* 2001 *Canonsburg Case*, 2001 U.S. Dist. LEXIS 26416 *9-10, 2001 WL 36339671 ("All three of Plaintiff's arguments in the present case were rejected by the appellate court in *St. Francis* . . ."). Similarly, the district court below was incorrect in suggesting that "*St. Francis*, which the *Canonsburg I* court followed" foreclosed a finding of invalidity under *Paralyzed Veterans*. *See* Mem. Op. at 19. *St. Francis*, like the court in the *2001 Canonsburg Case*, never analyzed the validity of the gap methodology under *Paralyzed Veterans* – *i.e.*, whether PRM § 2534.5, even if it were an interpretive rule, comprised a fundamental change in the agency's definitive interpretation of the RCL Exception Reg, thus requiring notice and comment. All district courts – *i.e.*, the two district courts in this Circuit in the *Mercy* and *Montefiore* cases – that have analyzed the lawfulness of PRM § 2534.5 through the lens of *Paralyzed Veterans* have reached the same conclusion, that it was invalid agency action undertaken without notice and comment.[27]

Indeed, the court in *Mercy* observed that the "controlling" *Paralyzed Veterans* line of authority "appears to supersede for this Court's purposes, relevant authority

---

[27] *San Joaquin Cmty. Hosp. v. Thompson*, No. 01-5733, 2002 WL 34596496, at *16 (E.D. Ca. Aug. 13, 2002), held that the *Paralyzed Veterans* analytical framework had not been adopted in the Ninth Circuit, and thus did not analyze the gap methodology thereunder.

43

from other circuits [*i.e., St. Francis and St. Luke's*].  *Mercy*, 2004 U.S. Dist.

LEXIS 27365 at *4.

　　With the changes that have occurred in the legal landscape, it is not

speculative to say that the court in the *2001 Canonsburg Case*, were it deciding the

case today, would have been obligated to view the case from a significantly

different perspective (*i.e.*, to consider the validity of the gap methodology using the

analytical framework of *Paralyzed Veterans*).[28]  These changes in the legal

landscape make it unfair to give the *2001 Canonsburg Case* a preclusive effect.

### E.　The district court below erred in concluding that a report issued in 1985 was relevant legislative history for DEFRA, an act passed the previous year

　　Although it did not reach the merits of the appeal below, the district court

made a finding relating to materials that were before Congress when it passed

DEFRA in 1984.  The district court's findings as to judicial notice are reviewed for

abuse of discretion.  *See Pub. Citizen v. Dep't. of State*, 276 F.3d 634, 640 (D.C.

Cir. 2002); *Whiting v. AARP*, 637 F.3d 355, 364 (D.C. Cir. 2011).

　　HHS had contended that certain unspecified findings of a report concerning

SNF costs, though not issued until 1985, were previewed, and thus adopted, by

Congress when it passed DEFRA in 1984.  *See* Mem. of P. & A. in Support of

---

[28] As well as *Alaska Professional Hunters*, which this Court also cited with
approval in *Mortgage Bankers  Association v. Harris*, 720 F.3d at 967-969.

Def.'s Mot. for Summ. J. at 5-6 & n2, *Canonsburg*, No. 1:09-cv-02385 (Dec. 15, 2010) (Dkt. #28).  Nothing in the administrative record of the instant case, however, showed when or how Congress previewed the 1985 Report, what was previewed, or who within Congress read the preview (and HHS did not offer same).  Perhaps more importantly, the legislative history for DEFRA makes no mention of the 1985 report.  As such, there was no record evidence for HHS's contention that "Congress accepted the finding of" the 1985 report.

The district court below, however, in describing the regulatory scheme for SNF reimbursement, stated "[a]ccording to several studies cited in the legislative history of DEFRA, half of the higher cost difference for hospital based SNFs compared to lower cost, freestanding SNFs, was attributable to intensity of care or mix of patient cases and the other half was likely caused by inefficiency."  Mem. Op. at 4-5 n.3.  Though lacking any record evidence that any such reports had been considered, much less cited or adopted by Congress, the district court concluded that Congress had been aware of a "preview" of "studies," by taking judicial notice of decisions from the Sixth Circuit and the United States District Court for the Eastern District of California.  *Id.* (citing *St. Francis*, 205 F.3d at 940; and *San Joaquin Cmty. Hosp.*, 2002 WL 34596496, at * 16).  A review of the *St. Francis* and *San Joaquin Community Hospital* opinions, however, reveals that the district

45

court abused its discretion in taking judicial notice that whatever might have been previewed had any bearing on the meaning of DEFRA.

*San Joaquin Community Hospital* merely notes "a preview of [the 1985 report] which was requested by Congress prior to passage of DEFRA."  2002 WL 34596496, at * 16.  It does not describe what information might have been in the preview, which members of Congress previewed it, or what Congress might have thought about the preview or, for that matter, whether and how much such a draft report differed from the final report published the following year.  Similarly, without citing any source for its conclusion, *St. Francis* states that Congress was "aware of results from several studies of the higher [hospital-based]-SNF costs" in connection with DEFRA.  Again, such a vague reference does not provide sufficient information as to what was communicated and to whom necessary to take judicial notice of same.  As such, there was no basis for the district court to reach any conclusion as to any "preview" and whether same had any bearing on HHS's interpretation of what Congress intended when passing DEFRA.

Accordingly, the district court's conclusion that a preview of the 1985 report was provided to Congress should be set aside as an abuse of discretion.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, the district court's decision granting HHS's motion for summary judgment should be reversed, and this case should be

46

remanded to the district court to enter a decision on the merits on Canonsburg

Hospital's claims.

Canonsburg Hospital may request oral argument.

Dated: April 1, 2014

                                        Respectfully submitted,


                                        */s/ Stephen P. Nash*
                                        Stephen P. Nash (D.C. Bar No. PA0037)
                                        Sven Collins*
                                        *Admitted Pro Hac Vice
                                        Patton Boggs LLP
                                        1801 California St., Ste 4900
                                        Denver, CO 80202
                                        Tel: (303) 894-6173
                                        Fax: (303) 894-9239
                                        E-mail: snash@pattonboggs.com

                                        Attorneys for Appellant

47

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Federal Rule of Appellate Procedure

32(a)(7)(C) that the foregoing Brief complies with the type-volume limitation of

14,000 words set forth in Rule 32(a)(7)(B), in that it contains 11,912 words in

content.

*/s/ Stephen P. Nash*
Stephen P. Nash
Attorney for Appellant

48

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 1st day of April, 2014, I served the foregoing Appellant's Brief and Addendum electronically upon the following counsel of record for Appellee:

Benjamin M. Shultz
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 514-3518
Fax: (202) 514-9405
Email: benjamin.shultz@usdoj.gov
*Counsel for Appellee*

Michael S. Raab
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC  20530
Tel: (202) 514-4053
Fax: (202) 514-7964
Email: michael.raab@usdoj.gov
*Counsel for Appellee*

*/s/ Stephen P. Nash*
Stephen P. Nash
Attorney for Appellant

# ADDENDUM

## Table of Contents

Page

5 U.S.C. § 706(c) ................................................................................A001

42 U.S.C. § 1395h ..............................................................................A002

42 U.S.C. § 1395oo ............................................................................A009

42 U.S.C. § 1395x(v)(1)(A) ...............................................................A013

42 U.S.C. § 1395yy ............................................................................A019

42 C.F.R. § 405.1803 .........................................................................A022

42 C.F.R. §§ 405.1835-405.1841 .......................................................A024

42 C.F.R. § 413.30 .............................................................................A027

50

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

### Historical and Revision Notes

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Abbreviation of Record

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.     Congressional review.
802.     Congressional disapproval procedure.
803.     Special rule on statutory, regulatory, and judicial deadlines.
804.     Definitions.
805.     Judicial review.
806.     Applicability; severability.
807.     Exemption for monetary policy.
808.     Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by oper-


sec. (a) of this section], in the case of a hospital which is paid periodic interim payments under such section, the Secretary of Health and Human Services shall provide that—

''(1) with respect to the last 21 days for which such payments would otherwise be made during fiscal year 1983, such payments shall be deferred until fiscal year 1984; and

''(2) with respect to the last 21 days for which such payments would otherwise be made during fiscal year 1984, such payments shall be deferred until fiscal year 1985.''

Pub. L. 96–499, title IX, §959, Dec. 5, 1980, 94 Stat. 2650, provided for deferral of interim payments to be made during last twenty-one days of fiscal year 1981 until fiscal year 1982, prior to repeal by Pub. L. 97–35, title XXI, §2155, Aug. 13, 1981, 95 Stat. 802.

## § 1395h. Use of public or private agencies or organizations to facilitate payment to providers of services

### (a) Authorization for agreement by Secretary for implementation; scope of agreement

If any group or association of providers of services wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization providing for the determination by such agency or organization (subject to the provisions of section 1395oo of this title and to such review by the Secretary as may be provided for by the agreement) of the amount of the payments required pursuant to this part to be made to such providers (and to providers assigned to such agency or organization under subsection (e) of this section), and for the making of such payments by such agency or organization to such providers (and to providers assigned to such agency or organization under subsection (e) of this section). Such agreement may also include provision for the agency or organization to do all or any part of the following: (1) to provide consultative services to institutions or agencies to enable them to establish and maintain fiscal records necessary for purposes of this part and otherwise to qualify as hospitals, extended care facilities, or home health agencies, and (2) with respect to the providers of services which are to receive payments through it (A) to serve as a center for, and communicate to providers, any information or instructions furnished to it by the Secretary, and serve as a channel of communication from providers to the Secretary; (B) to make such audits of the records of providers as may be necessary to insure that proper payments are made under this part; and (C) to perform such other functions as are necessary to carry out this subsection. As used in this subchapter and part B of subchapter XI of this chapter, the term ''fiscal intermediary'' means an agency or organization with a contract under this section.

### (b) Prerequisites for agreement or renewal of agreement by Secretary

The Secretary shall not enter into or renew an agreement with any agency or organization under this section unless—

(1) he finds—

(A) after applying the standards, criteria, and procedures developed under subsection (f) of this section, that to do so is consistent with the effective and efficient administration of this part, and

(B) that such agency or organization is willing and able to assist the providers to which payments are made through it under this part in the application of safeguards against unnecessary utilization of services furnished by them to individuals entitled to hospital insurance benefits under section 426 of this title, and the agreement provides for such assistance; and

(2) such agency or organization agrees—

(A) to furnish to the Secretary such of the information acquired by it in carrying out its agreement under this section, and

(B) to provide the Secretary with access to all such data, information, and claims processing operations,

as the Secretary may find necessary in performing his functions under this part.

### (c) Terms and conditions of agreements; prompt payment of claims

(1) An agreement with any agency or organization under this section may contain such terms and conditions as the Secretary finds necessary or appropriate, may provide for advances of funds to the agency or organization for the making of payments by it under subsection (a) of this section, and shall provide for payment of so much of the cost of administration of the agency or organization as is determined by the Secretary to be necessary and proper for carrying out the functions covered by the agreement. The Secretary shall provide that in determining the necessary and proper cost of administration, the Secretary shall, with respect to each agreement, take into account the amount that is reasonable and adequate to meet the costs which must be incurred by an efficiently and economically operated agency or organization in carrying out the terms of its agreement. The Secretary shall cause to have published in the Federal Register, by not later than September 1 before each fiscal year, data, standards, and methodology to be used to establish budgets for fiscal intermediaries under this section for that fiscal year, and shall cause to be published in the Federal Register for public comment, at least 90 days before such data, standards, and methodology are published, the data, standards, and methodology proposed to be used. The Secretary may not require, as a condition of entering into or renewing an agreement under this section or under section 1395hh of this title, that a fiscal intermediary match data obtained other than in its activities under this part with data used in the administration of this part for purposes of identifying situations in which the provisions of section 1395y(b) of this title may apply.

(2)(A) Each agreement under this section shall provide that payment shall be issued, mailed, or otherwise transmitted with respect to not less than 95 percent of all claims submitted under this subchapter—

(i) which are clean claims, and

(ii) for which payment is not made on a periodic interim payment basis,

within the applicable number of calendar days after the date on which the claim is received.

USCA Case #13-5370     Document #1486516     Filed: 04/01/2014     Page 65 of 91

(B) In this paragraph:

(i) The term ''clean claim'' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstance requiring special treatment that prevents timely payment from being made on the claim under this subchapter.

(ii) The term ''applicable number of calendar days'' means—

(I) with respect to claims received in the 12-month period beginning October 1, 1986, 30 calendar days,

(II) with respect to claims received in the 12-month period beginning October 1, 1987, 26 calendar days,

(III) with respect to claims received in the 12-month period beginning October 1, 1988, 25 calendar days, and [1]

(IV) with respect to claims received in the 12-month period beginning October 1, 1989, and claims received in any succeeding 12-month period ending on or before September 30, 1993, 24 calendar days.[2]

(V) with respect to claims received in the 12-month period beginning October 1, 1993, and claims received in any succeeding 12-month period, 30 calendar days.

(C) If payment is not issued, mailed, or otherwise transmitted within the applicable number of calendar days (as defined in clause (ii) of subparagraph (B)) after a clean claim (as defined in clause (i) of such subparagraph) is received from a hospital, rural primary care hospital, skilled nursing facility, home health agency, hospice program, comprehensive outpatient rehabilitation facility, or rehabilitation agency that is not receiving payments on a periodic interim payment basis with respect to such services, interest shall be paid at the rate used for purposes of section 3902(a) of title 31 (relating to interest penalties for failure to make prompt payments) for the period beginning on the day after the required payment date and ending on the date on which payment is made.

(3)(A) Each agreement under this section shall provide that no payment shall be issued, mailed, or otherwise transmitted with respect to any claim submitted under this subchapter within the applicable number of calendar days after the date on which the claim is received.

(B) In this paragraph, the term ''applicable number of calendar days'' means—

(i) with respect to claims submitted electronically as prescribed by the Secretary, 13 days, and

(ii) with respect to claims submitted otherwise, 26 days.

**(d) Nomination of agency or organization; withdrawal**

If the nomination of an agency or organization as provided in this section is made by a group or association of providers of services, it shall not be binding on members of the group or association which notify the Secretary of their election to that effect. Any provider may, upon such notice as may be specified in the agreement under this section with an agency or organization, withdraw its nomination to receive payments through such agency or organization. Any provider which has withdrawn its nomination, and any provider which has not made a nomination, may elect to receive payments from any agency or organization which has entered into an agreement with the Secretary under this section if the Secretary and such agency or organization agree to it.

**(e) Assignment or reassignment of provider of services; designation of agency or organization to perform provider services and home health agency functions**

(1) Notwithstanding subsections (a) and (d) of this section, the Secretary, after taking into consideration any preferences of providers of services, may assign or reassign any provider of services to any agency or organization which has entered into an agreement with him under this section, if he determines, after applying the standards, criteria, and procedures developed under subsection (f) of this section, that such assignment or reassignment would result in the more effective and efficient administration of this part.

(2) Notwithstanding subsections (a) and (d) of this section, the Secretary may (subject to the provisions of paragraph (4)) designate a national or regional agency or organization which has entered into an agreement with him under this section to perform functions under the agreement with respect to a class of providers of services in the Nation or region (as the case may be), if he determines, after applying the standards, criteria, and procedures developed under subsection (f) of this section, that such designation would result in more effective and efficient administration of this part.

(3)(A) Before the Secretary makes an assignment or reassignment under paragraph (1) of a provider of services to other than the agency or organization nominated by the provider, he shall furnish (i) the provider and such agency or organization with a full explanation of the reasons for his determination as to the efficiency and effectiveness of the agency or organization to perform the functions required under this part with respect to the provider, and (ii) such agency or organization with opportunity for a hearing, and such determination shall be subject to judicial review in accordance with chapter 7 of title 5.

(B) Before the Secretary makes a designation under paragraph (2) with respect to a class of providers of services, he shall furnish (i) such providers and the agencies and organizations adversely affected by such designation with a full explanation of the reasons for his determination as to the efficiency and effectiveness of such agencies and organizations to perform the functions required under this part with respect to such providers, and (ii) the agencies and organizations adversely affected by such designation with opportunity for a hearing, and such determination shall be subject to judicial review in accordance with chapter 7 of title 5.

(4) Notwithstanding subsections (a) and (d) of this section and paragraphs (1), (2), and (3) of this subsection, the Secretary shall designate

---

[1] So in original. The word ''and'' probably should not appear.

[2] So in original. The period probably should be '', and''.

regional agencies or organizations which have entered into an agreement with him under this section to perform functions under such agreement with respect to home health agencies (as defined in section 1395x(*o*) of this title) in the region, except that in assigning such agencies to such designated regional agencies or organizations the Secretary shall assign a home health agency which is a subdivision of a hospital (and such agency and hospital are affiliated or under common control) only if, after applying such criteria relating to administrative efficiency and effectiveness as he shall promulgate, he determines that such assignment would result in the more effective and efficient administration of this subchapter. By not later than July 1, 1987, the Secretary shall limit the number of such regional agencies or organizations to not more than ten.

(5) Notwithstanding any other provision of this subchapter, the Secretary shall designate the agency or organization which has entered into an agreement under this section to perform functions under such an agreement with respect to each hospice program, except that with respect to a hospice program which is a subdivision of a provider of services (and such hospice program and provider of services are under common control) due regard shall be given to the agency or organization which performs the functions under this section for the provider of services.

**(f) Development of standards, criteria, and procedures by Secretary for evaluation of agency or organization performance**

(1) In order to determine whether the Secretary should enter into, renew, or terminate an agreement under this section with an agency or organization, whether the Secretary should assign or reassign a provider of services to an agency or organization, and whether the Secretary should designate an agency or organization to perform services with respect to a class of providers of services, the Secretary shall develop standards, criteria, and procedures to evaluate such agency's or organization's (A) overall performance of claims processing (including the agency's or organization's success in recovering payments made under this subchapter for services for which payment has been or could be made under a primary plan (as defined in section 1395y(b)(2)(A) of this title)) and other related functions required to be performed by such an agency or organization under an agreement entered into under this section, and (B) performance of such functions with respect to specific providers of services, and the Secretary shall establish standards and criteria with respect to the efficient and effective administration of this part. No agency or organization shall be found under such standards and criteria not to be efficient or effective or to be less efficient or effective solely on the ground that the agency or organization serves only providers located in a single State.

(2) The standards and criteria established under paragraph (1) shall include—

(A) with respect to claims for services furnished under this part by any provider of services other than a hospital—

(i) whether such agency or organization is able to process 75 percent of reconsiderations within 60 days (except in the case of fiscal year 1989, 66 percent of reconsiderations) and 90 percent of reconsiderations within 90 days, and

(ii) the extent to which such agency's or organization's determinations are reversed on appeal; and

(B) with respect to applications for an exemption from or exception or adjustment to the target amount applicable under section 1395ww(b) of this title to a hospital that is not a subsection (d) hospital (as defined in section 1395ww(d)(1)(B) of this title)—

(i) if such agency or organization receives a completed application, whether such agency or organization is able to process such application not later than 75 days after the application is filed, and

(ii) if such agency or organization receives an incomplete application, whether such agency or organization is able to return the application with instructions on how to complete the application not later than 60 days after the application is filed.

**(g) Termination of agreement; procedures applicable**

An agreement with the Secretary under this section may be terminated—

(1) by the agency or organization which entered into such agreement at such time and upon such notice to the Secretary, to the public, and to the providers as may be provided in regulations, or

(2) by the Secretary at such time and upon such notice to the agency or organization, to the providers which have nominated it for purposes of this section, and to the public, as may be provided in regulations, but only if he finds, after applying the standards, criteria, and procedures developed under subsection (f) of this section and after reasonable notice and opportunity for hearing to the agency or organization, that (A) the agency or organization has failed substantially to carry out the agreement, or (B) the continuation of some or all of the functions provided for in the agreement with the agency or organization is disadvantageous or is inconsistent with the efficient administration of this part.

**(h) Bonding requirement under agreement for officers and employees of agency or organization**

An agreement with an agency or organization under this section may require any of its officers or employees certifying payments or disbursing funds pursuant to the agreement, or otherwise participating in carrying out the agreement, to give surety bond to the United States in such amount as the Secretary may deem appropriate.

**(i) Liability of certifying and disbursing officers designated under agreement for negligent, etc., payments**

(1) No individual designated pursuant to an agreement under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable

with respect to any payments certified by him under this section.

(2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

(3) No such agency or organization shall be liable to the United States for any payments referred to in paragraph (1) or (2).

**(j) Denial of claim; notification and reconsideration**

An agreement with an agency or organization under this section shall require that, with respect to a claim for home health services, extended care services, or post-hospital extended care services submitted by a provider to such agency or organization that is denied, such agency or organization—

(1) furnish the provider and the individual with respect to whom the claim is made with a written explanation of the denial and of the statutory or regulatory basis for the denial; and

(2) in the case of a request for reconsideration of a denial, promptly notify such individual and the provider of the disposition of such reconsideration.

**(k) Annual reporting requirement on erroneous payment recovery**

An agreement with an agency or organization under this section shall require that such agency or organization submit an annual report to the Secretary describing the steps taken to recover payments made for items or services for which payment has been or could be made under a primary plan (as defined in section 1395y(b)(2)(A) of this title).

**(*l*) No authority for activities carried out under Medicare Integrity Program**

No agency or organization may carry out (or receive payment for carrying out) any activity pursuant to an agreement under this section to the extent that the activity is carried out pursuant to a contract under the Medicare Integrity Program under section 1395ddd of this title.

(Aug. 14, 1935, ch. 531, title XVIII, §1816, as added July 30, 1965, Pub. L. 89–97, title I, §102(a), 79 Stat. 297; amended Oct. 30, 1972, Pub. L. 92–603, title II, §243(b), 86 Stat. 1422; Oct. 25, 1977, Pub. L. 95–142, §14(a), 91 Stat. 1198; Dec. 5, 1980, Pub. L. 96–499, title IX, §930(*o*), 94 Stat. 2632; Sept. 3, 1982, Pub. L. 97–248, title I, §122(c)(3), 96 Stat. 359; July 18, 1984, Pub. L. 98–369, div. B, title III, §2326(b), (c)(1), (d)(1), 98 Stat. 1087; Oct. 21, 1986, Pub. L. 99–509, title IX, §§9311(b), 9352(a)(2), 100 Stat. 1997, 2044; Dec. 22, 1987, Pub. L. 100–203, title IV, §§4031(a)(1), 4032(a), (b), 4035(a)(1), 4085(d)(1), 101 Stat. 1330–75 to 1330–78, 1330–130; July 1, 1988, Pub. L. 100–360, title II, §203(f), title IV, §411(e)(1)(B), 102 Stat. 725, 775; Dec. 13, 1989, Pub. L. 101–234, title II, §201(a), 103 Stat. 1981; Dec. 19, 1989, Pub. L. 101–239, title VI, §§6003(g)(3)(D)(vi), 6202(d)(1), 103 Stat. 2153, 2234; Nov. 5, 1990, Pub. L. 101–508, title IV, §4005(c)(1)(A), 104 Stat. 1388–41; Aug. 10, 1993, Pub. L. 103–66, title XIII, §13568(a), (b), 107 Stat.

608; Oct. 31, 1994, Pub. L. 103–432, title I, §§110(d)(2), 151(b)(1)(A), (2)(A), 108 Stat. 4408, 4433, 4434; Aug. 21, 1996, Pub. L. 104–191, title II, §202(b)(1), 110 Stat. 1998.)

REFERENCES IN TEXT

Part B of subchapter XI of this chapter, referred to in subsec. (a), is classified to section 1320c et seq. of this title.

AMENDMENTS

1996—Subsec. (*l*). Pub. L. 104–191 added subsec. (*l*).

1994—Subsec. (f)(1)(A). Pub. L. 103–432, §151(b)(2)(A), inserted "(including the agency's or organization's success in recovering payments made under this subchapter for services for which payment has been or could be made under a primary plan (as defined in section 1395y(b)(2)(A) of this title))" after "processing".

Subsec. (f)(2)(A)(ii). Pub. L. 103–432, §110(d)(2), substituted "such agency's" for "such agency".

Subsec. (k). Pub. L. 103–432, §151(b)(1)(A), added subsec. (k).

1993—Subsec. (c)(2)(B)(ii)(IV), (V). Pub. L. 103–66, §13568(b), substituted "period ending on or before September 30, 1993" for "period" in subcl. (IV) and added subcl. (V).

Subsec. (c)(3)(B). Pub. L. 103–66, §13568(a), added cls. (i) and (ii) and struck out former cls. (i) and (ii) which read as follows:

"(i) with respect to claims received in the 3-month period beginning July 1, 1988, 10 days, and

"(ii) with respect to claims received in the 12-month period beginning October 1, 1988, 14 days."

1990—Subsec. (f). Pub. L. 101–508 designated existing provisions as par. (1), redesignated former pars. (1) and (2) as subpars. (A) and (B), respectively, struck out "Such standards and criteria" and all that follows, which was executed by striking out "Such standards and criteria shall be published in the Federal Register, and opportunity shall be provided for public comment prior to implementation. Such standards and criteria shall include with respect to claims for services furnished under this part by any provider of services other than a hospital whether such agency or organization is able to process 75 percent of reconsiderations within 60 days (except in the case of the fiscal year 1989, 66 percent of reconsiderations) and 90 percent of reconsiderations within 90 days and the extent to which its determinations are reversed on appeal.", and added par. (2).

1989—Subsec. (c)(1). Pub. L. 101–239, §6202(d)(1), inserted at end "The Secretary may not require, as a condition of entering into or renewing an agreement under this section or under section 1395hh of this title, that a fiscal intermediary match data obtained other than in its activities under this part with data used in the administration of this part for purposes of identifying situations in which the provisions of section 1395y(b) of this title may apply."

Subsec. (c)(2)(C). Pub. L. 101–239, §6003(g)(3)(D)(vi), inserted "rural primary care hospital," after "hospital,".

Subsec. (k). Pub. L. 101–234 repealed Pub. L. 100–360, §203(f), and provided that the provisions of law amended or repealed by such section are restored or revived as if such section had not been enacted, see 1988 Amendment note below.

1988—Subsec. (j)(2). Pub. L. 100–360, §411(e)(1)(B), inserted "in the case of a request for reconsideration of a denial," and substituted "the disposition" for "disposition".

Subsec. (k). Pub. L. 100–360, §203(f), added subsec. (k) relating to use of regional intermediaries in administration of benefits.

1987—Subsec. (c)(1). Pub. L. 100–203, §4035(a)(1), inserted at end "The Secretary shall cause to have published in the Federal Register, by not later than September 1 before each fiscal year, data, standards, and methodology to be used to establish budgets for fiscal intermediaries under this section for that fiscal year, and shall cause to be published in the Federal Register

for public comment, at least 90 days before such data, standards, and methodology are published, the data, standards, and methodology proposed to be used.''

Subsec. (c)(2)(C). Pub. L. 100–203, § 4085(d)(1), substituted ''hospice program, comprehensive outpatient rehabilitation facility, or rehabilitation agency'' for ''or hospice program''.

Subsec. (c)(3). Pub. L. 100–203, § 4031(a)(1), added par. (3).

Subsec. (f). Pub. L. 100–203, § 4023(b), inserted at end ''Such standards and criteria shall include with respect to claims for services furnished under this part by any provider of services other than a hospital whether such agency or organization is able to process 75 percent of reconsiderations within 60 days (except in the case of the fiscal year 1989, 66 percent of reconsiderations) and 90 percent of reconsiderations within 90 days and the extent to which its determinations are reversed on appeal.''

Subsec. (j). Pub. L. 100–203, § 4032(a), added subsec. (j).

1986—Subsec. (a). Pub. L. 99–509, § 9352(a)(2), inserted at end ''As used in this subchapter and part B of subchapter XI of this chapter, the term 'fiscal intermediary' means an agency or organization with a contract under this section.''

Subsec. (c). Pub. L. 99–509, § 9311(b), designated existing provisions as par. (1) and added par. (2).

1984—Subsec. (c). Pub. L. 98–369, § 2326(d)(1), inserted provision that the Secretary, in determining the necessary and proper cost of administration with respect to each agreement, take into account the amount that is reasonable and adequate to meet the costs which must be incurred by an efficiently and economically operated agency or organization in carrying out the terms of its agreement.

Subsec. (e)(4). Pub. L. 98–369, § 2326(b), inserted provision that not later than July 1, 1987, the Secretary limit the number of regional agencies or organizations to not more than two.

Subsec. (f). Pub. L. 98–369, § 2326(c)(1), struck out in cl. (2) '', by regulation,'' after ''Secretary shall establish'' and inserted provision that the standards and criteria be published in the Federal Register and an opportunity be provided for public comment prior to implementation.

1982—Subsec. (e)(5). Pub. L. 97–248 added par. (5).

1980—Subsec. (e)(2). Pub. L. 96–499, § 930(*o*)(1), inserted ''(subject to the provisions of paragraph (4))''.

Subsec. (e)(4). Pub. L. 96–499, § 930(*o*)(2), added par. (4).

1977—Subsec. (a). Pub. L. 95–142, § 14(a)(1), inserted provisions relating to applicability to providers assigned to the agency or organization under subsec. (e) of this section.

Subsec. (b). Pub. L. 95–142, § 14(a)(2), substituted provisions setting forth criteria for agreements by the Secretary or renewal of such agreements with agencies or organizations, for provisions setting forth criteria for agreements by the Secretary with agencies or organizations.

Subsecs. (e), (f). Pub. L. 95–142, § 14(a)(4), (5), added subsecs. (e) and (f). Former subsecs. (e) and (f) redesignated (g) and (h), respectively.

Subsec. (g). Pub. L. 95–142, § 14(a)(3), (4), redesignated former subsec. (e) as (g) and inserted provisions relating to applicability of standards, etc., developed under subsec. (f) of this section. Former subsec. (g) redesignated (i).

Subsecs. (h), (i). Pub. L. 95–142, § 14(a)(4), redesignated former subsecs. (f) and (g) as (h) and (i), respectively.

1972—Subsec. (a). Pub. L. 92–603 inserted reference to provisions of section 1395*oo* of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Section 151(b)(4) of Pub. L. 103–432 provided that: ''The amendments made by paragraphs (1) and (2) [amending this section and section 1395u of this title] shall apply to contracts with fiscal intermediaries and carriers under title XVIII of the Social Security Act [this subchapter] for contract years beginning with 1995.''

EFFECTIVE DATE OF 1993 AMENDMENT

Section 13568(c) of Pub. L. 103–66 provided that: ''The amendments made by this section [amending this section and section 1395u of this title] shall apply to claims received on or after October 1, 1993.''

EFFECTIVE DATE OF 1989 AMENDMENTS

Section 6202(d)(3) of Pub. L. 101–239 provided that: ''The amendments made by this subsection [amending this section and section 1395u of this title] shall apply to agreements and contracts entered into or renewed on or after the date of the enactment of this Act [Dec. 19, 1989].''

Amendment by Pub. L. 101–234 effective Jan. 1, 1990, see section 201(c) of Pub. L. 101–234, set out as a note under section 1320a–7a of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by section 203(f) of Pub. L. 100–360 applicable to items and services furnished on or after Jan. 1, 1990, see section 203(g) of Pub. L. 100–360, set out as a note under section 1320c–3 of this title.

Except as specifically provided in section 411 of Pub. L. 100–360, amendment by section 411(e)(1)(B) of Pub. L. 100–360, as it relates to a provision in the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, effective as if included in the enactment of that provision in Pub. L. 100–203, see section 411(a) of Pub. L. 100–360, set out as a Reference to OBRA; Effective Date note under section 106 of Title 1, General Provisions.

EFFECTIVE DATE OF 1987 AMENDMENT

Section 4031(a)(3)(A) of Pub. L. 100–203 provided that: ''The amendments made by paragraphs (1) and (2) [amending this section and section 1395u of this title] shall apply to claims received on or after July 1, 1987.''

Section 4032(c)(1) of Pub. L. 100–203, as amended by Pub. L. 100–360, title IV, § 411(e)(1)(C), July 1, 1988, 102 Stat. 775, provided that:

''(A) The amendment made by subsection (a) [amending this section] shall apply with respect to claims received on or after January 1, 1988.

''(B) The amendment made by subsection (b) [amending this section] shall apply with respect to reconsiderations requested on or after October 1, 1988.''

Section 4035(a)(3) of Pub. L. 100–203 provided that: ''The amendments made by this section [amending this section and sections 1395u and 1395hh of this title] shall take effect on the date of the enactment of this Act [Dec. 22, 1987] and shall apply to budgets for fiscal years beginning with fiscal year 1989.''

Section 4085(d)(2) of Pub. L. 100–203 provided that:

''(A) The amendment made by paragraph (1) [amending this section] shall apply to claims received on or after the date of enactment of this Act [Dec. 22, 1987].

''(B) The Secretary of Health and Human Services shall provide for such timely amendments to agreements under section 1816 [this section], and regulations, to such extent as may be necessary to implement the amendment made by paragraph (1).''

EFFECTIVE DATE OF 1986 AMENDMENT

Section 9311(d) of Pub. L. 99–509 provided that:

''(1) Except as provided in paragraph (2), the amendments made by subsections (b) and (c) [amending this section and section 1395u of this title] shall apply to claims received on or after November 1, 1986.

''(2) Sections 1816(c)(2)(C)) [sic] and 1842(c)(2)(C) of the Social Security Act [subsec. (c)(2)(C) of this section and section 1395u(c)(2)(C) of this title], as added by such amendments, shall apply to claims received on or after April 1, 1987.

''(3) The Secretary of Health and Human Services shall provide for such timely amendments to agreements under section 1816 of the Social Security Act [this section] and contracts under section 1842 of such Act [section 1395u of this title], and regulations, to such extent as may be necessary to implement the provisions of this Act on a timely basis.''

Amendment by section 9352(a)(2) of Pub. L. 99–509 to be implemented by Secretary of Health and Human Services not later than 6 months after Oct. 21, 1986, see section 9352(c)(1) of Pub. L. 99–509, set out as a note under section 1320c–2 of this title.

#### Effective Date of 1984 Amendment

Section 2326(d)(3) of Pub. L. 98–369 provided that: "The amendments made by this subsection [amending this section and section 1395u of this title] shall apply to agreements and contracts entered into or renewed after September 30, 1984."

#### Effective Date of 1982 Amendment

Amendment by Pub. L. 97–248 applicable to hospice care provided on or after Nov. 1, 1983, see section 122(h)(1) of Pub. L. 97–248, as amended, set out as a note under section 1395c of this title.

#### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–499 effective Dec. 5, 1980, see section 930(s)(1) of Pub. L. 96–499, set out as a note under section 1395x of this title.

#### Effective Date of 1977 Amendment

Section 14(c), (d) of Pub. L. 95–142 provided that:

"(c) The amendment made by paragraphs (2) and (3) of subsection (a) [amending this section] to the extent that they require application of standards, criteria, and procedures developed under section 1816(f) of the Social Security Act [subsec. (f) of this section] shall apply to the entering into, renewal, or termination of agreements on and after October 1, 1978.

"(d) Except as provided in subsection (c), the amendment made by subsection (a)(2) [amending this section] shall apply to agreements entered into or renewed on or after the date of enactment of this Act [Oct. 25, 1977]."

#### Effective Date of 1972 Amendment

Amendment by Pub. L. 92–603 applicable with respect to cost reports of providers of services for accounting periods ending on or after June 30, 1973, see section 243(c) of Pub. L. 92–603, set out as an Effective Date note under section 1395oo of this title.

#### Advisory Committee on Medicare Home Health Claims

Section 427 of Pub. L. 100–360, which provided that the Administrator of the Health Care Financing Administration was to establish an advisory committee to be known as the Advisory Committee on Medicare Home Health Claims to study the reasons for the increase in the denial of claims for home health services during 1986 and 1987, the ramifications of such increase, and the need to reform the process involved in such denials, was repealed by Pub. L. 101–234, title III, §301(a), Dec. 13, 1989, 103 Stat. 1985.

#### Amendments to Agreements and Contracts Necessary To Implement Section 4031(a) of Pub. L. 100–203

Section 4031(a)(3)(B) of Pub. L. 100–203 provided that: "The Secretary of Health and Human Services shall provide for such timely amendments to agreements under section 1816 of the Social Security Act [this section] and contracts under section 1842 of such Act [section 1395u of this title], and regulations, to such extent as may be necessary to implement the provisions of this subsection [amending this section and section 1395u of this title] on a timely basis."

#### Prohibition of Policies Other Than as Provided by Section 4031 of Pub. L. 100–203 Intended To Slow Down Medicare Payments; Budget Considerations

Section 4031(b), (c) of Pub. L. 100–203 provided that:

"(b) Prohibition of Other Policies Intended To Slow Down Medicare Payments.—Notwithstanding any other provision of law, except as specifically provided in this section [amending this section and section 1395u of this title and enacting provisions set out as notes under this section], the Secretary of Health and Human Services is not authorized to issue, after the date of the enactment of this Act [Dec. 22, 1987], and before October 1, 1990, any final regulation, instruction, or other policy change which is primarily intended to have the effect of slowing down claims processing, or delaying payment of claims, under title XVIII of the Social Security Act [this subchapter].

"(c) Budget Considerations.—For purposes of section 202 of the Balanced Budget and Emergency Deficit Control Reaffirmation Act of 1987 [2 U.S.C. 909], this section is a necessary (but secondary) result of a significant policy change."

#### Amendments to Agreements and Contracts Necessary To Implement Section 4032(a), (b) of Pub. L. 100–203

Section 4032(c)(2) provided that: "The Secretary of Health and Human Services shall provide for such timely amendments to agreements under section 1816 [this section] and contracts under section 1842 of the Social Security Act [section 1395u of this title], and regulations, to such extent as may be necessary to implement the amendments made by subsections (a) and (b) [amending this section] on a timely basis."

#### Replacement of Agency, Organization, or Carrier Processing Medicare Claims; Number of Agreements and Contracts Authorized for Fiscal Years 1985 Through 1993

Section 2326(a) of Pub. L. 98–369, as amended by Pub. L. 98–617, §3(a)(2), Nov. 8, 1984, 98 Stat. 3295; Pub. L. 99–509, title IX, §9321(b), Oct. 21, 1986, 100 Stat. 2016; Pub. L. 101–239, title VI, §6215(a), Dec. 19, 1989, 103 Stat. 2252; Pub. L. 103–432, title I, §159(a), Oct. 31, 1994, 108 Stat. 4443, provided that: "During each fiscal year (beginning with fiscal year 1985 and ending with fiscal year 1993), the Secretary of Health and Human Services may enter into not more than two agreements under section 1816 of the Social Security Act [this section], and not more than two contracts under section 1842 of such Act [section 1395u of this title], on the basis of competitive bidding, without regard to the nominating process under section 1816(a) of such Act or cost reimbursement provisions under sections 1816(c) or 1842(c) of such Act during the term of the agreement. Such procedure may be used only for the purpose of replacing an agency or organization or carrier which over a 2-year period of time has been in the lowest 20th percentile of agencies and organizations or carriers having agreements or contracts under the respective section, as measured by the Secretary's cost and performance criteria. In addition, beginning with fiscal year 1990 and any subsequent fiscal year the Secretary may enter into such additional agreements and contracts without regard to such cost reimbursement provisions if the fiscal intermediary or carrier involved and the Secretary agree to waive such provisions, but the Secretary may not take any action that has the effect of requiring that the intermediary or carrier agree to waive such provisions, including requiring such a waiver as a condition for entering into or renewing such an agreement or contract. Any agency or organization or carrier selected on the basis of competitive bidding must perform all of the duties listed in section 1816(a) of such Act, or the duties listed in paragraphs (1) through (4) of section 1842(a) of such Act, as the case may be, and must be a health insuring organization (as determined by the Secretary)."

[Section 159(b) of Pub. L. 103–432 provided that: "The amendment made by subsection (a) [amending section 2326(a) of Pub. L. 98–369, set out above] shall apply beginning with fiscal year 1994."]

[Section 6215(b) of Pub. L. 101–239 provided that: "The amendments made by subsection (a) [amending section 2326(a) of Pub. L. 98–369, set out above] shall apply beginning with fiscal year 1990."]

Section 118 of Pub. L. 97–248, as amended by Pub. L. 99–272, title IX, §9216(a), Apr. 7, 1986, 100 Stat. 180, provided that: ''In addition to any funds otherwise provided for payments to intermediaries and carriers under agreements entered into under sections 1816 and 1842 of the Social Security Act [this section and section 1395u of this title], there are transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Fund in such proportions as the Secretary of Health and Human Services determines to be appropriate, an additional $45,000,000 for each of fiscal years 1983, 1984, and 1985, and $105,000,000 for each of fiscal years 1986, 1987, and 1988 for payments to such intermediaries and carriers under such agreements to be used exclusively for purposes of carrying out provider cost audits, of reviewing medical necessity, and of recovering third-party liability payments, consistent with the provisions of sections 1816 and 1842 of the Social Security Act.''

[Section 9216(b) of Pub. L. 99–272 provided that: ''The amendments made by subsection (a) [amending section 118 of Pub. L. 97–248, set out above] shall apply to fiscal years beginning with fiscal year 1986.'']

Section 14(b) of Pub. L. 95–142 directed the Secretary of Health, Education, and Welfare to develop the standards, criteria, and procedures described in subsection (f) of section 1816 of the Social Security Act [subsec. (f) of this section] (as added by subsection (a)(5)) not later than Oct. 1, 1978.

This section is referred to in sections 1320a–3, 1320c–2, 1320c–3, 1395g, 1395u, 1395hh, 1395mm, 1395oo, 1395pp, 1395ddd of this title.

## § 1395i. Federal Hospital Insurance Trust Fund

### (a) Creation; deposits; transfers from Treasury

There is hereby created on the books of the Treasury of the United States a trust fund to be known as the ''Federal Hospital Insurance Trust Fund'' (hereinafter in this section referred to as the ''Trust Fund''). The Trust Fund shall consist of such gifts and bequests as may be made as provided in section 401(i)(1) of this title, and such amounts as may be deposited in, or appropriated to, such fund as provided in this part. There are hereby appropriated to the Trust Fund for the fiscal year ending June 30, 1966, and for each fiscal year thereafter, out of any moneys in the Treasury not otherwise appropriated, amounts equivalent to 100 per centum of—

(1) the taxes imposed by sections 3101(b) and 3111(b) of the Internal Revenue Code of 1986 with respect to wages reported to the Secretary of the Treasury or his delegate pursuant to subtitle F of such Code after December 31, 1965, as determined by the Secretary of the Treasury by applying the applicable rates of tax under such sections to such wages, which wages shall be certified by the Commissioner of Social Security on the basis of records of wages established and maintained by the Commissioner of Social Security in accordance with such reports; and

(2) the taxes imposed by section 1401(b) of the Internal Revenue Code of 1986 with respect to self-employment income reported to the Secretary of the Treasury or his delegate on tax returns under subtitle F of such Code, as determined by the Secretary of the Treasury by applying the applicable rate of tax under such section to such self-employment income, which self-employment income shall be certified by the Commissioner of Social Security on the basis of records of self-employment established and maintained by the Commissioner of Social Security in accordance with such returns.

The amounts appropriated by the preceding sentence shall be transferred from time to time from the general fund in the Treasury to the Trust Fund, such amounts to be determined on the basis of estimates by the Secretary of the Treasury of the taxes, specified in the preceding sentence, paid to or deposited into the Treasury; and proper adjustments shall be made in amounts subsequently transferred to the extent prior estimates were in excess of or were less than the taxes specified in such sentence.

### (b) Board of Trustees; composition; meetings; duties

With respect to the Trust Fund, there is hereby created a body to be known as the Board of Trustees of the Trust Fund (hereinafter in this section referred to as the ''Board of Trustees'') composed of the Commissioner of Social Security, the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services, all ex officio, and of two members of the public (both of whom may not be from the same political party), who shall be nominated by the President for a term of four years and subject to confirmation by the Senate. A member of the Board of Trustees serving as a member of the public and nominated and confirmed to fill a vacancy occurring during a term shall be nominated and confirmed only for the remainder of such term. An individual nominated and confirmed as a member of the public may serve in such position after the expiration of such member's term until the earlier of the time at which the member's successor takes office or the time at which a report of the Board is first issued under paragraph (2) after the expiration of the member's term. The Secretary of the Treasury shall be the Managing Trustee of the Board of Trustees (hereinafter in this section referred to as the ''Managing Trustee''). The Administrator of the Health Care Financing Administration shall serve as the Secretary of the Board of Trustees. The Board of Trustees shall meet not less frequently than once each calendar year. It shall be the duty of the Board of Trustees to—

(1) Hold the Trust Fund;

(2) Report to the Congress not later than the first day of April of each year on the operation and status of the Trust Fund during the preceding fiscal year and on its expected operation and status during the current fiscal year and the next 2 fiscal years;

(3) Report immediately to the Congress whenever the Board is of the opinion that the amount of the Trust Fund is unduly small; and

(4) Review the general policies followed in managing the Trust Fund, and recommend changes in such policies, including necessary changes in the provisions of law which govern the way in which the Trust Fund is to be managed.

MEDICARE SELF-REFERRAL DISCLOSURE PROTOCOL

Pub. L. 111–148, title VI, § 6409, Mar. 23, 2010, 124 Stat. 772, provided that:

"(a) DEVELOPMENT OF SELF-REFERRAL DISCLOSURE PROTOCOL.—

"(1) IN GENERAL.—The Secretary of Health and Human Services, in cooperation with the Inspector General of the Department of Health and Human Services, shall establish, not later than 6 months after the date of the enactment of this Act [Mar. 23, 2010], a protocol to enable health care providers of services and suppliers to disclose an actual or potential violation of section 1877 of the Social Security Act (42 U.S.C. 1395nn) pursuant to a self-referral disclosure protocol (in this section referred to as a 'SRDP'). The SRDP shall include direction to health care providers of services and suppliers on—

"(A) a specific person, official, or office to whom such disclosures shall be made; and

"(B) instruction on the implication of the SRDP on corporate integrity agreements and corporate compliance agreements.

"(2) PUBLICATION ON INTERNET WEBSITE OF SRDP INFORMATION.—The Secretary of Health and Human Services shall post information on the public Internet website of the Centers for Medicare & Medicaid Services to inform relevant stakeholders of how to disclose actual or potential violations pursuant to an SRDP.

"(3) RELATION TO ADVISORY OPINIONS.—The SRDP shall be separate from the advisory opinion process set forth in regulations implementing section 1877(g) of the Social Security Act [42 U.S.C. 1395nn(g)].

"(b) REDUCTION IN AMOUNTS OWED.—The Secretary of Health and Human Services is authorized to reduce the amount due and owing for all violations under section 1877 of the Social Security Act [42 U.S.C. 1395nn] to an amount less than that specified in subsection (g) of such section. In establishing such amount for a violation, the Secretary may consider the following factors:

"(1) The nature and extent of the improper or illegal practice.

"(2) The timeliness of such self-disclosure.

"(3) The cooperation in providing additional information related to the disclosure.

"(4) Such other factors as the Secretary considers appropriate.

"(c) REPORT.—Not later than 18 months after the date on which the SRDP protocol is established under subsection (a)(1), the Secretary shall submit to Congress a report on the implementation of this section. Such report shall include—

"(1) the number of health care providers of services and suppliers making disclosures pursuant to the SRDP;

"(2) the amounts collected pursuant to the SRDP;

"(3) the types of violations reported under the SRDP; and

"(4) such other information as may be necessary to evaluate the impact of this section."

APPLICATION OF EXCEPTION FOR HOSPITALS UNDER DEVELOPMENT

Pub. L. 108–173, title V, § 507(b), Dec. 8, 2003, 117 Stat. 2296, provided that: "For purposes of section 1877(h)(7)(B)(i)(II) of the Social Security Act [subsec. (h)(7)(B)(i)(II) of this section], as added by subsection (a)(1)(B), in determining whether a hospital is under development as of November 18, 2003, the Secretary [of Health and Human Services] shall consider—

"(1) whether architectural plans have been completed, funding has been received, zoning requirements have been met, and necessary approvals from appropriate State agencies have been received; and

"(2) any other evidence the Secretary determines would indicate whether a hospital is under development as of such date."

STUDIES

Pub. L. 108–173, title V, § 507(c), Dec. 8, 2003, 117 Stat. 2296, provided that:

"(1) MEDPAC STUDY.—The Medicare Payment Advisory Commission, in consultation with the Comptroller General of the United States, shall conduct a study to determine—

"(A) any differences in the costs of health care services furnished to patients by physician-owned specialty hospitals and the costs of such services furnished by local full-service community hospitals within specific diagnosis-related groups;

"(B) the extent to which specialty hospitals, relative to local full-service community hospitals, treat patients in certain diagnosis-related groups within a category, such as cardiology, and an analysis of the selection;

"(C) the financial impact of physician-owned specialty hospitals on local full-service community hospitals;

"(D) how the current diagnosis-related group system should be updated to better reflect the cost of delivering care in a hospital setting; and

"(E) the proportions of payments received, by type of payer, between the specialty hospitals and local full-service community hospitals.

"(2) HHS STUDY.—The Secretary [of Health and Human Services] shall conduct a study of a representative sample of specialty hospitals—

"(A) to determine the percentage of patients admitted to physician-owned specialty hospitals who are referred by physicians with an ownership interest;

"(B) to determine the referral patterns of physician owners, including the percentage of patients they referred to physician-owned specialty hospitals and the percentage of patients they referred to local full-service community hospitals for the same condition;

"(C) to compare the quality of care furnished in physician-owned specialty hospitals and in local full-service community hospitals for similar conditions and patient satisfaction with such care; and

"(D) to assess the differences in uncompensated care, as defined by the Secretary, between the specialty hospital and local full-service community hospitals, and the relative value of any tax exemption available to such hospitals.

"(3) REPORTS.—Not later than 15 months after the date of the enactment of this Act [Dec. 8, 2003], the Commission and the Secretary, respectively, shall each submit to Congress a report on the studies conducted under paragraphs (1) and (2), respectively, and shall include any recommendations for legislation or administrative changes."

GAO STUDY OF OWNERSHIP BY REFERRING PHYSICIANS

Section 6204(e) of Pub. L. 101–239 directed Comptroller General to conduct a study of ownership of hospitals and other providers of medicare services by referring physicians and, by not later than Feb. 1, 1991, report to Congress on results of such study, prior to repeal by Pub. L. 104–316, title I, § 122(h)(1), Oct. 19, 1996, 110 Stat. 3837.

STATISTICAL SUMMARY OF COMPARATIVE UTILIZATION

Section 6204(f) of Pub. L. 101–239, as amended by Pub. L. 101–508, title IV, § 4207(e)(4)(A), formerly § 4027(e)(4)(A), Nov. 5, 1990, 104 Stat. 1388–122, renumbered Pub. L. 103–432, title I, § 160(d)(4), Oct. 31, 1994, 108 Stat. 4444; Pub. L. 104–316, title I, § 122(h)(2), Oct. 19, 1996, 110 Stat. 3837, directed Secretary of Health and Human Services, not later than June 30, 1992, to submit to Congress a statistical profile comparing utilization of items and services by medicare beneficiaries served by entities in which the referring physician has a direct or indirect financial interest and by medicare beneficiaries served by other entities, for the States and entities specified in subsec. (f) of this section (other than entities providing clinical laboratory services).

## § 1395oo. Provider Reimbursement Review Board

### (a) Establishment

Any provider of services which has filed a required cost report within the time specified in

regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board (hereinafter referred to as the ''Board'') which shall be established by the Secretary in accordance with subsection (h) of this section and (except as provided in subsection (g)(2) of this section) any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if—

(1) such provider—

(A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary pursuant to section 1395h of this title as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report, or

(ii) is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title,

(B) has not received such final determination from such intermediary on a timely basis after filing such report, where such report complied with the rules and regulations of the Secretary relating to such report, or

(C) has not received such final determination on a timely basis after filing a supplementary cost report, where such cost report did not so comply and such supplementary cost report did so comply,

(2) the amount in controversy is $10,000 or more, and

(3) such provider files a request for a hearing within 180 days after notice of the intermediary's final determination under paragraph (1)(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180 days after notice of the Secretary's final determination, or with respect to appeals pursuant to paragraph (1) (B) or (C), within 180 days after notice of such determination would have been received if such determination had been made on a timely basis.

**(b) Appeals by groups**

The provisions of subsection (a) of this section shall apply to any group of providers of services if each provider of services in such group would, upon the filing of an appeal (but without regard to the $10,000 limitation), be entitled to such a hearing, but only if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more.

**(c) Right to counsel; rules of evidence**

At such hearing, the provider of services shall have the right to be represented by counsel, to introduce evidence, and to examine and cross-examine witnesses. Evidence may be received at any such hearing even though inadmissible under rules of evidence applicable to court procedure.

**(d) Decisions of Board**

A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence as may be obtained or received by the Board, and shall be supported by substantial evidence when the record is viewed as a whole. The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

**(e) Rules and regulations**

The Board shall have full power and authority to make rules and establish procedures, not inconsistent with the provisions of this subchapter or regulations of the Secretary, which are necessary or appropriate to carry out the provisions of this section. In the course of any hearing the Board may administer oaths and affirmations. The provisions of subsections (d) and (e) of section 405 of this title with respect to subpenas shall apply to the Board to the same extent as they apply to the Secretary with respect to subchapter II of this chapter.

**(f) Finality of decision; judicial review; determinations of Board authority; jurisdiction; venue; interest on amount in controversy**

(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) of this section and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to

render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5 notwithstanding any other provisions in section 405 of this title. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) of this section must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

(2) Where a provider seeks judicial review pursuant to paragraph (1), the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180-day period as determined pursuant to subsection (a)(3) of this section and equal to the rate of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund for the month in which the civil action authorized under paragraph (1) is commenced, to be awarded by the reviewing court in favor of the prevailing party.

(3) No interest awarded pursuant to paragraph (2) shall be deemed income or cost for the purposes of determining reimbursement due providers under this chapter.

**(g) Certain findings not reviewable**

(1) The finding of a fiscal intermediary that no payment may be made under this subchapter for any expenses incurred for items or services furnished to an individual because such items or services are listed in section 1395y of this title shall not be reviewed by the Board, or by any court pursuant to an action brought under subsection (f) of this section.

(2) The determinations and other decisions described in section 1395ww(d)(7) of this title shall not be reviewed by the Board or by any court pursuant to an action brought under subsection (f) of this section or otherwise.

**(h) Composition and compensation**

The Board shall be composed of five members appointed by the Secretary without regard to the provisions of title 5 governing appointments in the competitive services. Two of such members shall be representative of providers of services. All of the members of the Board shall be persons knowledgeable in the field of payment of providers of services, and at least one of them shall be a certified public accountant. Members of the Board shall be entitled to receive compensation at rates fixed by the Secretary, but not exceeding the rate specified (at the time the service involved is rendered by such members) for grade GS–18 in section 5332 of title 5. The term of office shall be three years, except that the Secretary shall appoint the initial members of the Board for shorter terms to the extent necessary to permit staggered terms of office.

**(i) Technical and clerical assistance**

The Board is authorized to engage such technical assistance as may be required to carry out its functions, and the Secretary shall, in addition, make available to the Board such secretarial, clerical, and other assistance as the Board may require to carry out its functions.

**(j) "Provider of services" defined**

In this section, the term "provider of services" includes a rural health clinic and a Federally qualified health center.

(Aug. 14, 1935, ch. 531, title XVIII, § 1878, as added Pub. L. 92–603, title II, § 243(a), Oct. 30, 1972, 86 Stat. 1420; amended Pub. L. 93–484, § 3(a), Oct. 26, 1974, 88 Stat. 1459; Pub. L. 96–499, title IX, § 955, Dec. 5, 1980, 94 Stat. 2647; Pub. L. 98–21, title VI, § 602(h), Apr. 20, 1983, 97 Stat. 165; Pub. L. 98–369, div. B, title III, §§ 2351(a)(1), (b)(1), 2354(b)(39), (40), July 18, 1984, 98 Stat. 1098, 1099, 1102; Pub. L. 101–508, title IV, § 4161(a)(6), (b)(4), Nov. 5, 1990, 104 Stat. 1388–94, 1388–95; Pub. L. 103–66, title XIII, § 13503(c)(1)(B), Aug. 10, 1993, 107 Stat. 579.)

AMENDMENTS

1993—Subsec. (f)(2). Pub. L. 103–66 substituted "the rate of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund for the month in which" for "the rate of return on equity capital established by regulation pursuant to section 1395x(v)(1)(B) of this title and in effect at the time".

1990—Subsec. (j). Pub. L. 101–508, § 4161(b)(4), inserted "a rural health clinic and" after "includes".

Pub. L. 101–508, § 4161(a)(6), added subsec. (j).

1984—Subsec. (c). Pub. L. 98–369, § 2354(b)(39), substituted "inadmissible" for "inadmissable".

Subsec. (e). Pub. L. 98–369, § 2354(b)(40), substituted "and (e)" for ", (e), and (f)".

Subsec. (f)(1). Pub. L. 98–369, § 2351(a)(1), substituted "notification of such determination is received" for "such determination is rendered" in third sentence.

Pub. L. 98–369, § 2351(b)(1), inserted "or which have obtained a hearing under subsection (b) of this section" after "common ownership or control" in last sentence.

1983—Subsec. (a). Pub. L. 98–21, § 602(h)(1)(A), inserted provision in introductory text that, except as provided in subsec. (g)(2) of this section, any hospital which receives payments in amounts computed under section 1395ww(b) or (d) of this title and which has submitted such reports within such time as Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by Board.

Subsec. (a)(1)(A). Pub. L. 98–21, § 602(h)(1)(B), (C), designated existing provisions as cl. (i) and added cl. (ii).

Subsec. (a)(3). Pub. L. 98–21, § 602(h)(1)(D), substituted "(1)(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180 days after notice of the Secretary's final determination," for "(1)(A)".

Subsec. (f)(1). Pub. L. 98–21, § 602(h)(2), inserted "(or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located)" after "the judicial district in which the provider is located", and "Any appeal to the Board or action for judicial review by providers which are under common ownership or control must be brought by such providers as a group with respect to any matter involving an issue common to such providers."

Subsec. (g). Pub. L. 98–21, § 602(h)(3), designated existing provisions as par. (1) and added par. (2).

Subsec. (h). Pub. L. 98–21, § 602(h)(4), substituted "payment of providers of services" for "cost reimbursement".

1980—Subsec. (f)(1). Pub. L. 96–499 inserted provision empowering providers of services to obtain judicial review of any action of a fiscal intermediary involving a

question of law or regulations relevant to matters in controversy whenever Board determined that it was without authority to decide such matters in controversy.

1974—Subsec. (f). Pub. L. 93–484 redesignated existing provisions as par. (1), inserted provisions authorizing judicial review for providers of final decisions of Board and judicial review of any affirmance by Secretary, and added pars. (2) and (3).

EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–66 effective Oct. 1, 1993, see section 13503(c)(2) of Pub. L. 103–66, set out as a note under section 1395x of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by section 4161(a)(6) of Pub. L. 101–508 applicable to cost reports for periods beginning on or after Oct. 1, 1991, see section 4161(a)(8)(C) of Pub. L. 101–508, set out as a note under section 1395k of this title.

Amendment by section 4161(b)(4) of Pub. L. 101–508 applicable to cost reports for periods beginning on or after Oct. 1, 1991, see section 4161(b)(5) of Pub. L. 101–508, set out as a note under section 1395x of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Section 2351(a)(2) of Pub. L. 98–369 provided that: ''The amendment made by paragraph (1) [amending this section] shall be effective with respect to any civil action commenced on or after the date of the enactment of this Act [July 18, 1984].''

Section 2351(b)(2) of Pub. L. 98–369 provided that: ''The amendment made by paragraph (1) [amending this section] shall be effective with respect to any appeal or action brought on or after the date of the enactment of this Act [July 18, 1984].''

Amendment by section 2354(b)(39), (40) of Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2354(e)(1) of Pub. L. 98–369, set out as a note under section 1320a–1 of this title.

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 98–21 applicable to items and services furnished by or under arrangement with a hospital beginning with its first cost reporting period that begins on or after Oct. 1, 1983, any change in a hospital's cost reporting period made after November 1982 to be recognized for such purposes only if the Secretary finds good cause therefor, see section 604(a)(1) of Pub. L. 98–21, set out as a note under section 1395ww of this title. See, also, section 2351(c) of Pub. L. 98–369, set out as a note below.

EFFECTIVE DATE OF 1974 AMENDMENT

Section 3(b) of Pub. L. 93–484 provided that: ''The amendment made by subsection (a) [amending this section] shall be applicable to cost reports of providers of services for accounting periods ending on or after June 30, 1973.''

EFFECTIVE DATE

Section 243(c) of Pub. L. 92–603 provided that: ''The amendments made by this section [enacting this section and amending section 1395h of this title] shall apply with respect to cost reports of providers of services, as defined in title XVIII of the Social Security Act [this subchapter], for accounting periods ending on or after June 30, 1973.''

REFERENCES IN OTHER LAWS TO GS–16, 17, OR 18 PAY RATES

References in laws to the rates of pay for GS–16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, §101(c)(1)] of Pub. L. 101–509, set out in a note under section 5376 of Title 5.

REVIEW OF PROVIDER REIMBURSEMENT REVIEW BOARD DECISIONS

Section 2351(c) of Pub. L. 98–369 provided that: ''Notwithstanding section 604 of the Social Security Amendments of 1983 (Public Law 98–21) [set out as an Effective Date of 1983 Amendments note under section 1395ww of this title]—

''(1) the amendments made by section 602(h)(2)(A) of that Act [amending this section] shall be effective with respect to any appeal or action brought on or after April 20, 1983; and

''(2) the amendments made by section 602(h)(2)(B) of that Act [amending this section] shall be effective with respect to any appeal or action brought on or after the date of the enactment of this Act [July 18, 1984].''

§ 1395pp. Limitation on liability where claims are disallowed

(a) Conditions prerequisite to payment for items and services notwithstanding determination of disallowance

Where—

(1) a determination is made that, by reason of section 1395y(a)(1) or (9) of this title or by reason of a coverage denial described in subsection (g) of this section, payment may not be made under part A or part B of this subchapter for any expenses incurred for items or services furnished an individual by a provider of services or by another person pursuant to an assignment under section 1395u(b)(3)(B)(ii) of this title, and

(2) both such individual and such provider of services or such other person, as the case may be, did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services under such part A or part B of this subchapter,

then to the extent permitted by this subchapter, payment shall, notwithstanding such determination, be made for such items or services (and for such period of time as the Secretary finds will carry out the objectives of this subchapter), as though section 1395y(a)(1) and section 1395y(a)(9) of this title did not apply and as though the coverage denial described in subsection (g) of this section had not occurred. In each such case the Secretary shall notify both such individual and such provider of services or such other person, as the case may be, of the conditions under which payment for such items or services was made and in the case of comparable situations arising thereafter with respect to such individual or such provider or such other person, each shall, by reason of such notice (or similar notices provided before the enactment of this section), be deemed to have knowledge that payment cannot be made for such items or services or reasonably comparable items or services. Any provider or other person furnishing items or services for which payment may not be made by reason of section 1395y(a)(1) or (9) of this title or by reason of a coverage denial described in subsection (g) of this section shall be deemed to have knowledge that payment cannot be made

Commission shall submit a report to Congress on such study and shall include in the report recommendations on the desirability of retaining current carrier-wide localities, changing to a system of statewide localities, or adopting Metropolitan Statistical Areas or other payment areas for purposes of payment under such part B.

''(7) COMMISSION STUDY OF PAYMENT FOR NON-PHYSICIAN PROVIDERS OF MEDICARE SERVICES.—The Physician Payment Review Commission shall conduct a study of the implications of a resource-based fee schedule for physicians' services for non-physician practitioners, such as physician assistants, clinical psychologists, nurse midwives, and other health practitioners whose services can be billed under the medicare program on a fee-for-service basis. The study shall address (A) what the proper level of payment should be for these practitioners, (B) whether or not adjustments to their payments should be subject to the medicare volume performance standard process, and (C) what update to use for services outside the medicare volume performance standard process. The Commission shall submit a report to Congress on such study by not later than July 1, 1991.

''(8) COMMISSION STUDY OF PHYSICIAN FEES UNDER MEDICAID.—The Physician Payment Review Commission shall conduct a study on physician fees under State medicaid programs established under title XIX of the Social Security Act [subchapter XIX of this chapter]. The Commission shall specifically examine in such study the adequacy of physician reimbursement under such programs, physician participation in such programs, and access to care by medicaid beneficiaries. By no later than July 1, 1991, the Commission shall submit a report to Congress on such study and shall include such recommendations as the Commission deems appropriate.

''(9) GAO STUDY ON PHYSICIAN ANTI-TRUST ISSUES.—The Comptroller General shall conduct a study of the effect of anti-trust laws on the ability of physicians to act in groups to educate and discipline peers of such physicians in order to reduce and eliminate ineffective practice patterns and inappropriate utilization. The study shall further address anti-trust issues as they relate to the adoption of practice guidelines by third-party payers and the role that practice guidelines might play as a defense in malpractice cases. By no later than July 1, 1991, the Comptroller General shall submit a report to Congress on such study and shall make such recommendations as the Comptroller General deems appropriate.''

[Section 126(h)(1) of Pub. L. 103–432 provided that the amendment made by that section to section 6102(d) of Pub. L. 101–239, set out above, is effective Oct. 31, 1994.]

#### DISTRIBUTION OF MODEL FEE SCHEDULE

Section 6102(e)(11) of Pub. L. 101–239, as amended by Pub. L. 101–508, title IV, §118(f)(2)(E), Nov. 5, 1990, 104 Stat. 1388–70, provided that: ''By September 1, 1990, the Secretary of Health and Human Services shall develop a Model Fee Schedule, using the methodology set forth in section 1848 of the Social Security Act [this section]. The Model Fee Schedule shall include as many services as the Secretary of Health and Human Services concludes can be assigned valid relative values. The Secretary of Health and Human Services shall submit the Model Fee Schedule to the appropriate committees of Congress and make it generally available to the public.''

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1395l, 1395m, 1395u, 1395w–1, 1395y, 1395rr of this title; title 5 section 8904.

### PART C—MISCELLANEOUS PROVISIONS

#### PART REFERRED TO IN OTHER SECTIONS

This part is referred to in sections 426, 1395i–4 of this title; title 45 section 231f.

## § 1395x. Definitions

For purposes of this subchapter—

### (a) Spell of illness

The term ''spell of illness'' with respect to any individual means a period of consecutive days—

(1) beginning with the first day (not included in a previous spell of illness) (A) on which such individual is furnished inpatient hospital services, inpatient rural primary care hospital services or extended care services, and (B) which occurs in a month for which he is entitled to benefits under part A of this subchapter, and

(2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is neither an inpatient of a hospital or rural primary care hospital nor an inpatient of a facility described in section 1396r(a)(2) of this title or subsection (y)(1) of this section.

### (b) Inpatient hospital services

The term ''inpatient hospital services'' means the following items and services furnished to an inpatient of a hospital and (except as provided in paragraph (3)) by the hospital—

(1) bed and board;

(2) such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are ordinarily furnished by such hospital for the care and treatment of inpatients; and

(3) such other diagnostic or therapeutic items or services, furnished by the hospital or by others under arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by such hospital or by others under such arrangements;

excluding, however—

(4) medical or surgical services provided by a physician, resident, or intern, services described by clauses[1] (i) or (iii) of subsection (s)(2)(K) of this section, certified nurse-midwife services, qualified psychologist services, and services of a certified registered nurse anesthetist; and

(5) the services of a private-duty nurse or other private-duty attendant.

Paragraph (4) shall not apply to services provided in a hospital by—

(6) an intern or a resident-in-training under a teaching program approved by the Council on Medical Education of the American Medical Association or, in the case of an osteopathic hospital, approved by the Committee on Hospitals of the Bureau of Professional Education of the American Osteopathic Association, or, in the case of services in a hospital or osteopathic hospital by an intern or resident-in-training in the field of dentistry, approved by the Council on Dental Education of the American Dental Association, or in the case of services in a hospital or osteopathic

---

[1] So in original. Probably should be ''clause''.

(1)) which would not be included under subsection (b) of this section if it were furnished to an inpatient of a hospital. None of the items and services referred to in the preceding paragraphs (other than paragraphs (1) and (2)(A)) of this subsection which are furnished to a patient of an institution which meets the definition of a hospital for purposes of section 1395(d) of this title shall be included unless such other conditions are met as the Secretary may find necessary relating to health and safety of individuals with respect to whom such items and services are furnished.

**(t) Drugs and biologicals**

(1) The term "drugs" and the term "biologicals", except for purposes of subsection (m)(5) of this section and paragraph (2), include only such drugs and biologicals, respectively, as are included (or approved for inclusion) in the United States Pharmacopoeia, the National Formulary, or the United States Homeopathic Pharmacopoeia, or in New Drugs or Accepted Dental Remedies (except for any drugs and biologicals unfavorably evaluated therein), or as are approved by the pharmacy and drug therapeutics committee (or equivalent committee) of the medical staff of the hospital furnishing such drugs and biologicals for use in such hospital.

(2)(A) For purposes of paragraph (1), the term "drugs" also includes any drugs or biologicals used in an anticancer chemotherapeutic regimen for a medically accepted indication (as described in subparagraph (B)).

(B) In subparagraph (A), the term "medically accepted indication", with respect to the use of a drug, includes any use which has been approved by the Food and Drug Administration for the drug, and includes another use of the drug if—

(i) the drug has been approved by the Food and Drug Administration; and

(ii)(I) such use is supported by one or more citations which are included (or approved for inclusion) in one or more of the following compendia: the American Hospital Formulary Service-Drug Information, the American Medical Association Drug Evaluations, the United States Pharmacopoeia-Drug Information, and other authoritative compendia as identified by the Secretary, unless the Secretary has determined that the use is not medically appropriate or the use is identified as not indicated in one or more such compendia, or

(II) the carrier involved determines, based upon guidance provided by the Secretary to carriers for determining accepted uses of drugs, that such use is medically accepted based on supportive clinical evidence in peer reviewed medical literature appearing in publications which have been identified for purposes of this subclause by the Secretary.

The Secretary may revise the list of compendia in clause (ii)(I) as is appropriate for identifying medically accepted indications for drugs.

**(u) Provider of services**

The term "provider of services" means a hospital, rural primary care hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice pro

gram, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund.

**(v) Reasonable costs**

(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

(B) In the case of extended care services, the regulations under subparagraph (A) shall not include provision for specific recognition of a return on equity capital.

(C) Where a hospital has an arrangement with a medical school under which the faculty of such

school provides services at such hospital, an amount not in excess of the reasonable cost of such services to the medical school shall be included in determining the reasonable cost to the hospital of furnishing services—

(i) for which payment may be made under part A of this subchapter, but only if—

(I) payment for such services as furnished under such arrangement would be made under part A of this subchapter to the hospital had such services been furnished by the hospital, and

(II) such hospital pays to the medical school at least the reasonable cost of such services to the medical school, or

(ii) for which payment may be made under part B of this subchapter, but only if such hospital pays to the medical school at least the reasonable cost of such services to the medical school.

(D) Where (i) physicians furnish services which are either inpatient hospital services (including services in conjunction with the teaching programs of such hospital) by reason of paragraph (7) of subsection (b) of this section or for which entitlement exists by reason of clause (II) of section 1395k(a)(2)(B)(i) of this title, and (ii) such hospital (or medical school under arrangement with such hospital) incurs no actual cost in the furnishing of such services, the reasonable cost of such services shall (under regulations of the Secretary) be deemed to be the cost such hospital or medical school would have incurred had it paid a salary to such physicians rendering such services approximately equivalent to the average salary paid to all physicians employed by such hospital (or if such employment does not exist, or is minimal in such hospital, by similar hospitals in a geographic area of sufficient size to assure reasonable inclusion of such average salary).

(E) Such regulations may, in the case of skilled nursing facilities in any State, provide for the use of rates, developed by the State in which such facilities are located, for the payment of the cost of skilled nursing facility services furnished under the State's plan approved under subchapter XIX of this chapter (and such rates may be increased by the Secretary on a class or size of institution or on a geographical basis by a percentage factor not in excess of 10 percent to take into account determinable items or services or other requirements under this subchapter not otherwise included in the computation of such State rates), if the Secretary finds that such rates are reasonably related to (but not necessarily limited to) analyses undertaken by such State of costs of care in comparable facilities in such State. Notwithstanding the previous sentence, such regulations with respect to skilled nursing facilities shall take into account (in a manner consistent with subparagraph (A) and based on patient-days of services furnished) the costs (including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this subchapter) of such facilities complying with the requirements of subsections

(b), (c), and (d) of section 1395i–3 of this title (including the costs of conducting nurse aide training and competency evaluation programs and competency evaluation programs).

(F) Such regulations shall require each provider of services (other than a fund) to make reports to the Secretary of information described in section 1320a(a) of this title in accordance with the uniform reporting system (established under such section) for that type of provider.

(G)(i) In any case in which a hospital provides inpatient services to an individual that would constitute post-hospital extended care services if provided by a skilled nursing facility and a quality control and peer review organization (or, in the absence of such a qualified organization, the Secretary or such agent as the Secretary may designate) determines that inpatient hospital services for the individual are not medically necessary but post-hospital extended care services for the individual are medically necessary and such extended care services are not otherwise available to the individual (as determined in accordance with criteria established by the Secretary) at the time of such determination, payment for such services provided to the individual shall continue to be made under this subchapter at the payment rate described in clause (ii) during the period in which—

(I) such post-hospital extended care services for the individual are medically necessary and not otherwise available to the individual (as so determined),

(II) inpatient hospital services for the individual are not medically necessary, and

(III) the individual is entitled to have payment made for post-hospital extended care services under this subchapter,

except that if the Secretary determines that there is not an excess of hospital beds in such hospital and (subject to clause (iv)) there is not an excess of hospital beds in the area of such hospital, such payment shall be made (during such period) on the basis of the amount otherwise payable under part A with respect to inpatient hospital services.

(ii)(I) Except as provided in subclause (II), the payment rate referred to in clause (i) is a rate equal to the estimated adjusted State-wide average rate per patient-day paid for services provided in skilled nursing facilities under the State plan approved under subchapter XIX of this chapter for the State in which such hospital is located, or, if the State in which the hospital is located does not have a State plan approved under subchapter XIX of this chapter, the estimated adjusted State-wide average allowable costs per patient-day for extended care services under this subchapter in that State.

(II) If a hospital has a unit which is a skilled nursing facility, the payment rate referred to in clause (i) for the hospital is a rate equal to the lesser of the rate described in subclause (I) or the allowable costs in effect under this subchapter for extended care services provided to patients of such unit.

(iii) Any day on which an individual receives inpatient services for which payment is made under this subparagraph shall, for purposes of this chapter (other than this subparagraph), be deemed to be a day on which the individual received inpatient hospital services.

A015

(iv) In determining under clause (i), in the case of a public hospital, whether or not there is an excess of hospital beds in the area of such hospital, such determination shall be made on the basis of only the public hospitals (including the hospital) which are in the area of the hospital and which are under common ownership with that hospital.

(H) In determining such reasonable cost with respect to home health agencies, the Secretary may not include—

(i) any costs incurred in connection with bonding or establishing an escrow account by any such agency as a result of the financial security requirement described in subsection (*o*)(7) of this section;

(ii) in the case of home health agencies to which the financial security requirement described in subsection (*o*)(7) of this section applies, any costs attributed to interest charged such an agency in connection with amounts borrowed by the agency to repay overpayments made under this subchapter to the agency, except that such costs may be included in reasonable cost if the Secretary determines that the agency was acting in good faith in borrowing the amounts;

(iii) in the case of contracts entered into by a home health agency after December 5, 1980, for the purpose of having services furnished for or on behalf of such agency, any cost incurred by such agency pursuant to any such contract which is entered into for a period exceeding five years; and

(iv) in the case of contracts entered into by a home health agency before December 5, 1980, for the purpose of having services furnished for or on behalf of such agency, any cost incurred by such agency pursuant to any such contract, which determines the amount payable by the home health agency on the basis of a percentage of the agency's reimbursement or claim for reimbursement for services furnished by the agency, to the extent that such cost exceeds the reasonable value of the services furnished on behalf of such agency.

(I) In determining such reasonable cost, the Secretary may not include any costs incurred by a provider with respect to any services furnished in connection with matters for which payment may be made under this subchapter and furnished pursuant to a contract between the provider and any of its subcontractors which is entered into after December 5, 1980, and the value or cost of which is $10,000 or more over a twelve-month period unless the contract contains a clause to the effect that—

(i) until the expiration of four years after the furnishing of such services pursuant to such contract, the subcontractor shall make available, upon written request by the Secretary, or upon request by the Comptroller General, or any of their duly authorized representatives, the contract, and books, documents and records of such subcontractor that are necessary to certify the nature and extent of such costs, and

(ii) if the subcontractor carries out any of the duties of the contract through a subcontract, with a value or cost of $10,000 or more over a twelve-month period, with a relat-

ed organization, such subcontract shall contain a clause to the effect that until the expiration of four years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request by the Secretary, or upon request by the Comptroller General, or any of their duly authorized representatives, the subcontract, and books, documents and records of such organization that are necessary to verify the nature and extent of such costs.

The Secretary shall prescribe in regulation [3] criteria and procedures which the Secretary shall use in obtaining access to books, documents, and records under clauses required in contracts and subcontracts under this subparagraph.

(J) Such regulations may not provide for any inpatient routine salary cost differential as a reimbursable cost for hospitals and skilled nursing facilities.

(K)(i) The Secretary shall issue regulations that provide, to the extent feasible, for the establishment of limitations on the amount of any costs or charges that shall be considered reasonable with respect to services provided on an outpatient basis by hospitals (other than bona fide emergency services as defined in clause (ii)) or clinics (other than rural health clinics), which are reimbursed on a cost basis or on the basis of cost related charges, and by physicians utilizing such outpatient facilities. Such limitations shall be reasonably related to the charges in the same area for similar services provided in physicians' offices. Such regulations shall provide for exceptions to such limitations in cases where similar services are not generally available in physicians' offices in the area to individuals entitled to benefits under this subchapter.

(ii) For purposes of clause (i), the term ''bona fide emergency services'' means services provided in a hospital emergency room after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(I) placing the patient's health in serious jeopardy;

(II) serious impairment to bodily functions; or

(III) serious dysfunction of any bodily organ or part.

(L)(i) The Secretary, in determining the amount of the payments that may be made under this subchapter with respect to services furnished by home health agencies, may not recognize as reasonable (in the efficient delivery of such services) costs for the provision of such services by an agency to the extent these costs exceed (on the aggregate for the agency) for cost reporting periods beginning on or after—

(I) July 1, 1985, and before July 1, 1986, 120 percent,

(II) July 1, 1986, and before July 1, 1987, 115 percent, or

(III) July 1, 1987, 112 percent,

---

[3] So in original. Probably should be ''regulations''.

of the mean of the labor-related and nonlabor per visit costs for free standing home health agencies.

(ii) Effective for cost reporting periods beginning on or after July 1, 1986, such limitations shall be applied on an aggregate basis for the agency, rather than on a discipline specific basis. The Secretary may provide for such exemptions and exceptions to such limitation as he deems appropriate.

(iii) Not later than July 1, 1991, and annually thereafter (but not for cost reporting periods beginning on or after July 1, 1994, and before July 1, 1996), the Secretary shall establish limits under this subparagraph for cost reporting periods beginning on or after such date by utilizing the area wage index applicable under section 1395ww(d)(3)(E) of this title and determined using the survey of the most recent available wages and wage-related costs of hospitals located in the geographic area in which the home health agency is located (determined without regard to whether such hospitals have been reclassified to a new geographic area pursuant to section 1395ww(d)(8)(B) of this title, a decision of the Medicare Geographic Classification Review Board under section 1395ww(d)(10) of this title, or a decision of the Secretary).

(M) Such regulations shall provide that costs respecting care provided by a provider of services, pursuant to an assurance under title VI or XVI of the Public Health Service Act [42 U.S.C. 291 et seq., 300q et seq.] that the provider will make available a reasonable volume of services to persons unable to pay therefor, shall not be allowable as reasonable costs.

(N) In determining such reasonable costs, costs incurred for activities directly related to influencing employees respecting unionization may not be included.

(O)(i) In establishing an appropriate allowance for depreciation and for interest on capital indebtedness and (if applicable) a return on equity capital with respect to an asset of a hospital or skilled nursing facility which has undergone a change of ownership, such regulations shall provide, except as provided in clause (iv), that the valuation of the asset after such change of ownership shall be the lesser of the allowable acquisition cost of such asset to the owner of record as of July 18, 1984 (or, in the case of an asset not in existence as of such date, the first owner of record of the asset after such date), or the acquisition cost of such asset to the new owner.

(ii) Such regulations shall provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984.

(iii) Such regulations shall not recognize, as reasonable in the provision of health care services, costs (including legal fees, accounting and administrative costs, travel costs, and the costs of feasibility studies) attributable to the negotiation or settlement of the sale or purchase of any capital asset (by acquisition or merger) for which any payment has previously been made under this subchapter.

(iv) In the case of the transfer of a hospital from ownership by a State to ownership by a nonprofit corporation without monetary consideration, the basis for capital allowances to the new owner shall be the book value of the hospital to the State at the time of the transfer.

(P) If such regulations provide for the payment for a return on equity capital (other than with respect to costs of inpatient hospital services), the rate of return to be recognized, for determining the reasonable cost of services furnished in a cost reporting period, shall be equal to the average of the rates of interest, for each of the months any part of which is included in the period, on obligations issued for purchase by the Federal Hospital Insurance Trust Fund.

(Q) Except as otherwise explicitly authorized, the Secretary is not authorized to limit the rate of increase on allowable costs of approved medical educational activities.

(R) In determining such reasonable cost, costs incurred by a provider of services representing a beneficiary in an unsuccessful appeal of a determination described in section 1395ff(b) of this title shall not be allowable as reasonable costs.

(S)(i) Such regulations shall not include provision for specific recognition of any return on equity capital with respect to hospital outpatient departments.

(ii)(I) Such regulations shall provide that, in determining the amount of the payments that may be made under this subchapter with respect to all the capital-related costs of outpatient hospital services, the Secretary shall reduce the amounts of such payments otherwise established under this subchapter by 15 percent for payments attributable to portions of cost reporting periods occurring during fiscal year 1990, by 15 percent for payments attributable to portions of cost reporting periods occurring during fiscal year 1991, and by 10 percent for payments attributable to portions of cost reporting periods occurring during fiscal years 1992 through 1998.

(II) The Secretary shall reduce the reasonable cost of outpatient hospital services (other than the capital-related costs of such services) otherwise determined pursuant to section 1395l(a)(2)(B)(i)(I) of this title by 5.8 percent for payments attributable to portions of cost reporting periods occurring during fiscal years 1991 through 1998.

(III) Subclauses (I) and (II) shall not apply to payments with respect to the costs of hospital outpatient services provided by any hospital that is a sole community hospital (as defined in section 1395ww(d)(5)(D)(iii) of this title [4] or a rural primary care hospital (as defined in subsection (mm)(1) of this section).

(IV) In applying subclauses (I) and (II) to services for which payment is made on the basis of a blend amount under section 1395l(i)(3)(A)(ii) or 1395l(n)(1)(A)(ii) of this title, the costs reflected in the amounts described in sections 1395l(i)(3)(B)(i)(I) and 1395l(n)(1)(B)(i)(I) of this title, respectively, shall be reduced in accordance with such subclause.[5]

(2)(A) If the bed and board furnished as part of inpatient hospital services (including inpatient tuberculosis hospital services and inpatient psychiatric hospital services) or post-hospital extended care services is in accommodations more

---

[4] So in original. Probably should be followed by a closing parenthesis.

[5] So in original. Probably should be "subclauses."

expensive than semi-private accommodations, the amount taken into account for purposes of payment under this subchapter with respect to such services may not exceed the amount that would be taken into account with respect to such services if furnished in such semi-private accommodations unless the more expensive accommodations were required for medical reasons.

(B) Where a provider of services which has an agreement in effect under this subchapter furnishes to an individual items or services which are in excess of or more expensive than the items or services with respect to which payment may be made under part A or part B of this subchapter, as the case may be, the Secretary shall take into account for purposes of payment to such provider of services only the items or services with respect to which such payment may be made.

(3) If the bed and board furnished as part of inpatient hospital services (including inpatient tuberculosis hospital services and inpatient psychiatric hospital services) or post-hospital extended care services is in accommodations other than, but not more expensive than, semi-private accommodations and the use of such other accommodations rather than semi-private accommodations was neither at the request of the patient nor for a reason which the Secretary determines is consistent with the purposes of this subchapter, the amount of the payment with respect to such bed and board under part A of this subchapter shall be the amount otherwise payable under this subchapter for such bed and board furnished in semi-private accommodations minus the difference between the charge customarily made by the hospital or skilled nursing facility for bed and board in semi-private accommodations and the charge customarily made by it for bed and board in the accommodations furnished.

(4) If a provider of services furnishes items or services to an individual which are in excess of or more expensive than the items or services determined to be necessary in the efficient delivery of needed health services and charges are imposed for such more expensive items or services under the authority granted in section 1395cc(a)(2)(B)(ii),[6] of this title, the amount of payment with respect to such items or services otherwise due such provider in any fiscal period shall be reduced to the extent that such payment plus such charges exceed the cost actually incurred for such items or services in the fiscal period in which such charges are imposed.

(5)(A) Where physical therapy services, occupational therapy services, speech therapy services, or other therapy services or services of other health-related personnel (other than physicians) are furnished under an arrangement with a provider of services or other organization, specified in the first sentence of subsection (p) of this section (including through the operation of subsection (g) of this section) the amount included in any payment to such provider or other organization under this subchapter as the reasonable cost of such services (as furnished under such arrangements) shall

[6] See References in Text note below.

not exceed an amount equal to the salary which would reasonably have been paid for such services (together with any additional costs that would have been incurred by the provider or other organization) to the person performing them if they had been performed in an employment relationship with such provider or other organization (rather than under such arrangement) plus the cost of such other expenses (including a reasonable allowance for traveltime and other reasonable types of expense related to any differences in acceptable methods of organization for the provision of such therapy) incurred by such person, as the Secretary may in regulations determine to be appropriate.

(B) Notwithstanding the provisions of subparagraph (A), if a provider of services or other organization specified in the first sentence of subsection (p) of this section requires the services of a therapist on a limited part-time basis, or only to perform intermittent services, the Secretary may make payment on the basis of a reasonable rate per unit of service, even though such rate is greater per unit of time than salary related amounts, where he finds that such greater payment is, in the aggregate, less than the amount that would have been paid if such organization had employed a therapist on a full- or part-time salary basis.

(6) For purposes of this subsection, the term, "semi-private accommodations" means two-bed, three-bed, or four-bed accommodations.

(7)(A) For limitation on Federal participation for capital expenditures which are out of conformity with a comprehensive plan of a State or areawide planning agency, see section 1320a-1 of this title.

(B) For further limitations on reasonable cost and determination of payment amounts for operating costs of inpatient hospital services and waivers for certain States, see section 1395ww of this title.

(C) For provisions restricting payment for provider-based physicians' services and for payments under certain percentage arrangements, see section 1395xx of this title.

(D) For further limitations on reasonable cost and determination of payment amounts for routine service costs of skilled nursing facilities, see section 1395yy of this title.

**(w) Arrangements for certain services; payments pursuant to arrangements for utilization review activities**

(1) The term "arrangements" is limited to arrangements under which receipt of payment by the hospital, rural primary care hospital, skilled nursing facility, home health agency, or hospice program (whether in its own right or as agent), with respect to services for which an individual is entitled to have payment made under this subchapter, discharges the liability of such individual or any other person to pay for the services.

(2) Utilization review activities conducted, in accordance with the requirements of the program established under part B of subchapter XI of this chapter with respect to services furnished by a hospital or rural primary care hospital to patients insured under part A of this subchapter or entitled to have payment made

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1395x of this title.

## § 1395yy. Payment to skilled nursing facilities for routine service costs

### (a) Per diem limitations

The Secretary, in determining the amount of the payments which may be made under this subchapter with respect to routine service costs of extended care services shall not recognize as reasonable (in the efficient delivery of health services) per diem costs of such services to the extent that such per diem costs exceed the following per diem limits, except as otherwise provided in this section:

(1) With respect to freestanding skilled nursing facilities located in urban areas, the limit shall be equal to 112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities located in urban areas.

(2) With respect to freestanding skilled nursing facilities located in rural areas, the limit shall be equal to 112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities located in rural areas.

(3) With respect to hospital-based skilled nursing facilities located in urban areas, the limit shall be equal to the sum of the limit for freestanding skilled nursing facilities located in urban areas, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities located in urban areas exceeds the limit for freestanding skilled nursing facilities located in urban areas.

(4) With respect to hospital-based skilled nursing facilities located in rural areas, the limit shall be equal to the sum of the limit for freestanding skilled nursing facilities located in rural areas, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities located in rural areas exceeds the limit for freestanding skilled nursing facilities located in rural areas.

In applying this subsection the Secretary shall make appropriate adjustments to the labor related portion of the costs based upon an appropriate wage index, and shall, for cost reporting periods beginning on or after October 1, 1992, on or after October 1, 1995, and every 2 years thereafter, provide for an update to the per diem cost limits described in this subsection[1]

### (b) Excess overhead allocations for hospital-based facilities

With respect to a hospital-based skilled nursing facility, the Secretary may not recognize as reasonable the portion of the cost differences between hospital-based and freestanding skilled nursing facilities attributable to excess overhead allocations.

### (c) Adjustments in limitations; publication of data

The Secretary may make adjustments in the limits set forth in subsection (a) of this section

---

[1] So in original. Probably should be followed by a period.

with respect to any skilled nursing facility to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility. The Secretary shall publish the data and criteria to be used for purposes of this subsection on an annual basis.

### (d) Access to skilled nursing facilities

(1) Any skilled nursing facility may choose to be paid under this subsection on the basis of a prospective payment for all routine service costs (including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this subchapter) and capital-related costs of extended care services provided in a cost reporting period if such facility had, in the preceding cost reporting period, fewer than 1,500 patient days with respect to which payments were made under this subchapter. Such prospective payment shall be in lieu of payments which would otherwise be made for routine service costs pursuant to section 1395x(v) of this title and subsections (a) through (c) of this section and capital-related costs pursuant to section 1395x(v) of this title. This subsection shall not apply to a facility for any cost reporting period immediately following a cost reporting period in which such facility had 1,500 or more patient days with respect to which payments were made under this subchapter, without regard to whether payments were made under this subsection during such preceding cost reporting period.

(2)(A) The amount of the payment under this section shall be determined on a per diem basis.

(B) Subject to the limitations of subparagraph (C), for skilled nursing facilities located—

(i) in an urban area, the amount shall be equal to 105 percent of the mean of the per diem reasonable routine service and capital-related costs of extended care services for skilled nursing facilities in urban areas within the same region, determined without regard to the limitations of subsection (a) of this section and adjusted for different area wage levels, and

(ii) in a rural area the amount shall be equal to 105 percent of the mean of the per diem reasonable routine service and capital-related costs of extended care services for skilled nursing facilities in rural areas within the same region, determined without regard to the limitations of subsection (a) of this section and adjusted for different area wage levels.

(C) The per diem amounts determined under subparagraph (B) shall not exceed the limit on routine service costs determined under subsection (a) of this section with respect to the facility, adjusted to take into account average capital-related costs with respect to the type and location of the facility.

(3) For purposes of this subsection, urban and rural areas shall be determined in the same manner as for purposes of subsection (a) of this section, and the term ''region'' shall have the same meaning as under section 1395ww(d)(2)(D) of this title.

(4) The Secretary shall establish the prospective payment amounts for cost reporting periods beginning in a fiscal year at least 90 days prior

A019

USCA Case #13-5370      Document #1486516          Filed: 04/01/2014      Page 82 of 91

to the beginning of such fiscal year, on the basis of the most recent data available for a 12-month period. A skilled nursing facility must notify the Secretary of its intention to be paid pursuant to this subsection for a cost reporting period no later than 30 days before the beginning of that period.

(5) The Secretary shall provide for a simplified cost report to be filed by facilities being paid pursuant to this subsection, which shall require only the cost information necessary for determining prospective payment amounts pursuant to paragraph (2) and reasonable costs of ancillary services.

(6) In lieu of payment on a cost basis for ancillary services provided by a facility which is being paid pursuant to this subsection, the Secretary may pay for such ancillary services on a reasonable charge basis if the Secretary determines that such payment basis will provide an equitable level of reimbursement and will ease the reporting burden of the facility.

(7) In computing the rates of payment to be made under this subsection, there shall be taken into account the costs described in the last sentence of section 1395v(y)(1)(E) of this title (relating to compliance with nursing facility requirements and of conducting nurse aide training and competency evaluation programs and competency evaluation programs).

(Aug. 14, 1935, ch. 531, title XVIII, § 1888, as added July 18, 1984, Pub. L. 98–369, div. B, title III, § 2319(b), 98 Stat. 1082; amended Apr. 7, 1986, Pub. L. 99–272, title IX, §§ 9126(a), (b), 9219(b)(1)(C), 100 Stat. 168, 170, 182; Oct. 22, 1986, Pub. L. 99–514, title XVIII, § 1895(b)(7)(A), (B), 100 Stat. 2933; Dec. 22, 1987, Pub. L. 100–203, title IV, § 4201(b)(2), 101 Stat. 1330–174; Nov. 5, 1990, Pub. L. 101–508, title IV, § 4008(e)(2), (h)(2)(A)(ii), 104 Stat. 1388–45, 1388–48; Aug. 10, 1993, Pub. L. 103–66, title XIII, § 13503(a)(2), (3)(A), 107 Stat. 578.)

AMENDMENTS

1993—Subsec. (a). Pub. L. 103–66, § 13503(a)(2), inserted '', on or after October 1, 1995,'' after ''October 1, 1992'' in concluding provisions.

Subsec. (b). Pub. L. 103–66, § 13503(a)(3)(A), substituted ''Secretary may not recognize'' for ''Secretary shall recognize'' and a period for ''(as determined by the Secretary) resulting from the reimbursement principles under this subchapter, notwithstanding the limits set forth in paragraph (3) or (4) of subsection (a) of this section.''

1990—Subsec. (a). Pub. L. 101–508, § 4008(e)(2), struck out period at end and inserted '', and shall, for cost reporting periods beginning on or after October 1, 1992 and every 2 years thereafter, provide for an update to the per diem cost limits described in this subsection''.

Subsec. (d)(1). Pub. L. 101–508, § 4008(h)(2)(A)(ii), substituted ''(including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this subchapter) and capital-related costs'' for ''(and capital-related costs)''.

1987—Subsec. (d)(7). Pub. L. 100–203 added par. (7).

1986—Subsec. (b). Pub. L. 99–272, § 9219(b)(1)(C), substituted ''notwithstanding'' for ''nothwithstanding''.

Subsec. (c). Pub. L. 99–272, § 9126(b), inserted provision requiring the Secretary to publish data and criteria to be used for purposes of this subsection on an annual basis.

Subsec. (d). Pub. L. 99–272, § 9126(a), added subsec. (d).

Subsec. (d)(1). Pub. L. 99–514, § 1895(b)(7)(A), substituted ''cost reporting period'' for ''fiscal year'' in five places.

Subsec. (d)(4). Pub. L. 99–514, § 1895(b)(7)(B), substituted ''cost reporting periods beginning in a fiscal year'' for ''each fiscal year'' and ''cost reporting period no later than 30 days before the beginning of that period'' for ''fiscal year within 60 days after the Secretary establishes the final prospective payment amounts for such fiscal year''.

EFFECTIVE DATE OF 1993 AMENDMENT

Section 13503(a)(3)(B) of Pub. L. 103–66 provided that: ''The amendments made by subparagraph (A) [amending this section] shall apply to cost reporting periods beginning on or after October 1, 1993.''

EFFECTIVE DATE OF 1990 AMENDMENT

Section 4008(e)(3) of Pub. L. 101–508 provided that: ''The amendments made by paragraphs (1) and (2) [amending this section and provisions set out as a note below] shall take effect as if included in the enactment of the Omnibus Budget Reconciliation Act of 1989 [Pub. L. 101–239].''

Amendment by section 4008(h)(2)(A)(ii) of Pub. L. 101–508 effective as if included in the enactment of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, see section 4008(h)(2)(P) of Pub. L. 101–508, set out as a note under section 1395i–3 of this title.

EFFECTIVE DATE OF 1987 AMENDMENT

Amendment by Pub. L. 100–203 applicable to services furnished on or after Oct. 1, 1990, without regard to whether regulations implementing such amendment are promulgated by such date, except as otherwise specifically provided in section 1395i–3 of this title, see section 4204(a) of Pub. L. 100–203, as amended, set out as an Effective Date note under section 1395i–3 of this title.

EFFECTIVE DATE OF 1986 AMENDMENTS

Section 1895(b)(7)(D) of Pub. L. 99–514 provided that: ''The amendments made by subparagraphs (A) and (B) [amending this section] apply to cost reporting periods beginning on or after October 1, 1986.''

Amendment by section 9219(b)(1)(C) of Pub. L. 99–272 effective as if originally included in the Deficit Reduction Act of 1984, Pub. L. 98–369, see section 9219(b)(1)(D) of Pub. L. 99–272, set out as a note under section 1395u of this title.

Section 9126(d) of Pub. L. 99–272, as amended by Pub. L. 99–514, title XVIII, § 1895(b)(7)(C), Oct. 22, 1986, 100 Stat. 2933, provided that:

''(1) The amendment made by subsection (a) [amending this section] shall apply to cost reporting periods beginning on or after October 1, 1986.

''(2) The amendment made by subsection (b) [amending this section] shall become effective on the date of the enactment of this Act [Apr. 7, 1986].''

EFFECTIVE DATE

Section 2319(c) of Pub. L. 98–369 provided that: ''The amendments made by subsections (a) [amending section 1395v of this title] and (b) [enacting this section] shall apply to cost reporting periods beginning on or after July 1, 1984.''

CONSTRUCTION OF WAGE INDEX FOR SKILLED NURSING
FACILITIES

Pub. L. 103–432, title I, § 106(a), Oct. 31, 1994, 108 Stat. 4405, provided that: ''Not later than 1 year after the date of the enactment of this Act [Oct. 31, 1994], the Secretary of Health and Human Services shall begin to collect data on employee compensation and paid hours of employment in skilled nursing facilities for the purpose of constructing a skilled nursing facility wage index adjustment to the routine service cost limits required under section 1888(a)(4) of the Social Security Act [subsec. (a)(4) of this section].''

NO CHANGE IN LIMITS ON PER DIEM SERVICE COSTS
FOR EXTENDED CARE SERVICES FOR FISCAL YEARS
1994 AND 1995

Section 13503(a)(1) of Pub. L. 103–66 provided that: ''The Secretary of Health and Human Services may not

provide for any change in the limits on per diem routine service costs for extended care services under section 1888 of the Social Security Act [this section] for cost reporting periods beginning during fiscal years 1994 and 1995, except as may be necessary to take into account the amendments made by paragraph (3)(A) [amending this section]. The effect of the preceding sentence shall not be considered by the Secretary in making adjustments pursuant to section 1888(c) of such Act to the payment limits for such services during such fiscal years.''

### NO CHANGE IN PROSPECTIVE PAYMENTS FOR SERVICES FURNISHED DURING FISCAL YEARS 1994 AND 1995

Section 13503(b) of Pub. L. 103–66 provided that: ''The Secretary of Health and Human Services may not change the amount of any prospective payment paid to a skilled nursing facility under section 1888(d) of the Social Security Act [subsec. (d) of this section] for services furnished during cost reporting periods beginning during fiscal years 1994 and 1995, except as may be necessary to take into account the amendment made by subsection (c)(1)(A) [amending section 1395x of this title].''

### PROSPECTIVE PAYMENT SYSTEM FOR SKILLED NURSING FACILITY SERVICES

Section 4008(k) of Pub. L. 101–508 provided that:
''(1) DEVELOPMENT OF PROPOSAL.—The Secretary of Health and Human Services shall develop a proposal to modify the current system under which skilled nursing facilities receive payment for extended care services under part A [part A of this subchapter] of the medicare program or a proposal to replace such system with a system under which such payments would be made on the basis of prospectively determined rates. In developing any proposal under this paragraph to replace the current system with a prospective payment system, the Secretary shall—
''(A) take into consideration the need to provide for appropriate limits on increases in expenditures under the medicare program without jeopardizing access to extended care services for individuals unable to care for themselves;
''(B) provide for adjustments to prospectively determined rates to account for changes in a facility's case mix, volume of cases, and the development of new technologies and standards of medical practice;
''(C) take into consideration the need to increase the payment otherwise made under such system in the case of services provided to patients whose length of stay or costs of treatment greatly exceed the length of stay or cost of treatment provided for under the applicable prospectively determined payment rate;
''(D) take into consideration the need to adjust payments under the system to take into account factors such as a disproportionate share of low-income patients, differences in wages and wage-related costs among facilities located in various geographic areas, and other factors the Secretary considers appropriate; and
''(E) take into consideration the appropriateness of classifying patients and payments upon functional disability, cognitive impairment, and other patient characteristics.
''(2) REPORTS.—(A) By not later than April 1, 1991, the Secretary (acting through the Administrator of the Health Care Financing Administration) shall submit any research studies to be used in developing the proposal under paragraph (1) to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives.
''(B) By not later than September 1, 1991, the Secretary shall submit the proposal developed under paragraph (1) to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives.
''(C) By not later than March 1, 1992, the Prospective Payment Assessment Commission shall submit an analysis of and comments on the proposal developed under paragraph (1) to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives.''

### USE OF MORE RECENT DATA REGARDING ROUTINE SERVICE COSTS OF SKILLED NURSING FACILITIES

Pub. L. 101–239, title VI, § 6024, Dec. 19, 1989, 103 Stat. 2167, as amended by Pub. L. 101–508, title IV, § 4008(e)(1), Nov. 5, 1990, 104 Stat. 1388–45, provided that: ''The Secretary of Health and Human Services shall determine mean per diem routine service costs for freestanding and hospital based skilled nursing facilities under section 1888(a) of the Social Security Act [subsec. (a) of this section] for cost reporting periods beginning on or after October 1, 1989, in accordance with regulations published by the Secretary that require the use of cost reports submitted by skilled nursing facilities for cost reporting periods beginning not earlier than October 1, 1985. The Secretary shall update such costs under such section for cost reporting periods beginning on or after October 1, 1989, by using cost reports submitted by skilled nursing facilities for cost reporting periods ending not earlier than January 31, 1988, and not later than December 31, 1988.''

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1395x, 1395tt of this title.

## § 1395zz. Repealed. Pub. L. 103–432, title I, § 171(j)(3), Oct. 31, 1994, 108 Stat. 4451

Section, act Aug. 14, 1935, ch. 531, title XVIII, § 1889, as added Nov. 5, 1990, Pub. L. 101–508, title IV, § 4361(a), 104 Stat. 1388–141, related to medicare and medigap information by telephone.

A prior section 1395zz, act Aug. 14, 1935, ch. 531, title XVIII, § 1889, formerly § 1833(f), as added Jan. 2, 1968, Pub. L. 90–248, title I, § 132(b), 81 Stat. 850, and amended Oct. 30, 1972, Pub. L. 92–603, title II, § 245(d), 86 Stat. 1424; Oct. 25, 1977, Pub. L. 95–142, § 16(a), 91 Stat. 1200; renumbered § 1889 and amended July 18, 1984, Pub. L. 98–369, div. B, title III, § 2321(d), 98 Stat. 1084, provided for purchase of durable medical equipment, covering (a) lease-purchase basis or rental and determination by Secretary, (b) waiver of coinsurance amount in purchase of used equipment, (c) reimbursement procedures, and (d) encouragement of lease-purchase basis, prior to repeal by Pub. L. 100–203, title IV, § 4062(d)(5), (e), Dec. 22, 1987, 101 Stat. 1330–109, applicable to covered items (other than oxygen and oxygen equipment) furnished on or after Jan. 1, 1989, and to oxygen and oxygen equipment furnished on or after June 1, 1989.

### EFFECTIVE DATE OF REPEAL

Repeal effective as if included in the enactment of Pub. L. 101–508, see section 171(l) of Pub. L. 103–432, set out as an Effective Date of 1994 Amendment note under section 1395ss of this title.

## § 1395aaa. Transferred

### CODIFICATION

Section, act Aug. 14, 1935, ch. 531, title XVIII, § 1890, as added Aug. 18, 1987, Pub. L. 100–93, § 10, 101 Stat. 696, which related to limitation of liability of beneficiaries with respect to services furnished by excluded individuals and entities, was amended and transferred to section 1862(e)(2) of act Aug. 14, 1935, by Pub. L. 100–360, title IV, § 411(i)(4)(D)(ii), July 1, 1988, 102 Stat. 790, as amended by Pub. L. 100–485, title VI, § 608(d)(24)(C)(ii), Oct. 13, 1988, 102 Stat. 2421, and is classified to section 1395y(e)(2) of this title.

provider, pursuant to § 405.1803 following the close of the provider's cost reporting period, for items and services furnished to beneficiaries for which reimbursement may be made on a reasonable cost basis under Medicare for the period covered by the cost report.

(2) With respect to a hospital that receives payments for inpatient hospital services under the prospective payment system (part 412 of this chapter), the term means a determination of the total amount of payment due the hospital, pursuant to § 405.1803 following the close of the hospital's cost reporting period, under that system for the period covered by the determination.

(3) For purposes of appeal to the Provider Reimbursement Review Board, the term is synonymous with the phrases ''intermediary's final determination'' and ''final determination of the Secretary'', as those phrases are used in section 1878(a) of the Act.

(4) For purposes of § 405.374 concerning claims collection activities, the term does not include an action by HCFA with respect to a compromise of a Medicare overpayment claim, or termination or suspension of collection action on an overpayment claim, against a provider or physician or other supplier.

*Intermediary hearing* means that hearing provided for in § 405.1809.

(b) *General rule*—(1) *Providers.* The principles of reimbursement for determining reasonable cost and prospective payment are contained in parts 413 and 412, respectively, of this chapter. In order to be reimbursed for covered services furnished to Medicare beneficiaries, providers of services are obliged to file cost reports with their intermediaries as specified in § 413.24(f) of this chapter. Where the term ''provider'' appears in this subpart, it includes hospitals paid under the prospective payment system for purposes of applying the appeal procedures described in this subpart to those hospitals.

(2) *Other entities participating in Medicare Part A.* In addition to providers of services whose status as such is indicated in the Act, there are entities (such as health maintenance organizations) that do not meet the statutory test for providers of services, which may also participate in Medicare. These entities are required to file periodic cost reports and are reimbursed on the basis of information furnished in the reports. Although the entities do not qualify for Board review, the rules as set forth in this subpart with respect to intermediary hearings are applicable to the entities to the maximum extent possible, for cost-reporting periods ending on or after December 31, 1971, where the amount of program reimbursement in controversy is at least $1,000.

(c) *Effective dates.* (1) Except as provided in paragraphs (c)(2) and (c)(3) of this section or in § 405.1885(e), this subpart applies to all cost reporting periods ending on or after December 31, 1971, for which reimbursement may be made on a reasonable cost basis.

(2) Sections 405.1835 to 405.1877 apply only to cost reporting periods ending on or after June 30, 1973, for which reimbursement may be made on a reasonable cost basis.

(3) With respect to hospitals under the prospective payment system (see part 412 of this chapter), the appeals procedures in §§ 405.1811 to 405.1877 that apply become applicable with the hospital's first cost reporting period beginning on or after October 1, 1983.

[39 FR 34515, Sept. 26, 1974. Redesignated at 42 FR 52826, Sept. 30, 1977, and amended at 48 FR 39834, Sept. 1, 1983; 48 FR 45773, Oct. 7, 1983; 49 FR 322, Jan. 3, 1984; 49 FR 23013, June 1, 1984; 51 FR 34793, Sept. 30, 1986]

§ **405.1803  Intermediary determination and notice of amount of program reimbursement.**

(a) *General requirement.* Upon receipt of a provider's cost report, or amended cost report where permitted or required, the intermediary must within a reasonable period of time (see § 405.1835(b)), furnish the provider and other parties as appropriate (see § 405.1805) a written notice reflecting the intermediary's determination of the total amount of reimbursement due the provider. The intermediary must include the following information in the notice, as appropriate:

(1) *Reasonable cost.* The notice must—

(i) Explain the intermediary's determination of total program reimbursement due the provider on the basis of

A022

http://heinonline.org/HOL/ViewImageLocal?handle=hein.cfr/cfr1996163&id=96&size=3...     3/28/2014

**Health Care Financing Administration, HHS**                    **§ 405.1807**

reasonable cost for the reporting period covered by the cost report or amended cost report; and

(ii) Relate this determination to the provider's claimed total program reimbursement due the provider for this period.

(2) *Prospective payment.* With respect to a hospital that receives payments for inpatient hospital services under the prospective payment system (see part 412 of this chapter), the intermediary must include in the notice its determination of the total amount of the payments due the hospital under that system for the cost reporting period covered by the notice. The notice must explain (with appropriate use of the applicable money amounts) any difference in the amount determined to be due, and the amounts received by the hospital during the cost reporting period covered by the notice.

(b) *Requirements for intermediary notices.* The intermediary must include in each notice appropriate references to law, regulations, HCFA Rulings, or program instructions to explain why the intermediary's determination of the amount of program reimbursement for the period differs from the amount the provider claimed. The notice must also inform the provider of its right to an intermediary or Board hearing (see §§ 405.1809, 405.1811, 405.1815, 405.1835, and 405.1843) and that the provider must request the hearing within 180 days after the date of the notice.

(c) *Use of notice as basis for recovery of overpayments.* The intermediary's determination as contained in its notice constitutes the basis for making the retroactive adjustment (required by § 413.64(f) of this chapter) to any program payments made to the provider during the period to which the determination applies, including the suspending of further payments to the provider in order to recover, or to aid in the recovery of, any overpayment identified in the determination to have been made to the provider, notwithstanding any request for hearing on the determination the provider may make under § 405.1811 or § 405.1835. Any sus-

pension will remain in effect as specified in § 405.373(a).

[48 FR 39834, Sept. 1, 1983, as amended at 49 FR 322, Jan 3, 1984; 51 FR 34793, Sept. 30, 1986]

### § 405.1804   Matters not subject to administrative and judicial review under prospective payment.

Neither administrative nor judicial review is available for controversies about the following matters:

(a) The determination of the requirement, or the proportional amount, of any budget neutrality adjustment in the prospective payment rates.

(b) The establishment of—

(1) Diagnosis related groups (DRGs);

(2) The methodology for the classification of inpatient discharges within the DRGs; or

(3) Appropriate weighting factors that reflect the relative hospital resources used with respect to discharge within each DRG.

[49 FR 322, Jan. 1, 1984]

### § 405.1805   Parties to intermediary determination.

The parties to the intermediary's determination are the provider and any other entity found by the intermediary to be a related organization of the provider under § 405.17 of this chapter.

[48 FR 39835, Sept. 1, 1983, as amended at 51 FR 34793, Sept. 30, 1986]

### § 405.1807   Effect of intermediary determination.

The determination shall be final and binding on the party or parties to such determination unless:

(a) An intermediary hearing is requested in accordance with § 405.1811 and an intermediary hearing decision rendered in accordance with § 405.1831; or

(b) The intermediary determination is revised in accordance with § 405.1885; or

(c) A Board hearing is requested in accordance with § 405.1835 and a hearing decision rendered pursuant thereto.

87

167–164  O—96——4

A023

and with the general instructions issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the intermediary.

(b) The determination of a fiscal intermediary that no payment may be made under title XVIII of the Act for any expense incurred for items and services furnished to an individual because such items and services are excluded from coverage pursuant to section 1862 of the Act, 42 U.S.C. 1395y (see subpart C of this part), shall not be reviewed by the hearing officer(s). Such determination shall be reviewed only in accordance with the applicable provisions of subparts G and H of this part.

### §405.1831 Intermediary hearing decision and notice.

The hearing officer(s) shall, on a timely basis, render a decision in writing based on the evidence in the record; such decision shall constitute the final determination of the intermediary. In such decision, he will cite applicable law, regulations, HCFA Rulings, and general instructions of the Health Care Financing Administration, as well as findings on all the matters in issue at the hearing. A copy of the decision will be mailed to all parties to the hearing at their last known addresses.

### §405.1833 Effect of intermediary hearing decision.

The intermediary hearing decision provided for in §405.1831 shall be final and binding upon all parties to the hearing unless such intermediary determination is revised in accordance with §405.1885.

### §405.1835 Right to Board hearing.

(a) *Criteria.* The provider (but no other individual, entity, or party) has a right to a hearing before the Board about any matter designated in §405.1801(a)(1), if:

(1) An intermediary determination has been made with respect to the provider; and

(2) The provider has filed a written request for a hearing before the Board under the provisions described in §405.1841(a)(1); and

(3) The amount in controversy (as determined in §405.1839(a)) is $10,000 or more.

(b) *Prospective payment exceptions.* Except with respect to matters for which administrative or judicial review is not permitted as specified in §405.1804, hospitals that are paid under the prospective payment system are entitled to hearings before the Board under this section if they otherwise meet the criteria described in paragraph (a) of this section.

(c) *Right to hearing based on late intermediary determination about reasonable cost.* Notwithstanding the provisions of paragraph (a)(1) of this section, the provider also has a right to a hearing before the Board if an intermediary's determination concerning the amount of reasonable cost reimbursement due a provider is not rendered within 12 months after receipt by the intermediary of a provider's perfected cost report or amended cost report (as permitted or as required to furnish sufficient data for purposes of making such determination—see §405.1803(a)) provided such delay was not occasioned by the fault of the provider.

[48 FR 39835, Sept. 1, 1983]

### §405.1837 Group appeal.

(a) *Criteria for group appeals.* Subject to paragraph (b) of this section, a group of providers may bring an appeal before the Board but only if—

(1) Each provider in the group is identified as one which would, upon the filing of a request for a hearing before the Board, but without regard to the $10,000 amount in controversy requirement, be entitled to a hearing under §405.1835;

(2) The matters at issue involve a common question of fact or of interpretation of law, regulations or HCFA Rulings; and

(3) The amount in controversy is, in the aggregate, $50,000 or more.

(b) *Providers under common ownership or control.* Effective April 20, 1983, any appeal filed by providers that are under common ownership or control must be brought by the providers as a group appeal in accordance with the provisions of paragraph (a) of this section with respect to any matters involving an issue common to the providers and for which

A024

USCA Case #13-5370    Document #1486516    Filed: 04/01/2014    Page 87 of 91

**Health Care Financing Administration, HHS** §405.1841

the amount in controversy is, in the aggregate, $50,000 or more (see §405.1841(a)(2)). A single provider involved in a group appeal that also wishes to appeal issues that are not common to the other providers in the group must file a separate hearing request (see §405.1841(a)(1)) and must separately meet the requirements in §405.1811 or §405.1835, as applicable.

[48 FR 39836, Sept. 1, 1983]

**§405.1839  Amount in controversy.**

(a) *Single appeals.* The $1,000 amount in controversy required under §405.1809 for an intermediary hearing and the $10,000 amount in controversy required under §405.1835 for a Board hearing is, as applicable to the matters for which the provider has requested a hearing, the combined total of the amounts computed as follows:

(1) *Providers under prospective payment.* For providers that are paid under the prospective payment system, by deducting—

(i) The total of the payment due the provider on other than a reasonable cost basis under the prospective payment system from the total amount that would be payable after a recomputation that takes into account any exclusion, exception, adjustment, or additional payment denied the provider under part 412 of this chapter, as applicable;

(ii) The total of the payment due the provider on a reasonable cost basis under the prospective payment system from the total reimbursable costs claimed by the provider; and

(iii) The adjusted total reimbursable costs due the provider on a reasonable cost basis under other than the prospective payment system from the total reimbursable costs claimed by the provider.

(2) *Providers not under prospective payment.* For providers that are not paid under the prospective payment system, by deducting the adjusted total reimbursable program costs due the provider on a reasonable cost basis from the total reimbursable costs claimed by the provider.

(b) *Group appeals.* The $50,000 amount in controversy required under §405.1837 for group appeals to the Board is, as applicable to the common matters for which the group of providers have requested a hearing, the combined total of the amounts computed as follows:

(1) *Providers under prospective payment.* For providers that are paid under the prospective payment system, by deducting—

(i) The total of the payment due the providers (in the aggregate) on other than a reasonable cost basis under the prospective payment system from the total amount that would be payable to the providers (in the aggregate) after a recomputation that takes into account any applicable exception, exclusion, adjustment, or additional payment denied the providers under part 412 of this chapter.

(ii) The total of the payment due the providers (in the aggregate) on a reasonable cost basis under the prospective payment system from the total reimbursable costs claimed in the aggregate by the providers; and

(iii) The adjusted total reimbursable costs due the providers (in the aggregate) on a reasonable cost basis under other than the prospective payment system from the total reimbursable costs claimed in the aggregate by the providers.

(2) *Providers not under prospective payment.* For providers that are not paid under the prospective payment system, by deducting the adjusted total reimbursable program costs due the providers (in the aggregate) on a reasonable cost basis from the total reimbursable costs claimed in the aggregate by the providers.

[49 FR 323, Jan. 3, 1984]

**§405.1841  Time, place, form, and content of request for Board hearing.**

(a) *General requirements.* (1) The request for a Board hearing must be filed in writing with the Board within 180 days of the date the notice of the intermediary's determination was mailed to the provider or, where notice of the determination was not timely rendered, within 180 days after the expiration of the period specified in §405.1835(c). Such request for Board hearing must identify the aspects of the determination with which the provider is dissatisfied, explain why the provider believes the determination is incorrect in such particulars, and be

91

accompanied by any documenting evidence the provider considers necessary to support its position. Prior to the commencement of the hearing proceedings, the provider may identify in writing additional aspects of the intermediary's determination with which it is dissatisfied and furnish any documentary evidence in support thereof.

(2) Effective April 20, 1983, any request for a Board hearing by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group appeal (see § 405.1837(b)) with respect to any matters at issue involving a question of fact or of interpretation of law, regulations, or HCFA Rulings common to the providers and for which the amount in controversy is $50,000 or more in the aggregate. If a group appeal is filed, the provider seeking the appeal must be separately identified in the request for hearing, which must be prepared and filed consistently with the requirements of paragraph (a)(1) of this section.

(b) *Extension of time limit for good cause.* A request for a Board hearing filed after the time limit prescribed in paragraph (a) of this section shall be dismissed by the Board, except that for good cause shown, the time limit may be extended. However, no such extension shall be granted by the Board if such request is filed more than 3 years after the date the notice of the intermediary's determination is mailed to the provider.

[48 FR 39836, Sept. 1, 1983, as amended at 51 FR 34793, Sept. 30, 1986]

### § 405.1842   Expediting Board proceedings.

(a) *Basis and purpose.* This section implements section 1878(f)(1) of the Social Security Act, as amended by section 955 of Public Law 96–499 (42 U.S.C. 1395oo(f)(1)). The amendment provides an opportunity for providers to obtain expedited administrative review when the Board determines that it does not have the authority to decide a question of law, regulation, or HCFA Ruling relevant to the case (see § 405.1867).

(b) *Basic rule.* (1) Except as provided in paragraph (b)(4) of this section, a provider may submit a written request

to the Board, with supporting documentation, to determine whether the Board has the authority to decide a question of law, regulations, or HCFA Rulings relevant to and controlling upon an issue to be reviewed by the Board. The Board is required to make an expedited review determination in writing, either denying or granting the request, within 30 days after the date of receipt of the request, as defined in paragraph (1) of this section. The Board may also issue a determination on its own motion that it lacks authority to decide a question of law, regulations or HCFA Rulings.

(2) The Board must determine that the provider (including each provider in a group appeal) is entitled to a hearing under section 1878(a) of the Act before making the determination described in paragraph (b)(1) of this section. Thus, the provider must file (or have already filed) a written request for a Board hearing that meets the requirements in § 405.1841. The information and documentation required with respect to the filing of a request for a hearing is used by the Board to determine jurisdiction under section 1878(a) of the Act.

(3) A provider's request for an expedited review determination cannot be considered to be filed with the Board, nor can the 30-day time period during which the Board is required to make an expedited review determination begin, until such time as the Board accepts jurisdiction of the case.

(4) Proceedings conducted by the Board under an authority other than section 1878(a) of the Act and §§ 405.1835 through 405.1873 of this subpart are not hearings for purposes of this section and are not subject to the expedited Board proceedings set forth in this section. For example, proceedings concerning reimbursement for capital expenditures conducted under section 1122(f) of the Act and § 405.1890 of this subpart are not hearings for purposes of this section. (Section 1122(f) specifically bars any administrative or judicial review.)

(c) *"Own motion" review.* If the Board is considering issuing a determination

92

(h) *Waiver of full or simplified cost reporting for low program utilization.* (1) If the provider has had low utilization of covered services by Medicare beneficiaries (as determined by the intermediary) and has received correspondingly low interim payments for the cost reporting period, the intermediary may waive a full cost report or the simplified cost report described in § 413.321 if it decides that it can determine, without a full or simplified report, the reasonable cost of covered services provided during that period.

(2) If a full or simplified cost report is waived, the provider must submit within the same time period required for full or simplified cost reports:

(i) The cost reporting forms prescribed by HCFA for this situation; and

(ii) Any other financial and statistical data the intermediary requires.

[51 FR 34793, Sept. 30, 1986, as amended at 57 FR 39829, Sept. 1, 1992; 59 FR 26964, May 25, 1994; 60 FR 33125, 33136, 33143, June 27, 1995; 60 FR 37594, July 21, 1995]

## Subpart C—Limits on Cost Reimbursement

### § 413.30 Limitations on reimbursable costs.

(a) *Introduction.* (1) *Scope.* This section implements section 1861(v)(1)(A) of the Act, by setting forth the general rules under which HCFA may establish limits on provider costs recognized as reasonable in determining Medicare program payments, and sections 1861(v)(7)(B) and 1886(a) of the Act, by setting forth the general rules under which HCFA may establish limits on the operating costs of inpatient hospital services that are recognized as reasonable in determining Medicare program payments. (For cost reporting periods beginning on or after October 1, 1983, the operating costs incurred in furnishing inpatient hospital services are not subject to the provisions of this section.) This section also sets forth rules governing exemptions, exceptions, and adjustments to limits established under this section that HCFA may make as appropriate in consideration of special needs or situations of particular providers.

(2) *General principle.* Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for the efficient delivery of needed health services. HCFA may establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups of items or services. These limits will be imposed prospectively and may be calculated on a per admission, per discharge, per diem, per visit, or other basis.

(b) *Procedure for establishing limits.* (1) In establishing limits under this section, HCFA may classify providers by type of provider (for example, hospitals, SNFs, and HHAs) and by other factors HCFA finds appropriate and practical, including—

(i) Type of services furnished;

(ii) Geographical area where services are furnished, allowing for grouping of noncontiguous areas having similar demographic and economic characteristics;

(iii) Size of institution;

(iv) Nature and mix of services furnished; or

(v) Type and mix of patients treated.

(2) Estimates of the costs necessary for efficient delivery of health services may be based on cost reports or other data providing indicators of current costs. Current and past period data will be adjusted to arrive at estimated costs for the prospective periods to which limits are being applied.

(3) Prior to the beginning of a cost period to which revised limits will be applied, HCFA will publish a notice in the FEDERAL REGISTER, establishing cost limits and explaining the basis on which they were calculated.

(4) In establishing limits under paragraph (b)(1) of this section, HCFA may find it inappropriate to apply particular limits to a class of providers due to the characteristics of the provider class, the data on which those limits are based, or the method by which the limits are determined. In such cases, HCFA may exclude that class of providers from the limits, explaining the basis of the exclusion in the notice setting forth the limits for the appropriate cost reporting periods.

373

A027

USCA Case #13-5370     Document #1486516     Filed: 04/01/2014     Page 90 of 91

(c) *Provider requests regarding applicability of cost limits.* A provider may request a reclassification, exception, or exemption from the cost limits imposed under this section. In addition, a hospital may request an adjustment to the cost limits imposed under this section. The provider's request must be made to its fiscal intermediary within 180 days of the date on the intermediary's notice of program reimbursement. The intermediary makes a recommendation on the provider's request to HCFA, which makes the decision. HCFA responds to the request within 180 days from the date HCFA receives the request from the intermediary. The intermediary notifies the provider of HCFA's decision. The time required for HCFA to review the request is considered good cause for the granting of an extension of the time limit to apply for a Board review, as specified in §405.1841 of this chapter. HCFA's decision is subject to review under subpart R of part 405 of this chapter.

(d) *Reclassification.* A provider may obtain a reclassification if it can show that its classification is at variance with the criteria specified in promulgating the limits.

(e) *Exemptions.* Exemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years. An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

(f) *Exceptions.* Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

(1) *Atypical services.* The provider can show that the—

(i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

(ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

(2) *Extraordinary circumstances.* The provider can show that it incurred higher costs due to extraordinary circumstances beyond its control. These circumstances include, but are not limited to, strikes, fire, earthquake, flood, or similar unusual occurrences with substantial cost effects.

(3) *Providers in areas with fluctuating populations.* (i) The provider is located in an area (for example, a resort area) that has a population that varies significantly during the year;

(ii) The appropriate health planning agency has determined that the area does not have a surplus of beds and similar services and has certified that the beds and services made available by the provider are necessary; and

(iii) The provider meets occupancy standards established by the Secretary.

(4) *Medical and paramedical education.* The provider can demonstrate that, if compared to other providers in its group, it incurs increased costs for items or services covered by limits under this section because of its operation of an approved education program specified in §413.85.

(5) *Unusual labor costs.* The provider has a percentage of labor costs that varies more than 10 percent from that included in the promulgation of the limits.

(g) *Operational review of providers receiving an exception.* Any provider that applies for an exception to the limits established under paragraph (f) of this section must agree to an operational review at the discretion of HCFA. The findings from any such review may be the basis for recommendations for improvements in the efficiency and economy of the provider's operations. If such recommendations are made, any future exceptions shall be contingent

374

A028

USCA Case #13-5370      Document #1486516          Filed: 04/01/2014      Page 91 of 91

**Health Care Financing Administration, HHS**                    **§413.35**

on the provider's implementation of these recommendations.

(h) *Adjustments.* For cost reporting periods beginning on or after October 1, 1982 and before October 1, 1983, HCFA may adjust the amount of a hospital's inpatient operating costs to take into account factors that could result in a significant distortion in the operating costs of inpatient hospital services. Such factors could include a decrease in the inpatient services that a hospital provides that are customarily provided directly by similar hospitals, or the manipulation of discharges to increase reimbursement. A decrease in inpatient services could result from changes that include, but are not limited to, such actions as closing a special care unit or changing the arrangements under which such services may be furnished, such as leasing a department.

[51 FR 34793, Sept. 30, 1986, as amended at 52 FR 21225, June 4, 1987; 53 FR 38553, Sept. 30, 1988; 60 FR 45849, Sept. 1, 1995]

## §413.35 Limitations on coverage of costs: Charges to beneficiaries if cost limits are applied to services.

(a) *Principle.* A provider of services that customarily furnishes an individual items or services that are more expensive than the items or services determined to be necessary in the efficient delivery of needed health services described in §413.30, may charge an individual entitled to benefits under Medicare for such more expensive items or services even though not requested by the individual. The charge, however, may not exceed the amount by which the cost of (or, if less, the customary charges for) such more expensive items or services furnished by such provider in the second cost reporting period immediately preceding the cost reporting period in which such charges are imposed exceeds the applicable limit imposed under the provisions of §413.30. This charge may be made only if—

(1) The intermediary determines that the charges have been calculated properly in accordance with the provisions of this section;

(2) The services are not emergency services as defined in paragraph (d) of this section;

(3) The admitting physician has no direct or indirect financial interest in such provider;

(4) HCFA has provided notice to the public through notice in a newspaper of general circulation servicing the provider's locality and such other notice as the Secretary may require, of any charges the provider is authorized to impose on individuals entitled to benefits under Medicare on account of costs in excess of the costs determined to be necessary in the efficient delivery of needed health services under Medicare; and

(5) The provider has, in the manner described in paragraph (e) of this section, identified such charges to such individual or person acting on his behalf as charges to meet the costs in excess of the costs determined to be necessary in the efficient delivery of needed health services under Medicare.

(b) *Provider request to charge beneficiaries for costs in excess of limits.* (1) If a provider's actual costs (or, if less, the customary charges) in the second preceding cost period exceed the prospective limits established for such costs, the intermediary will, at the provider's request, validate in advance the charges that may be made to the beneficiaries for the excess.

(2) If a provider does not have a second preceding cost period and is a new provider as defined in §413.30(e), the provider, subject to validation by the intermediary, will estimate the current cost of the service to which a limit is being applied. Such amount will be adjusted to an amount equivalent to costs in the second preceding year by use of a factor to be developed based on estimates of cost increases during the preceding two years and published by SSA or HCFA. The amount thus derived will be used in lieu of the second preceding cost period amount in determining the charge to the beneficiary.

(3) To obtain consideration of such a request, the provider must submit to the intermediary a statement indicating the chagre for which it is seeking validation and providing the data and method used to determine the amount. Such statement should include the—

(i) Provider's name and number;

375

A029