**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 13-5370

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

CANONSBURG GENERAL HOSPITAL,

Plaintiff-Appellant,

v.

KATHLEEN SEBELIUS,
Secretary, U.S. Department of Health and Human Services,

Defendant-Appellee.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

**INITIAL BRIEF FOR THE APPELLEE**
————————————

STUART F. DELERY
  *Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

MICHAEL S. RAAB
  *(202) 514-4053*
BENJAMIN M. SHULTZ
  *(202) 514-3518*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.  <u>Parties and Amici</u>**.  Plaintiff-appellant is Canonsburg General Hospital.  Defendant-appellee is Kathleen Sebelius, the Secretary of Health and Human Services.  Undersigned counsel is unaware of any amici**.**

**B.  <u>Rulings Under Review</u>**.  Plaintiff appeals from a October 17, 2013 order and judgment of the Honorable Beryl A. Howell of the United States District Court for the District of Columbia.  The district court's opinion is not yet published, but is available on Westlaw at 2013 WL 5658757 (Oct. 17, 2013).  It can be found in the Joint Appendix at pages JA__-__.

**C.  <u>Related Cases</u>**.  This case has not previously been before this court or any other court.  Undersigned counsel is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Benjamin M. Shultz
Benjamin M. Shultz

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF THE ISSUE...............................................................1

PERTINENT STATUTES AND REGULATIONS ..................................2

STATEMENT OF THE CASE ...............................................................2

A.     Statutory And Regulatory Background ..........................................2

B.     Factual Background .........................................................................8

SUMMARY OF ARGUMENT ..............................................................13

STANDARD OF REVIEW....................................................................16

ARGUMENT .........................................................................................17

I.     The District Court Correctly Invoked Issue Preclusion...............17

     A.     The Legal Landscape Has Not Changed So Drastically
        As To Allow Canonsburg To Renew Its *Paralyzed
        Veterans* Argument ..............................................................19

     B.     The District Court Properly Declined To Find That
        Preclusion Had Been Waived.................................................29

     C.     Canonsburg's Policy Arguments Lack Merit.........................39

II.    The District Court Did Not Err In Its Treatment Of A
     Government Report.......................................................................43

CONCLUSION .....................................................................................46

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page**

*Abraham Lincoln Mem'l Hosp. v. Sebelius,*
   698 F.3d 536 (7th Cir. 2012) ............................................................24

*Aguilar v. Attorney General,*
   663 F.3d 692 (3d Cir. 2011) ..............................................................22

*Alaska Professional Hunters Association, Inc. v. FAA,*
   177 F.3d 1030 (D.C. Cir. 1999) ..................................................20, 21

*Am. Med. Int'l, Inc. v. Secretary of HEW,*
   677 F.2d 118 (D.C. Cir. 1981) ..........................................................19

*Apotex, Inc. v. FDA,*
   393 F.3d 210 (D.C. Cir. 2004) ....................................................29, 39

*Appalachian Reg'l Healthcare, Inc. v. Shalala,*
   131 F.3d 1050 (D.C. Cir. 1997) ........................................................31

*Ass'n of Am. R.R. v. Dep't of Transp.,*
   198 F.3d 944 (D.C. Cir. 1999) ..........................................................27

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.,*
   402 U.S. 313 (1971) ..........................................................................18

*Bruszewski v. United States,*
   War Shipping Admin., 181 F.2d 419 (3d Cir. 1950) ........................18

*Canonsburg General Hosp. v. Thompson,*
   2001 WL 36339671 (W.D. Pa. Feb. 28, 2001)* ........................9, 10, 21

*Cellco Partnership v. FCC,*
   357 F.3d 88 (D.C. Cir. 2004) ............................................................45

_____
*Authorities upon which we chiefly rely are marked with asterisks.

*Citizens for a Better Env't v. Gorsuch,*
  718 F.2d 1117 (D.C. Cir. 1983) ........................................................... 40

*Clark-Cowlitz Joint Operating Agency v. FERC,*
  826 F.2d 1074 (D.C. Cir. 1987) ........................................................... 33

*Clodfelter v. Republic of Sudan,*
  720 F.3d 199 (4th Cir. 2013) ............................................................... 17

*Comm'r v. Sunnen,*
  333 U.S. 591 (1948) ............................................................................. 24

*Consol. Edison Co. of N.Y. v. Bodman,*
  449 F.3d 1254 (D.C. Cir. 2006) ........................................................... 38

*CSI Aviation Servs., Inc., v. U.S. Dep't of Transp.,*
  637 F.3d 408 (D.C. Cir. 2011) ............................................................. 35

*Darrell Andrews Trucking, Inc. v. Federal Motor Carrier
  Safety Admin.,* 296 F.3d 1120 (D.C. Cir. 2002) ................................... 27

*Devon Energy Corp. v. Kempthorne,*
  551 F.3d 1030 (D.C. Cir. 2008) ................................................... 25, 26

*Dynaquest Corp. v. U.S. Postal Serv.,*
  242 F.3d 1070 (D.C. Cir. 2001) ........................................................... 19

*Federated Dep't Stores, Inc. v. Moitie,*
  452 U.S. 394 (1981) ..................................................................... 22, 39

*Fletcher v. Jones,*
  105 F.2d 58 (D.C. Cir. 1939) .............................................................. 45

*FLRA v. U.S. Dep't of the Treasury,*
  884 F.2d 1446 (D.C. Cir. 1989) ........................................................... 20

_____

\*Authorities upon which we chiefly rely are marked with asterisks.

*Fort Bend Cmty. Hosp. v. Thompson,*
  2003 WL 25973213 (S.D. Tex., Aug. 26, 2003) ................................... 40

*Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure*
  *Div. of World Color Press, Inc.,*
  843 F.2d 1490 (D.C. Cir. 1988) ..................................................... 19, 21

*High Country Home Health, Inc. v. Thompson,*
  359 F.3d 1307 (10th Cir. 2004) ....................................................... 42

*Howard Young Med. Ctr., Inc. v. Shalala,*
  207 F.3d 437 (7th Cir. 2000) ............................................................ 31

*Hudson v. FAA,*
  192 F.3d 1031 (D.C. Cir. 1999) ........................................................ 27

*In re Quality 89-92 Hospital Based SNF Group Providers,*
  2009 WL 1441591 (Administrator, Mar. 10, 2009) ............................ 27

*LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham,*
  347 F.3d 315 (D.C. Cir. 2003) .......................................................... 45

*Limbach v. Hooven & Allison Co.,*
  466 U.S. 353 (1984) ................................................................... 20, 28

*Manin v. NTSB,*
  627 F.3d 1239 (D.C. Cir. 2011) ........................................................ 35

*Martin v. Dep't of Justice,*
  488 F.3d 446 (D.C. Cir. 2007) .......................................................... 18

*Medcenter One Health Sys. v. Sebelius,*
  635 F.3d 348 (8th Cir. 2011) ............................................................ 31

*Mercy Medical Skilled Nursing Facility v. Thompson,*
  2004 WL 3541332 (D.D.C. May. 14, 2004) ....................................... 26

_____

\*Authorities upon which we chiefly rely are marked with asterisks.

*Miller v. Cal. Speedway Corp.,*
  536 F.3d 1020 (9th Cir. 2008) ............................................................23

*Montana v. United States,*
  440 U.S. 147 (1979)* .............................................................17, 18, 35

*Montefiore Medical Ctr. v. Leavitt,*
  578 F. Supp. 2d 129 (D.D.C. 2008) .....................................................26

*Morgan Stanley Capital Group, Inc. v. Pub. Util. Dist.*
  *No. 1 of Snohomish Cnty.*, 554 U.S. 527 (2008) ............................37, 38

*Morris v. Sullivan,*
  897 F.2d 553 (D.C. Cir. 1990)* ...............................................15, 32, 33

*NLRB v. Wyman-Gordon Co.,*
  394 U.S. 759 (1969) ..............................................................................38

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,*
  117 F.3d 579 (D.C. Cir. 1997) ..................................................9, 14, 20

*Pinnacle Health Hosps. v. Sebelius,*
  681 F.3d 424 (D.C. Cir. 2012) .............................................................16

*Plaut v. Spendthrift Farm, Inc.,*
  514 U.S. 211 (1995) ..............................................................................34

*Poulin v. Bowen,*
  817 F.2d 865 (D.C. Cir. 1987) ..................................................15, 31, 32

*Poulin v. Heckler,*
  591 F. Supp. 1577 (D.D.C. 1984) .........................................................34

*Ramaprakash v. FAA,*
  346 F.3d 1121 (D.C. Cir. 2003) ...........................................................33

_____

*Authorities upon which we chiefly rely are marked with asterisks.

*Ranger Cellular v. FCC*,
 333 F.3d 255 (D.C. Cir. 2003) ..........................................................17

*San Joaquin Cmty. Hosp. v. Thompson*,
 2002 WL 34596496 (E.D. Cal., Aug. 13, 2002) ...................................40

*SBC, Inc. v. FCC*,
 414 F.3d 486 (3d Cir. 2005) ........................................................21, 22

*Sebelius v. Auburn Reg'l Med. Ctr.*,
 133 S. Ct. 817 (2013)..........................................................................42

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943)........................................... 12, 15, 36, 37, 38

*Shea v. Director, Office of Workers' Comp. Programs*,
 929 F.2d 736 (D.C. Cir. 1991)* ....................................................37, 38

*Shell Offshore, Inc. v. Babbitt*,
 238 F.3d 622 (5th Cir. 2001)..............................................................24

*St. Elizabeth's Medical Ctr. of Boston, Inc. v. Thompson*,
 396 F.3d 1228 (D.C. Cir. 2005) ............................................................5

*St. Francis Health Care Centre v. Shalala*,
 205 F.3d 937 (6th Cir. 2000)......................................................9, 21, 40

*St. Luke's Methodist Hospital v. Thompson*,
 315 F.3d 984 (8th Cir. 2003)....................................................29, 31, 40

*Stanton v. District of Columbia Court of Appeals*,
 127 F.3d 72 (D.C. Cir. 1997)* ........................................... 12, 34, 35, 37

*Taylor v. Sturgell*,
 553 U.S. 880 (2008)............................................................................37

_____
*Authorities upon which we chiefly rely are marked with asterisks.

*Threadgill v. Armstrong World Indus., Inc.,*
    928 F.2d 1366 (3d Cir. 1991) .......................................... 29

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994) .......................................... 36

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993) ..................................................... 17

*United States v. Moser,*
    266 U.S. 236 (1924) ..................................................... 18

*United Video, Inc. v. FCC,*
    890 F.2d 1173 (D.C. Cir. 1989) ..................................... 37

*Warder v. Shalala,*
    149 F.3d 73 (1st Cir. 1998) .......................................... 23

**Statutes:**

5 U.S.C. § 706(2)(A) ....................................................... 44

5 U.S.C. § 706(2)(E) ....................................................... 44

28 U.S.C. § 1291 ............................................................. 1

42 U.S.C. § 1395h (2000) .................................................. 6

42 U.S.C. § 1395x(u) ....................................................... 2

42 U.S.C. § 1395x(v)(1)(A) (1982) ...................................... 2

42 U.S.C. § 1395x(v)(1)(E)(i) (1982) ................................... 2

42 U.S.C. § 1395oo(a) ...................................................... 6

---

*Authorities upon which we chiefly rely are marked with asterisks.

42 U.S.C. § 1395oo(f)(1) ........................................................... 1, 7, 8, 9, 23

42 U.S.C. § 1395yy(a) ................................................................... 3, 45

42 U.S.C. § 1395yy(a)(1) ...................................................................... 4

42 U.S.C. § 1395yy(a)(2) ...................................................................... 4

42 U.S.C. § 1395yy(a)(3) ...................................................................... 4

42 U.S.C. § 1395yy(a)(4) ...................................................................... 4

42 U.S.C. § 1395yy(c) ....................................................................... 4, 10

42 U.S.C. § 1395yy(e) ........................................................................... 3

Balanced Budget Act of 1997,
    Pub. L. No. 105-33, § 4432(a), 111 Stat. 251 ................................... 2, 3

Deficit Reduction Act of 1984,
    Pub. L. No. 98-369, § 2319(b), 98 Stat. 494 ........................................ 3

**Regulations:**

42 C.F.R. § 405.1801(b)(1) ....................................................................... 6

42 C.F.R. § 405.1803(a) ............................................................................ 6

42 C.F.R. § 405.1843* ............................................................................ 42

42 C.F.R. § 405.1843(a) ...................................................................... 7, 30

42 C.F.R. § 405.1843(b) ...................................................................... 7, 30

42 C.F.R. § 405.1843(d)(1) ..................................................................... 30

_____

*Authorities upon which we chiefly rely are marked with asterisks.

42 C.F.R. § 405.1875(a) ............................................................ 7

42 C.F.R. § 405.1875(a)(4) ...................................................... 7

42 C.F.R. § 405.1875(c)(3)(i) ................................................... 7

42 C.F.R. § 405.1875(c)(4) ................................................ 7, 30

42 C.F.R. § 405.1875(d) .............................................. 7, 30, 42

42 C.F.R. § 413.20(b) ............................................................. 6

42 C.F.R. § 413.30 ................................................................ 28

42 C.F.R. § 413.30(f) (1994) .............................................. 5, 28

42 C.F.R. § 413.30(f)(1) (1994) ............................................... 5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ...................................................... 1

**Legislative Materials:**

H.R. Rep. No. 98-861 (1984) .................................................. 3

**Other Authorities:**

44 Fed. Reg. 31802 (June 1, 1979) ......................................... 5

44 Fed. Reg. 51542 (Aug. 31, 1979) ....................................... 3

73 Fed. Reg. 30190 (May 23, 2008) ................................. 42, 43

---

*Authorities upon which we chiefly rely are marked with asterisks.

Brief for Respondents, *SBC, Inc. v. FCC*, 414 F.3d 486  (3d Cir. 2005)
(No. 03-4311), *available at* http://transition.fcc.gov/ogc/
briefs/03-4311_031804.pdf (last visited May 9, 2014) .......................21

Restatement (Second) of Judgments § 28............................ 19, 23, 24, 41

U.S. Dep't of Health & Human Servs., *Office of the Secretary
Staff Divisions*, http://www.hhs.gov/about/foa/
osleadership/index.html ....................................................................43

U.S. Dep't of Health & Human Servs., *Operating Divisions*,
http://www.hhs.gov/about/foa/opdivs/index.html...............................43

---

*Authorities upon which we chiefly rely are marked with asterisks.

## GLOSSARY

| | |
|---|---|
| Administrator | Administrator of the Centers for Medicare and Medicaid Services |
| Board | Provider Reimbursement Review Board |
| Canonsburg | Canonsburg General Hospital |
| HHS | Department of Health and Human Services |
| Manual | Provider Reimbursement Manual |
| Medicare Program | Centers for Medicare and Medicaid Services |

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 42 U.S.C. § 1395oo(f)(1).

Final judgment entered on October 17, 2013, DE36, JA__,[1] and plaintiff

filed a timely notice of appeal on December 16, 2013, *see* DE37, JA__;

Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C.

§ 1291.

## STATEMENT OF THE ISSUE

Plaintiff is a Medicare provider.  For several different years,

plaintiff's costs exceeded a reimbursement limit.  Medicare partially

denied requests for reimbursement beyond that limit, and plaintiff

unsuccessfully challenged those denials in district court.  Thereafter,

plaintiff brought the same challenge in a different district, for a later

year.  The questions presented are:

1.  Whether the legal landscape has changed so significantly that

the government cannot invoke issue preclusion.

---

[1] Citations to the numbered district court docket entries are abbreviated "DE__."  Citations to pages in the Joint Appendix are abbreviated "JA__."  Citations to pages in the Administrative Record are abbreviated "AR__."

2.  Whether the Department of Health and Human Services "waived" issue preclusion as a defense when it was not invoked during an administrative proceeding to which it was not a party.

3.  Whether the district court properly inferred that a draft public report was shared with Congress, after that conclusion was reached in the agency decision under review.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are included in the addendum.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

*1.  Cost Limits For Skilled Nursing Facilities*

Medicare makes payments to various "Skilled Nursing Facilities." 42 U.S.C. § 1395x(u).  At the times relevant to this appeal, these facilities were reimbursed for their "reasonable costs," which could not include "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A), (E)(i) (1982).[2]  Regulations promulgated by the Secretary of Health and

---

[2] In 1997, Congress eliminated the cost-based reimbursement system for these facilities.  *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4432(a), 111 Stat. 251, 414 (codified at 42 U.S.C.

Human Services (HHS) helped define when a facility's costs were "reasonable." *See, e.g.*, 44 Fed. Reg. 51542 (Aug. 31, 1979).

Congress enacted additional restrictions as part of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 2319(b), 98 Stat. 494, 1082-83 (codified as amended at 42 U.S.C. § 1395yy(a)). Under that statute, facilities were classified along two dimensions: whether they were "hospital-based" or "freestanding," and whether they were "urban" or "rural." *See* 42 U.S.C. § 1395yy(a). This resulted in four possible groups (urban freestanding, rural freestanding, urban hospital-based, and rural hospital-based). Each group had its own limit on the routine costs eligible for reimbursement. *Id.*

At the time Congress imposed these classifications, it understood that "the operating costs of hospital-based facilities were typically much higher than those of" their freestanding counterparts. H.R. Rep. No. 98-861, at 1295 (1984). While the reasons for this difference were subject to debate, contemporary studies attributed about 50 percent of the disparity to inefficiencies at hospital-based facilities. *See* DE28-10 at 27, JA__ (report to Congress) (citing two studies from 1984, which

§ 1395yy(e)). The amendment only applies to cost-reporting periods that begin on or after July 1, 1998. *Id.* § 4432(d).

3

showed that other factors explained only 50 percent and 43 percent of the difference, respectively); *see also* DE28-13 at 17, 28, JA__, __.

Consistent with those study results, the Deficit Reduction Act imposed cost limits that treated 50 percent of the difference as legally significant. Freestanding facilities could be reimbursed up to 112 percent of the average costs in their group. *See* 42 U.S.C. § 1395yy(a)(1)-(2). But hospital-based facilities faced a limit equal to the limit for geographically-similar freestanding facilities, plus 50 percent of the difference between that figure and 112 percent of the average costs for geographically similar hospital-based facilities. *Id.* § 1395yy(a)(3)-(4). By way of example, this meant that if the limit for urban freestanding facilities was $100, while 112 percent of the average costs for urban hospital-based facilities totaled $150, the ultimate limit for the latter group would be $100 + .5($150 - $100), which equals $125.

At the same time it enacted these limits, Congress declared that HHS "may" make adjustments to these limits "to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility." *Id.* § 1395yy(c). Congress did not specify any particular methodology for granting such exceptions. *Id.*

4

HHS partially wielded this discretion through a regulation codified at 42 C.F.R. § 413.30(f)(1) (1994); *see also* 44 Fed. Reg. 31802, 31802-03 (June 1, 1979) (original promulgation). Known as the "atypical services" exception, this regulation stated that the applicable cost limits "may" be adjusted if the provider could show that (1) it furnished services that were "atypical in nature and scope" compared to its peers, and (2) those services were "necessary in the efficient delivery of needed healthcare" to patients with special needs. 42 C.F.R. § 413.30(f)(1) (1994). The regulation additionally explained that any adjustments would be made "only to the extent the costs are reasonable." *Id.* § 413.30(f).

2. For many years, HHS has maintained "a compilation of interpretative rules" known as the Provider Reimbursement Manual ("Manual"). *St. Elizabeth's Medical Ctr. of Boston, Inc. v. Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005). In 1994, HHS added a new provision to the Manual known as Section 2534.5, which was to be used "[i]n determining reasonable cost . . . in excess of the cost limit." DE28-1 at 1, 9-10, JA__, __-__. Relevant here, Section 2534.5 explained that if a facility wanted to obtain an adjustment to its cost limits, such

5

adjustments would be applied "to 112 percent of the [relevant] group's mean" cost.  DE28-1 at 10, JA__.  In effect, this understanding of "reasonable cost" precluded hospital-based facilities from obtaining an atypical services exception for the amount between its cost limit and the relevant 112 percent figure.  That paralleled the same gap that Congress had written into law in 1984, in the face of evidence that the gap was merited due to inefficiencies among hospital-based facilities.

   2.  *Provider Disputes And Appeals*

   Much of the Medicare program is administered with the assistance of private contractors, once known as fiscal intermediaries. 42 U.S.C. § 1395h (2000).  To receive payment, Skilled Nursing Facilities must send their intermediary an annual cost report.  42 C.F.R. §§ 405.1801(b)(1), 413.20(b).  The intermediary then generates a final "determination" of the total reimbursement due for the relevant fiscal period.  *Id.* § 405.1803(a).

   If the provider is dissatisfied with this determination, and meets other jurisdictional requirements, the provider can request a hearing before the Provider Reimbursement Review Board ("Board").  42 U.S.C. § 1395oo(a).  The provider and its intermediary are the parties to such a

6

hearing.  42 C.F.R. § 405.1843(a).  Regulations further specify that "[n]either the Secretary nor [the Medicare Program][3] may be made a party to the proceedings in a Board appeal."  *Id.* § 405.1843(b).

Once the Board issues a decision, that decision is final "unless the Secretary" issues her own decision within 60 days.  42 U.S.C. § 1395oo(f)(1).  The power to issue such a decision has been delegated to the Medicare Program's Administrator.  *See* 42 C.F.R. § 405.1875(a). The Medicare Program "may tender written submissions" during the Administrator's review, *id.* § 405.1875(a)(4), but regulations make clear that the Medicare Program is not a "party" at this stage, just as it was not a "party" to the earlier Board proceedings.  *See, e.g.*, *id.* § 405.1875(c)(3)(i) (explaining that notice of review must be sent "to the parties, [the Medicare Program], and any other affected nonparty"); *id.* § 405.1875(c)(4) (explaining that "a party, [the Medicare Program], or . . . another affected nonparty" can offer written submissions); *id.* § 405.1875(d) (barring *ex parte* communications "from any party, [the Medicare Program], or other affected nonparty").

---

[3] We use the shorthand "Medicare Program" to refer to the Centers for Medicare & Medicaid Services; that agency is also known as "CMS," and was formerly called the "Health Care Financing Administration."

After the Administrator issues a decision, a provider can obtain further review in district court. 42 U.S.C. § 1395oo(f)(1). Suit may be filed in either the provider's home district, or in the District of Columbia. *Id.*

## B.    Factual Background

1. Plaintiff Canonsburg General Hospital ("Canonsburg") operates a Skilled Nursing Facility in Pennsylvania that is urban and hospital-based. DE1 at 2, JA__; AR46, JA__. During its first few years of operation, Canonsburg received a special exemption from the applicable cost limits because it was a new provider. DE1 at 9, JA__. Beginning in its fiscal year 1987, however, Canonsburg sought an exception to the applicable cost limits on the theory that it provided "atypical services." DE1 at 9, JA__.

Canonsburg's claims were treated in accordance with Manual Section 2534.5. DE28-7 at 5, JA__. After that treatment was upheld by the Board with regard to fiscal year 1987 (and several ensuing years), Canonsburg filed suit in the Western District of Pennsylvania in February 2000. DE28-2 at 3, JA__; DE28-3 at 3-4, JA__-__. By filing in

that district, Canonsburg elected to forgo its right to sue in the District of Columbia.  *See* 42 U.S.C. § 1395oo(f)(1).

In the Pennsylvania district court, Canonsburg alleged that Manual Section 2534.5 was (1) contrary to the Medicare statute, (2) contrary to the HHS regulation governing atypical services, (3) invalid as a substantive rule promulgated without notice and comment, (4) invalid as an interpretative rule under the doctrine of *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), and (5) otherwise arbitrary and capricious.  *See* DE28-4 at 16-28, JA__-__.

The district court rejected all of Canonsburg's arguments.  *See Canonsburg General Hosp. v. Thompson* ("*Canonsburg I*"), 2001 WL 36339671 (W.D. Pa. Feb. 28, 2001).  In doing so, the court relied heavily on the Sixth Circuit's opinion in *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937 (6th Cir. 2000), which had sustained Section 2534.5 against a similar attack.  *Canonsburg I*, 2001 WL at *4-5.  Canonsburg could have appealed the district court's decision to the Third Circuit, but it declined to do so.  DE28-2 at 3-5, JA__-__.

2.  While its Pennsylvania challenge was still pending with regard to several fiscal years, Canonsburg initiated a materially identical

challenge with regard to yet another year (fiscal 1996).  *See* AR1039-40, JA__-__.  As of mid-2000, Canonsburg's appeal before the Board was fully briefed and awaiting Board action.  AR527, JA__.

For reasons that the record does not fully explain, the Board delayed holding a hearing in this case until April 2009.  AR36, JA__. Shortly before that hearing, Canonsburg tendered an updated position paper that discussed several intervening court decisions on the Manual provision at issue.  *See* AR520, JA__; AR56-88, JA__-__.  The updated filing carefully avoided any mention of Canonsburg's own unsuccessful lawsuit.  *See* AR56-88, JA__-__.

The Board ruled for Canonsburg.  AR41-44, JA__-__.  But the Medicare Administrator (acting through the Acting Deputy Administrator) reversed the Board's decision.  AR2-18, JA__-__.  The Administrator explained that the Manual provision was consistent with the fully discretionary authority given to HHS in 42 U.S.C. § 1395yy(c); that HHS's regulations had never actually required the agency to give any provider a discretionary exception for atypical services; that the Manual provision was a reasonable and appropriate interpretation of what constituted "reasonable" costs; and that the provision did not need

10

to be promulgated through notice and comment rulemaking, even under the *Paralyzed Veterans* line of cases.  AR13-17, JA__-__.

Canonsburg sought review in the District of Columbia.  As it had done in its prior lawsuit, Canonsburg argued that the Manual provision was contrary to the Medicare Act, contrary to the atypical services regulation, improperly adopted without notice and comment rulemaking, and otherwise arbitrary.  *Compare* DE1 at 12-13, JA__-__, *with* DE 28-4 at 16-28, JA__-__.

HHS explained in its answer that issue preclusion barred all of these arguments.  DE10 at 1, JA__.  And it sought summary judgment on this basis (among others).  DE28 at 18-27, JA__-__.

The district court agreed.  It noted that Canonsburg had not contested the fact that it was raising the same issues it had raised in *Canonsburg I*, nor had it disputed that all of those issues were conclusively resolved against it.  DE35 at 11-13, JA__-__.  And while Canonsburg contended that applying the doctrine would be unfair, the district court found that there was nothing unfair about holding the plaintiff to its prior decision to accept the adverse judgment against it without taking an appeal.  Moreover, the court explained, plaintiff had

failed to establish a significant change in law that could overcome

preclusion: two district court decisions, plus a 2005 Third Circuit

opinion that favorably cited *Paralyzed Veterans*, hardly established that

the Pennsylvania district court would have been required to reach a

different outcome if the case had been brought today.  DE35 at 13-24,

JA__-__.  The court further noted that the validity of the Manual

provision "has not been the subject of a ruling by any" authority binding

on it, and was actually the subject of a deep division among various

courts, including a split between the Sixth and Eighth circuits.  DE35 at

23-24, JA__-__.

The district court also rejected the argument that HHS had

"waived" issue preclusion as a defense.  Moreover, even assuming that

HHS *could* have raised the defense during the agency proceedings (a

point the court did not resolve), issue preclusion "protects the interests

of the courts," and hence the district court had power on its own to take

notice of the prior decision and give it preclusive effect.  DE35 at 24-27,

JA__-__ (citing, *inter alia*, *Stanton v. District of Columbia Court of

Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997)).  And while Canonsburg

appealed to the principles expressed in *SEC v. Chenery Corp.*, 318 U.S.

12

80 (1943), that doctrine was inapplicable to a defense like judicial issue preclusion, which was not an issue entrusted to agency expertise or discretion.  DE35 at 27-30, JA__-__.

Finally, the district court rejected Canonsburg's naked appeal to policy considerations, explaining that Canonsburg had misapprehended the interests at stake.  Finding preclusion here would conserve judicial resources, a key focus of the doctrine.  And Canonsburg's invocation of other considerations did not otherwise establish that preclusion should not apply.  DE 35 at 30-32, JA__-__.

## SUMMARY OF ARGUMENT

In 2000, Canonsburg had a full and fair opportunity to litigate every issue that it seeks to advance in this case.  Canonsburg elected to litigate those issues in the Western District of Pennsylvania (even though it was free to choose the District of Columbia as its venue) and the Pennsylvania district court rejected Canonsburg's arguments.

Canonsburg declined to appeal that decision.  Yet now, in an essentially identical case, it is trying to litigate those issues all over again.  The district court correctly held that Canonsburg is foreclosed from doing so.

1.  In seeking to circumvent the prior judgment, Canonsburg contends that its argument under *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), is premised on a significant "change" in the law that qualifies for an exception to general preclusion principles.  But the supposed "change" here is illusory.  The Third Circuit has not adopted the *Paralyzed Veterans* doctrine, and it certainly had not rejected it as of 2001, when Canonsburg declined to appeal the adverse decision against it.  Moreover, if Canonsburg had wanted to be in a Circuit that recognized *Paralyzed Veterans*, it could have brought its original lawsuit in the District of Columbia; no "change" in law rendered that option available in 2009.

In any event, any "change" in Third Circuit law regarding *Paralyzed Veterans* is insufficient to foreclose issue preclusion.  There is a current Circuit split and pending *certiorari* petition regarding the doctrine's validity.  And even if the *Paralyzed Veterans* framework governed the case, HHS would have strong arguments that it acted consistently with that doctrine.

2.  Canonsburg also contends that any preclusion defense was waived when it was not invoked during administrative proceedings.

14

But the Medicare Program was not a party to those proceedings, rendering waiver particularly inappropriate here.  Nor is there any statutory or regulatory provision that required the issue to be raised administratively.  And it is undisputed that HHS complied with Federal Rule of Civil Procedure 8(c).

Against all of this, Canonsburg invokes a highly unusual Social Security case, *Poulin v. Bowen*, 817 F.2d 865 (D.C. Cir. 1987).  That case is distinguishable for a whole host of reasons, including several that this Court has already recognized when cabining the reach of that decision, *see Morris v. Sullivan*, 897 F.2d 553 (D.C. Cir. 1990).  Moreover, unlike in *Poulin*, here the district court invoked its power to raise preclusion notwithstanding any waiver, an invocation reviewed for abuse of discretion.

Canonsburg also invokes *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), arguing that the agency's decision could not be sustained on preclusion grounds if those grounds were not mentioned by the agency.  But *Chenery* does not apply when, as here, the agency's decision can be sustained on a basis that does not intrude on agency discretion or

15

expertise.  Issue preclusion is a question of federal common law, which courts have long been empowered to invoke *sua sponte*.

3.  Canonsburg's remaining arguments lack merit.  Canonsburg's several policy arguments are irrelevant since there is no general policy exception to *res judicata*.  Those arguments are also incorrectly applied to the case at hand, and they mistakenly fault the agency for settlements it made in an attempt to put to rest a waning dispute that should not affect cost years after 1999.  Canonsburg also objects to a sentence in the district court's opinion about a 1985 study, but that sentence has nothing do with issue preclusion.  In any event, the sentence merely paralleled an identical inference the Administrator made below, based on a variety of facts before her, and that finding was entirely reasonable.

## STANDARD OF REVIEW

The district court granted summary judgment to HHS, and this Court's review is thus largely *de novo*.  *Pinnacle Health Hosps. v. Sebelius*, 681 F.3d 424, 426 (D.C. Cir. 2012).  However, when a reviewing court decides to invoke issue preclusion, notwithstanding a party's failure to preserve the issue, that decision is an inherently

16

discretionary action that should be reviewed only for abuse of discretion.  *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 207-08 (4th Cir. 2013); *see also U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445-48 (1993) (appellate court's decision to raise an antecedent issue *sua sponte* is reviewed only for abuse of discretion); *Ranger Cellular v. FCC*, 333 F.3d 255, 261-62 (D.C. Cir. 2003) (invoking *U.S. National Bank*, as an initial reviewing court, to consider an argument not raised during administrative proceedings).

## ARGUMENT

## I.    The District Court Correctly Invoked Issue Preclusion

When an issue is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits" involving the same parties.  *Montana v. United States*, 440 U.S. 147, 153 (1979).  This doctrine of issue preclusion is "central to the purpose for which civil courts have been established," which is the "conclusive resolution of disputes."  *Id.*  The doctrine protects judgment winners "from the expense and vexation attending multiple lawsuits," it helps conserve scarce "judicial resources," and it helps "foster[ ] reliance on judicial action by minimizing the possibility

17

of inconsistent decisions." *Id.* at 153-54. Thus, absent some "'overriding

consideration of fairness,'" "'[b]oth orderliness and reasonable time

saving in judicial administration require" that losing parties be bound

by a losing decision they had a full and fair opportunity to litigate.

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 324-25

(1971) (quoting *Bruszewski v. United States War Shipping Admin.*, 181

F.2d 419, 421 (3d Cir. 1950)).

This Court has articulated three requirements for preclusion to

apply. First, the issue being raised must be the same one the parties

contested and submitted for decision in the earlier case. *Martin v. Dep't

of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007). Second, the issue must

have actually and necessarily been decided by a court with jurisdiction.

*Id.* Finally, preclusion cannot work a "basic unfairness" to the party to

be bound. *Id.* (internal quotation marks omitted).[4]

---

[4] There may also be an exception for "unmixed questions of law."
*United States v. Moser*, 266 U.S. 236, 242 (1924). But at the very least,
that doctrine has no application when the subject matter of the original
action is closely aligned with the subject matter of the latter action.
*Montana*, 440 U.S. at 162-63. That circumstance is plainly present
here—the only material difference between the two suits is the fiscal
year at issue—and Canonsburg has not argued for this exception.

18

The district court found, and Canonsburg does not dispute, that the first two requirements are satisfied for every issue that Canonsburg seeks to litigate in this case.  Rather, Canonsburg contends that the third requirement is not met, with regard to a single issue in its complaint, in light of an alleged change in law.  And it also contends that a preclusion defense must have been advanced during administrative proceedings.  Those arguments are incorrect.

### A.    The Legal Landscape Has Not Changed So Drastically As To Allow Canonsburg To Renew Its *Paralyzed Veterans* Argument

Although issue preclusion applies without regard for the correctness of the original decision, *see Dynaquest Corp. v. U.S. Postal Serv.*, 242 F.3d 1070, 1075 (D.C. Cir. 2001), courts have recognized a narrow exception when there has been a sufficiently momentous change in the "governing law."  *Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988); *see also Am. Med. Int'l, Inc. v. Secretary of HEW*, 677 F.2d 118, 121 (D.C. Cir. 1981) (per curiam) (requiring the change to be "significant" (internal quotation marks omitted)); Restatement (Second) of Judgments § 28, cmt. c.  Usually, the exception is applied to take

19

account of an intervening and controlling Supreme Court decision, or of an agency's change in policy on an issue on which it is entitled to deference. *See, e.g.*, *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 362-63 (1984); *FLRA v. U.S. Dep't of the Treasury*, 884 F.2d 1446, 1456 (D.C. Cir. 1989); *Graphic Comm'cns*, 843 F.2d at 1493.

Canonsburg invokes this exception solely for its *Paralyzed Veterans* argument. Br. 36-44. Canonsburg errs on multiple levels.

1. In *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), and *Alaska Professional Hunters Association, Inc. v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999), this Court concluded that an agency cannot make "a fundamental change in its interpretation" of a regulation without first going through notice and comment rulemaking. *Paralyzed Veterans*, 117 F.3d at 586. Canonsburg invoked that principle in *Canonsburg I*, and it argued that the Manual provision constituted "a substantial change in HHS's long-standing interpretation" of the regulation governing atypical services, triggering notice and comment requirements. Br. 37-38. But the district court in the Pennsylvania case rejected this argument, relying on the Sixth Circuit's dual recognition that administrative agencies "are not bound

20

by" their prior interpretations, and that allegedly new interpretations should be evaluated "without regard" to any shift from a prior construction. *St. Francis*, 205 F.3d at 947 n.11 (internal quotation marks omitted); *see also Canonsburg I*, 2001 WL, at *4-5 (expressly "adopting the reasoning of the *St. Francis* court" and explaining that the Manual provision was "exempt from . . . notice and comment requirements").[5]

Canonsburg seeks to escape this decision by contending that the Third Circuit has since "adopted the *Paralyzed Veterans* analytical framework." Br. 39 (citing *SBC, Inc. v. FCC*, 414 F.3d 486 (3d Cir. 2005)). That is incorrect. Instead, in a case where the agency declined to take issue with the *Paralyzed Veterans* principle in its brief,[6] the Third Circuit simply cited *Paralyzed Veterans* favorably before holding that the agency had never changed its interpretation. *SBC*, 414 F.3d at

---

[5] Thus, although neither the Sixth Circuit nor the Pennsylvania district court cited *Paralyzed Veterans*, both decisions rejected that doctrine's key premise that revision is different from initial interpretation. *See Alaska Hunters*, 177 F.3d at 1033-34 (acknowledging that interpretive rules are ordinarily exempt from notice and comment, but distinguishing situations where a definitive interpretation is later "significantly revise[d]").

[6] *See* Brief for Respondents, *SBC*, 414 F.3d 486 (No. 03-4311), at 26, *available at* http://transition.fcc.gov/ogc/briefs/03-4311_031804.pdf (last visited May 9, 2014).

21

498-501. That favorable citation was entirely unnecessary to the
Court's actual holding, rendering it nonbinding dicta under Third
Circuit precedent. *See, e.g.*, *Aguilar v. Attorney General*, 663 F.3d 692,
699 (3d Cir. 2011).

Furthermore, *SBC* did not overrule any prior Third Circuit
precedent on *Paralyzed Veterans*. If Canonsburg had wished to press
the issue on appeal to the Third Circuit back in 2001, it would have
been free to do so. And it had strong incentives to take an appeal in
*Canonsburg I* since five different cost years were at issue there, and
Canonsburg believed over a million dollars was at stake. *See* DE28-3 at
3, JA__-__. Canonsburg should be held to its litigation decision. *See*
*Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 400-01 (1981)
(refusing to excuse both claim and issue preclusion in a case where
various parties "made a calculated choice to forgo their appeals," yet
later sought to be "the windfall beneficiaries of an appellate reversal
procured by other independent parties").

2. Even if *SBC* had constituted a material break in Third Circuit
precedent, Canonsburg should be held to its decision to file suit in the
Pennsylvania district court. When Canonsburg filed its original case in

February 2000, *see* DE28-2 at 2, JA\_\_, *Paralyzed Veterans* and *Alaska Hunters* were already the law of this Circuit. If Canonsburg preferred to be in a Circuit that recognized *Paralyzed Veterans*, it was free to file its suit in the District of Columbia. *See* 42 U.S.C. § 1395oo(f)(1). Canonsburg cannot now contend that there was a "change" in controlling law when that controlling law was readily available to it at the time it filed suit. And since Canonsburg voluntarily bypassed that law through its venue choice, it is inappropriate for Canonsburg to invoke a preclusion exception, rooted in equitable principles, now that it has buyer's remorse. *See* Restatement (Second) of Judgments § 28, cmt. c (explaining that in the absence of concerns about competitive disadvantage, the exception for change in law aims to avoid "a manifestly *inequitable* administration of the laws" (emphasis added)).

Moreover, the alleged "change" in legal climate is an unstable one. Even apart from *SBC*, a Circuit split currently exists with respect to *Paralyzed Veterans*: the First and Ninth Circuits have rejected the doctrine, while the Fifth Circuit has joined this Court in adopting it. *Compare Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1033 (9th Cir. 2008), *and Warder v. Shalala*, 149 F.3d 73, 81-82 (1st Cir. 1998), *with*

23

*Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 629-30 (5th Cir. 2001).

And the Seventh Circuit has criticized *Paralyzed Veterans*. *See*

*Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 560 (7th Cir.

2012) ("[The doctrine] conflicts with the APA's rulemaking provisions

. . . and is therefore not persuasive.").  The issue is now the subject of a

pending *certiorari* petition filed by the government.  *See* Pet. for a Writ

of Certiorari, *Perez v. Mortgage Bankers Ass'n*, No. 13-1041 (S. Ct.)

(filed Feb. 28, 2014).

Given this split in authority (and potential Supreme Court action)

a preclusion exception would be inappropriate.  The change-in-law

exception is based on avoiding inequity, and ensuring that one litigant

alone does not face a different legal regime than the rest of the country.

*See Comm'r v. Sunnen*, 333 U.S. 591, 599 (1948) (rooting the exception

in the need to avoid "inequalities in the administration" of the law, and

in the desire to prevent "a fertile basis for litigious confusion");

Restatement (Second) of Judgments § 28, cmt. c.  But where

disuniformity persists regardless, it makes no sense to appeal to that

uniformity value to forgive preclusion.  And that is all the more true

when there is a reasonable prospect that the "change" in law might be undone by the Supreme Court.

3.  Nor is it even the case that Canonsburg would necessarily prevail if *Paralyzed Veterans* applies, which makes a preclusion exception even less compelling.  *Paralyzed Veterans* only applies if the agency's original interpretation was "a definitive and binding statement on behalf of the agency . . . from a source with the authority to bind the agency."  *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1040 (D.C. Cir. 2008).  Yet Canonsburg has never identified such an interpretation in this litigation.  Canonsburg states that "for almost 15 years, HHS interpreted" its atypical services regulation to allow full recovery above the cost limits.  Br. 38 n.22; *see also* Br. 7.  But Canonsburg conspicuously fails to cite any actual statement from the agency to that effect (let alone a statement from an official with binding policymaking authority).  Instead, Canonsburg's brief relies exclusively, *see* Br. 7, on the district court's quotation of the Board's flatly incorrect (and unsourced) assertion that this point is "undisputed."  *Compare* AR41, JA__ (Board's assertion), *with* AR13, 15-16, JA__, __-__ (Administrator's decision, which disputed this point).  And the district court decisions in

*Mercy* and *Montefiore* similarly asserted (without adequate citation)

that the Secretary had an established practice of granting the full

exceptions. *See Mercy Medical Skilled Nursing Facility v. Thompson*,

2004 WL 3541332, at *3 (D.D.C. May. 14, 2004) (no source cited);

*Montefiore Medical Ctr. v. Leavitt*, 578 F. Supp. 2d 129, 131, 134

(D.D.C. 2008) (relying on a misreading of an admission, and an

unsourced assertion in the underlying Board decision).[7]

Moreover, as this Court explained in *Devon*, the mere fact that

some agency officials may have acted a certain way for a number of

years is irrelevant in the absence of a definitively stated interpretation.

*Devon*, 551 F.3d at 1040. Thus, even if some agency officials allowed

individual providers to obtain full reimbursement, when requested on

---

[7] The underlying materials cited in *Montefiore* are available in the publicly-filed Joint Appendix in that case. *See* Joint Appendix, *Montefiore Med. Ctr. v. Sebelius*, No. 08-5489 (D.C. Cir.) (filed Sept. 29, 2009), at 44, 91. The fact that HHS actually admitted in the district court, *see id.* at 44, was that for fifteen years HHS "interpreted the regulation to allow reimbursement under the atypical services exception *for all reasonable costs* above the routine cost limitation if a [facility] otherwise met the requirements of 42 C.F.R. § 413.30(f)." *Montefiore* Joint Appendix at 33 (emphasis in original). The italicized language is important, because the Manual provision at issue was always an interpretation of what costs above the limit were "reasonable." Thus, even when applying the Manual provision, HHS believes it is allowing reimbursement for all "reasonable" costs above the limit.

26

an individual basis, such a practice would be insufficient.  In any event, even before the Manual provision was adopted, HHS actually had a documented history of *refusing* to grant exceptions for costs between the cost-limit and the 112 percent figure.  *See In re Quality 89-92 Hospital Based SNF Group Providers*, 2009 WL 1441591, at *9 & nn.20-21 (Administrator, Mar. 10, 2009) (discussing several examples from before 1994)*;* DE32-2 at 2, 3-4, JA__-__ (additional example); DE32-4 at 2-3, JA__-__ (additional example).  This undermines any suggestion that HHS had an "express, direct, and uniform interpretation" before issuing the Manual provision, *Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944, 949 (D.C. Cir. 1999), further establishing the lack of any definitive agency interpretation.  *See also Darrell Andrews Trucking, Inc. v. Federal Motor Carrier Safety Admin.*, 296 F.3d 1120, 1126 (D.C. Cir. 2002) (*Paralyzed Veterans* inapplicable when agency's earlier position was "ambiguous").

In any event, notice and comment is not required if the "new" interpretation is actually just "an application of the regulation to a changed situation which calls for a different policy" rather than "a different interpretation of the regulation." *Hudson v. FAA*, 192 F.3d

27

1031, 1036 (D.C. Cir. 1999).  Here, there is no dispute that the agency has never strayed from its view that 42 C.F.R. § 413.30 requires the provider to show that its claimed costs are reasonable.  To the extent HHS made any change, it was only in the application of that test to a new environment—after enactment of the Deficit Reduction Act of 1984—in which HHS believed that hospital-based facilities have significantly more inefficiencies than their free standing counterparts. *See* AR17, JA__.

By invoking these problems with Canonsburg's merits argument, we are not arguing that Canonsburg can only survive preclusion if it can definitively show that it would prevail on remand.  *Cf. Limbach*, 466 U.S. at 363 (excusing preclusion when intervening Supreme Court case changed the governing legal standard, yet remanding for application of that standard).  Nor do we contend that the Court should resolve the merits of Canonsburg's claim here.  But the serious underlying problems with Canonsburg's arguments underscore that preclusion should not be excused based on nonbinding dicta, from a court of appeals decision, in the context of a significant Circuit split,

and where Canonsburg itself previously opted out of this Court's jurisprudence.

4.  Canonsburg also briefly references the Eighth Circuit's decision in *St. Luke's Methodist Hospital v. Thompson*, 315 F.3d 984 (8th Cir. 2003), and the district court decisions in *Mercy* and *Montefiore*.  But *St. Luke's* (which went into conflict with the earlier Sixth Circuit decision in *St. Francis*) never reached the *Paralyzed Veterans* issue, *see* 315 F.3d at 988-89, and an Eighth Circuit decision would in any event not have been controlling in the Western District of Pennsylvania.  The district court decisions in *Mercy* and *Montefiore* also would not have bound that (or any) court.  *See Apotex, Inc. v. FDA*, 393 F.3d 210, 218 (D.C. Cir. 2004); *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991).  And, in any event, the *Mercy* and *Montefiore* decisions are of minimal significance since those courts, unlike the district court in the Pennsylvania case, were bound to follow *Paralyzed Veterans*.

## B.  The District Court Properly Declined To Find That Preclusion Had Been Waived

Apart from arguing that the requirements for preclusion were not met, Canonsburg separately contends that HHS "waived" the doctrine when it was not raised during administrative proceedings.  Br. 20-28.

29

Unlike its argument for an exception (which applies only to its *Paralyzed Veterans* argument), this argument would allow Canonsburg to litigate all the issues in its complaint. The district court, however, correctly rejected Canonsburg's argument.

1. Canonsburg does not suggest that anything in the Medicare statute, or any implementing regulations, required HHS to raise issue preclusion as a defense at the administrative stage. Nor can it—the Medicare Program is actually *prohibited* from being a party during these administrative proceedings, which are structured as adversarial matters between the provider and its intermediary. *See* 42 C.F.R. § 405.1843(a)-(b). If the Medicare Program wishes to make its views known during administrative proceedings, regulations contemplate it acting in a role akin to an *amicus*. *Id.* § 405.1843(d)(1); *see also id.* § 405.1875(c)(4) (explaining that "a party, [the Medicare Program], or . . . another affected nonparty" can offer written submissions to the Administrator); *id.* § 405.1875(d) (barring *ex parte* communications "from any party, [the Medicare Program], or other affected nonparty"). And that structure is consistent with this Court's recognition that "the intermediary's position" during administrative proceedings "is not the

30

Secretary's." *Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d
1050, 1053 n.4 (D.C. Cir. 1997); *see also Medcenter One Health Sys. v.
Sebelius*, 635 F.3d 348, 350-51 (8th Cir. 2011) (intermediary's
concession before the Board did "not bind HHS, which was not a party"
to the proceeding); *Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d
437, 443 (7th Cir. 2000) (similar).

Furthermore, Canonsburg does not dispute that HHS complied
with Federal Rule of Civil Procedure 8(c)(1), which requires parties to
state affirmative defenses in their responsive pleadings.  HHS's Answer
unambiguously declared, from the beginning, that the government
intended to raise issue preclusion as a defense.  DE10 at 1, JA__.

Without any statute or rule to invoke, Canonsburg relies solely on
this Court's decision in a Social Security case, *Poulin v. Bowen*, 817
F.2d 865 (D.C. Cir. 1987).  Br. 20-28.  But that case is inapplicable for a
host of reasons.

First, *Poulin* is a case in which an Administrative Law Judge
expressly recognized that *res judicata* might be available as a defense,
and yet instead elected to resolve the case on the merits.  817 F.2d at
869.  This Court determined that as a result of such actions, and in the

context of a non-adversarial proceeding with an unrepresented party,

the Administrative Law Judge had effected a "discretionary reopening"

of the original decision under the relevant regulations. *Id.* at 868, 869

& n.31.  And as this Court explained in a later decision, the crucial

point in *Poulin* was that the Administrative Law Judge had "explicitly

noted" the possibility of a *res judicata* defense yet failed to invoke it;

where that fact was absent, there was no reopening. *Morris v. Sullivan*,

897 F.2d 553, 557 n.8 (D.C. Cir. 1990); *see also id.* at 558 (construing

*Poulin* as "applicable only when the agency has clearly stated or

otherwise demonstrated that it has . . . reopened *the original case* on the

merits" (emphasis added)).  In this case by contrast (1) neither the

Board nor the Administrator expressly recognized the possibility of a

preclusion defense; (2) there is no other indication that the Board or

Administrator in any way "reopened" Canonsburg's claims regarding

the cost years at issue in *Canonsburg I*; and (3) the case is governed by

an entirely different regulatory structure than the one at issue in

*Poulin*.

Second, unlike in *Poulin*, *see* 817 F.2d at 869, here HHS

affirmatively raised preclusion as a defense in its Answer.  DE10 at 1,

32

JA__.  Canonsburg treats *Poulin* as though that aspect of the opinion only articulated an alternate ground for decision.  Br. 24.  But this Court appears to have read *Poulin* differently.  *See Morris*, 897 F.2d at 557 n.8 (finding *Poulin* "distinguishable" in a case where the agency "raised *res judicata* in [its] pleadings").

Third, *Poulin* was a case in which the original decision was administrative rather than judicial.  While Canonsburg is correct that there is some overlap between judicial and administrative preclusion, *see* Br. 24-25, this Court has explained that "preclusion principles are to be applied more flexibly to administrative adjudications that to judicial proceedings."  *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1080 n.5 (D.C. Cir. 1987) (en banc).  And since agencies have significant leeway to reconsider their own decisions, *see, e.g.*, *Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003), it makes sense that a court would more readily conclude that an agency has reopened one of its own decisions before it concludes that an agency has reopened an issue that was resolved in an earlier judicial decision.

Fourth and finally, this case is different from *Poulin* in that the district court here expressly concluded that it would *sua sponte* raise

33

preclusion as a defense in the event the agency had administratively waived it. *Compare* DE35 at 26, JA__, *with Poulin v. Heckler*, 591 F. Supp. 1577 (D.D.C. 1984) (*Poulin* district court decision, which never discussed preclusion).

As noted above, *see supra* p. 16-17, such a determination is reviewed only for abuse of discretion. *See also Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997) (explaining that because preclusion "belongs to courts as well as to litigants, even a *party*'s forfeiture" of the defense "does not destroy a *court*'s ability to consider the issue sua sponte"). *Accord Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995). The district court did not abuse its discretion. Preclusion was fully briefed in the district court, ensuring that Canonsburg had a full and fair opportunity to contest it. Moreover, any "waiver" by HHS occurred in an administrative proceeding in which (by regulation) it was not a party, and in which the intermediary's position paper was filed *before* the court issued its 2001 decision in *Canonsburg I. See* AR527, JA__ (papers filed in 2000). And Canonsburg itself arguably shared responsibility in any omission by the intermediary, since it revised its position paper to delete any reference to the earlier

34

litigation.  *Compare* AR 543, JA__ (original position paper, filed in 2000, which noted the then-pending litigation in Pennsylvania), *with* AR57-58, JA__-__ (updated position paper, filed in 2009, which had no mention of this).

It does not matter that, as Canonsburg notes, *Stanton* was a case where the party could still raise preclusion on remand.  This Court merely noted that fact to explain why it did not feel bound by Rule 8(c)(1), *see Stanton*, 127 F.3d at 76-77, and as previously noted neither that Rule, nor any other written requirement, is an obstacle here. Moreover, *Stanton*'s key observation was that preclusion protects the interests of the judiciary itself in addition to the parties' interests, and that point is both valid and supported by Supreme Court case law, *see Montana*, 440 U.S. at 153.  In any event, an initial "waiver" would not prevent the agency from asserting preclusion on remand if it wished to; agencies are regularly given the opportunity on remand to present new bases for decision that were not previously articulated.  *E.g.*, *CSI Aviation Servs., Inc., v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011); *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

Canonsburg's reliance on *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 150 n.1 (D.C. Cir. 1994), is also misplaced. The Court in *Transaero* declined to raise preclusion *sua sponte*. But in *Transaero* (and the cases it cites) the party never raised preclusion in district court and therefore ran afoul of Fed. R. Civ. P. 8(c)(1). Here, HHS undisputedly complied with that requirement, and the district court's discretion was accordingly not cabined by it.

2. In the alternative, Canonsburg invokes *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and its progeny, arguing that the district court could not invoke a preclusion defense that the agency had not invoked. But *Chenery* is not properly extended to this circumstance.

The Supreme Court in *Chenery* explained that the "grounds upon which an administrative order must be judged" are those that the agency articulates. 318 U.S. at 87. But the Court also explained that this rule was rooted in concerns that the judiciary should not intrude on matters entrusted to agency discretion. Thus, "[i]f an order is valid only as a determination of policy or judgment which *the agency alone* is authorized to make and which it has not made," the appellate court cannot sustain the order on alternate grounds. *Id.* at 88 (emphasis

36

added).  Otherwise, the court would be invading "the domain which Congress has exclusively entrusted to an administrative agency."  *Id.*

In light of those principles, *Chenery* is inapplicable when the agency's decision can be sustained on a basis that does not intrude on agency discretion.  *See, e.g.*, *Morgan Stanley Capital Group, Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 544-45 (2008); *Shea v. Director, Office of Workers' Comp. Programs*, 929 F.2d 736, 739 n.4 (D.C. Cir. 1991); *United Video, Inc. v. FCC*, 890 F.2d 1173, 1190 (D.C. Cir. 1989).  And that circumstance describes this case. Preclusion here was a matter of federal common law, *see Taylor v. Sturgell*, 553 U.S. 880, 891 (2008), and HHS had no special discretion or expertise to apply to the issue.

Additionally, and as the district court correctly recognized, *see* DE35 at 28, JA__, issue preclusion "belongs to courts as well as to litigants," *Stanton*, 127 F.3d at 77.  This renders the issue particularly ill-suited for application of the *Chenery* doctrine, which has no role to play when the issue is "within the power of the [judiciary] to formulate." *Shea*, 929 F.2d at 739 n.4 (internal quotation marks omitted).

37

Canonsburg nonetheless observes that the agency alone was authorized to determine the amount of payment due under the Medicare Act.  Br. 30-32.  That is true but beside the point.  Virtually *every* case involving a *Chenery* exception involves some sort of overarching decision entrusted to the agency.  *E.g.*, *Morgan Stanley*, 554 U.S. at 531-32 (Federal Energy Regulatory Commission had to determine if rates were just and reasonable); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 & n.6 (1969) (plurality opinion) (NLRB vested with authority to superintend union election); *Shea*, 929 F.2d at 736-37 (benefit determination entrusted to the Benefits Review Board).  That is why courts properly frame the inquiry as whether the underlying "issue," *Shea*, 929 F.2d at 739 n.4, was entrusted to agency discretion.

In any event, *Chenery* is inapplicable for an additional reason. *Chenery* circumscribes a court's ability to evaluate the "validity" of an administrative order.  *Chenery*, 318 U.S. at 87.  But when a court invokes issue preclusion, it "does not review the merits" of those issues where preclusion applies.  *Consol. Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006).  Thus, when the district court dismissed the case, it did so in an opinion that did not assess the

38

"validity" of the agency's order.  *See* DE35 at 32-33, JA__-__.  And as a result, the district court did not run afoul of *Chenery*.

### C.    Canonsburg's Policy Arguments Lack Merit

1.  Without attempting to tether its arguments to any recognized preclusion exception, Canonsburg advances several policy arguments. Br. 33-36.  But "[t]here is no general public policy exception to the operation of *res judicta*."  *Apotex*, 393 F.3d at 219; *see also Federated Department Stores*, 452 U.S. at 401.  And in any event, these policy arguments lack merit.

First, Canonsburg expresses concern that its and the agency's resources were wasted deciding the underlying merits, which it suggests could have been avoided if preclusion had been invoked sooner. Br. 33-34.  In fact, the agency's approach was highly efficient.  Because the final decision rested on issues of Medicare law, the result was that both the merits *and* preclusion could be decided in a single judicial proceeding.  By contrast, if the agency had solely applied preclusion and then been reversed, the result would have been an administrative remand, followed by (presumably) a new judicial proceeding in which the provider appealed a loss on the merits.

39

Moreover, Canonsburg's arguments make particularly little sense as applied to this case, since the parties had already briefed the underlying merits before the Board in 2000, before any issue preclusion defense became available.  AR527, JA__.  Injecting an additional issue into the case would have simply slowed things down.  And if Canonsburg had nonetheless wanted to have the agency decide the issue, it was free to inform the Board about its litigation loss.  Instead, as noted above, it excised any mention of the Pennsylvania litigation from its original filing.

Canonsburg also complains about the fact that HHS settled two district court cases in this Circuit, and that it continues to use the challenged methodology (when dealing with fiscal years 1999 and earlier, *see supra* n.2).  Br. 34-35.  It is unclear how this relates to Canonsburg's preclusion arguments, particularly given the presence of a circuit split regardless of how this Court rules.  *See St. Francis*, 205 F.3d 937 (6th Cir.) (Manual provision valid); *St. Luke's*, 315 F.3d 984 (8th Cir.) (Manual provision invalid).[8]  Moreover, this Court has placed

_____

[8] District courts are also split.  In addition to *Canonsburg I*, two other district courts agreed with HHS's position.  *See Fort Bend Cmty. Hosp. v. Thompson*, 2003 WL 25973213 (S.D. Tex., Aug. 26, 2003); *San*

voluntary settlements in "high judicial favor," recognizing that both the
parties and "the general public" benefit from such results. *Citizens for a
Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (internal
quotation marks omitted).  It would thus be particularly inappropriate
to penalize HHS for its settlements, which have attempted to put to rest
an issue that should have no relevance to any provider's reimbursement
for years after 1999.  *See supra* n.2.  In any event, if Canonsburg had
wanted a definitive resolution of the issue in this Circuit, it was free to
file *Canonsburg I* in the District of Columbia.

Canonsburg's final policy argument attempts to account for the
existing split in authority.  But that is a policy reason *favoring*
preclusion, since it explains why there is no need to apply the "change
in law" exception.  *See supra* pp. 23-25.  Moreover, preclusion is
animated in part by the recognition that "similar legal disputes between
the same parties at different points in time should not be disparate."
Restatement (Second) of Judgments § 28, cmt. c.  Applying preclusion

---

*Joaquin Cmty. Hosp. v. Thompson*, 2002 WL 34596496, at *13-20 (E.D.
Cal., Aug. 13, 2002).  On the other side are the *Mercy* and *Montefiore*
decisions discussed above.

ensures that Canonsburg receives consistent treatment across all of its cost years. Excusing preclusion could eliminate that.

2. Finally, as the Supreme Court has noted, the Board "'is burdened by an immense caseload.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826 (2013) (quoting *High Country Home Health, Inc. v. Thompson*, 359 F.3d 1307, 1310 (10th Cir. 2004)). And at the time this case was nearing a Board hearing there was "a huge backlog of cases." 73 Fed. Reg. 30190, 30191 (May 23, 2008). The Medicare Program does not generally monitor all of these cases, or take an active role in them, and it instead relies on the intermediaries to handle administrative disputes. These intermediaries ordinarily have no continuing role in a case once it reaches federal court, and thus are often not well positioned to be aware that a provider has brought (and lost) a court challenge.

The Board and the Administrator are even less well positioned to invoke preclusion.[9] By design, these adjudicators are kept separate from the HHS officials responsible for litigation. *See* 42 C.F.R. § 405.1843 (recognizing that the Medicare Program is a separate entity from the Board); *id.* § 405.1875(d) (barring "ex parte" communications

---

[9] HHS informs us that it is unaware of any final agency decision, by either the Board or Administrator, that rested on preclusion.

42

between the Medicare Program and the Administrator); *see also* 73 Fed.

Reg. at 30215 ("The Board is an impartial, independent forum . . . . The

Board's only concern is to provide a fair and just hearing process . . . .").

Moreover, the HHS attorneys who coordinate court litigation reside in

the Office of General Counsel, which is distinct from the Medicare

Program and the Administrator.[10]  Adopting Canonsburg's waiver

argument could force HHS to reassess how it structures dispute

resolution at the administrative stage.

## II.    The District Court Did Not Err In Its Treatment Of A Government Report

Separate from its preclusion arguments, Canonsburg takes issue

with an isolated sentence and footnote in the district court's opinion,

which mentioned "several studies cited in the legislative history of" the

Deficit Reduction Act.  DE35 at 4, JA__; *see also* Br. 44-46.  Canonsburg

concedes that this point was "immaterial" to the district court's opinion,

Br. 20, and thus this Court need not reach the issue if it affirms.

Moreover, because the issue only affects the underlying merits—which

---

[10] *See* U.S. Dep't of Health & Human Servs., *Operating Divisions*, http://www.hhs.gov/about/foa/opdivs/index.html; U.S. Dep't of Health & Human Servs., *Office of the Secretary Staff Divisions*, http://www.hhs.gov/about/foa/osleadership/index.html.

the district court has not yet addressed—this Court may find it prudent
to defer consideration of Canonsburg's objection pending a final
decision.  At that point the Court will presumably have a better idea of
whether, and how, the sentence affects the dispute at issue.

In any event, the district court did not commit any error.  In
proceedings before the Administrator, the Medicare Program explained
in an *amicus* submission that the results of a 1985 "Report to Congress
. . . were known well before the release of the report."  AR27, JA__.  And
the Administrator concluded that the "results of this report were
communicated to Congress before" the Deficit Reduction Act's 1984
enactment.  AR9, JA__.  The Administrator noted Canonsburg's
assertion that the report had not been shared early, yet expressly found
otherwise.  AR 10 n.16, JA__.  The Administrator explained that "the
distinctive formula" the Deficit Reduction Act imposed for hospital-
based facilities, which "corresponds to the finding of the Report, lends
support to" the Medicare Program's *amicus* contentions.  *Id.*

To the extent that finding was factual, it must be sustained if
supported by substantial evidence.  5 U.S.C. § 706(2)(E).  Otherwise, it
is subject to arbitrary and capricious review.  *See id.* § 706(2)(A).  And

the Administrator's finding was eminently reasonable.  The 1985
Report itself discussed research performed in 1984.[11]  *See* DE28-10 at
27, JA__.  The Medicare Program, which authored the report and
presumably had a role in its dissemination, *see* DE28-10 at 9, JA__, told
the Administrator that the results "were known well before" the report's
formal release.  AR27, JA__.  And the cost limits that Congress enacted
in 1984 are the most compelling evidence of all—consistent with the
report's conclusions, the Deficit Reduction Act treated 50 percent of the
difference between freestanding facilities' costs, and hospital-based
facilities' costs, as legally significant.  *See* 42 U.S.C. § 1395yy(a).  The
reasonable inference is that Congress knew about the report's findings.

   Because the Administrator's finding was supported by substantial
evidence, and not arbitrary and capricious, the district court was
required to accept it.  In any event, even if the matter was subject to *de*

---

[11] The district court, and this Court, can take judicial notice of a
public report to Congress.  *See Cellco Partnership v. FCC*, 357 F.3d 88,
96 (D.C. Cir. 2004) (agency report); *LeBoeuf, Lamb, Greene & MacRae,
LLP v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (agency letter to
House Speaker); *Fletcher v. Jones*, 105 F.2d 58, 61-62 & nn.15-16 (D.C.
Cir. 1939) (agency annual report, sent to Congress).  Canonsburg does
not contend otherwise; it merely objects to the notion that Congress
knew the report's findings when it enacted the Deficit Reduction Act.

*novo* review in the district court, the court reached the correct

conclusion for the reasons expressed in the previous paragraph.

## CONCLUSION

For the reasons expressed above, the district court's judgment

should be affirmed.

Respectfully submitted,

STUART F. DELERY
  *Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

MICHAEL S. RAAB
  *(202) 514-4053*
**/s/ Benjamin M. Shultz**
BENJAMIN M. SHULTZ
  *(202) 514-3518*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

May 12, 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that the certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **<u>9030 words</u>**, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


<u>**/s/ Benjamin M. Shultz**</u>
BENJAMIN M. SHULTZ

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Attorneys for all parties will be served automatically by the Court's CM/ECF system.

**/s/ Benjamin M. Shultz**
BENJAMIN M. SHULTZ

**ADDENDUM**

# ADDENDUM CONTENTS

Item                                                                          Page

42 U.S.C. § 1395x(v)(1) (1982) (excerpts)........................................A1

42 U.S.C. § 1395oo(f)(1) ........................................................A3

42 U.S.C. § 1395yy (excerpts) ..................................................A5

42 C.F.R. § 413.30 (1994) ......................................................A7

42 C.F.R. § 405.1845 ...........................................................A10

42 C.F.R. § 405.1875 ...........................................................A11

42 U.S.C. § 1395x(v)(1) (1982) (excerpts)

(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by

A1

such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

. . .

(E)(i) Such regulations shall provide that any determination of reasonable cost with respect to services provided by hospital-based skilled nursing facilities shall be made on the basis of a single standard based on the reasonableness of costs incurred by free standing skilled nursing facilities, subject to such adjustments as the Secretary may deem appropriate.

42 U.S.C. § 1395oo(f)(1)

A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) of this section and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of Title 5 notwithstanding any other provisions in section 405 of this title. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have

obtained a hearing under subsection (b) of this section must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

42 U.S.C. § 1395yy (excerpts)

(a) Per diem limitations

The Secretary, in determining the amount of the payments which may be made under this subchapter with respect to routine service costs of extended care services shall not recognize as reasonable (in the efficient delivery of health services) per diem costs of such services to the extent that such per diem costs exceed the following per diem limits, except as otherwise provided in this section:

> (1) With respect to freestanding skilled nursing facilities located in urban areas, the limit shall be equal to 112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities located in urban areas.
> (2) With respect to freestanding skilled nursing facilities located in rural areas, the limit shall be equal to 112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities located in rural areas.
> (3) With respect to hospital-based skilled nursing facilities located in urban areas, the limit shall be equal to the sum of the limit for freestanding skilled nursing facilities located in urban areas, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities located in urban areas exceeds the limit for freestanding skilled nursing facilities located in urban areas.
> (4) With respect to hospital-based skilled nursing facilities located in rural areas, the limit shall be equal to the sum of the limit for freestanding skilled nursing facilities located in rural areas, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities located in rural areas exceeds the limit for freestanding skilled nursing facilities located in rural areas.

In applying this subsection the Secretary shall make appropriate adjustments to the labor related portion of the costs based upon an appropriate wage index, and shall, for cost reporting periods beginning on or after October 1, 1992, on or after October 1, 1995, and every 2

years thereafter, provide for an update to the per diem cost limits described in this subsection, except that the limits effective for cost reporting periods beginning on or after October 1, 1997, shall be based on the limits effective for cost reporting periods beginning on or after October 1, 1996.

. . .

(c) Adjustments in limitations; publication of data

The Secretary may make adjustments in the limits set forth in subsection (a) of this section with respect to any skilled nursing facility to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility. The Secretary shall publish the data and criteria to be used for purposes of this subsection on an annual basis.

**Health Care Financing Administration, HHS** **§ 413.30**

Name(s) and Number(s)) for the cost reporting period beginning _____ and ending _____ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

(iv) A hospital may request a delay or waiver of the electronic submission requirement in paragraph (f)(4)(i) of this section if this requirement would cause a financial hardship. The hospital must submit a written request for delay or waiver with necessary supporting documentation to its intermediary at least 120 days prior to the end of its cost reporting period. The intermediary reviews the request and forwards it with a recommendation for approval or denial, to HCFA central office within 30 days of receipt of the request. HCFA central office either approves or denies the request and notifies the intermediary within 60 days of receipt of the request.

(5) An acceptable cost report submission is defined as follows:

(i) All providers—The provider, must complete and submit the required cost reporting forms, including all necessary signatures. A cost report is rejected for lack of supporting documentation only if it does not include the Provider Cost Reimbursement Questionnaire. Additionally, a cost report for a teaching hospital is rejected for lack of supporting documentation if the cost report does not include a copy of the Intern and Resident Information System diskette.

(ii) For providers that are required to file electronic cost reports—In addition to the requirements of paragraphs (f)(4) and (f)(5)(i) of this section, the provider must submit its cost reports in an electronic cost report format in conformance with the requirements contained in the Electronic Cost Report (ECR) Specifications Manual (unless the provider has received an exemption from HCFA).

(iii) The intermediary makes a determination of acceptability within 30 days of receipt of the provider's cost

report. If the cost report is considered unacceptable, the intermediary returns the cost report with a letter explaining the reasons for the rejection. When the cost report is rejected, it is deemed an unacceptable submission and treated as if a report had never been filed.

(g) *Exception from full cost reporting for lack of program utilization.* If a provider does not furnish any covered services to Medicare beneficiaries during a cost reporting period, it is not required to submit a full cost report. It must, however, submit an abbreviated cost report, as prescribed by HCFA.

(h) *Waiver of full or simplified cost reporting for low program utilization.* (1) If the provider has had low utilization of covered services by Medicare beneficiaries (as determined by the intermediary) and has received correspondingly low interim payments for the cost reporting period, the intermediary may waive a full cost report or the simplified cost report described in § 413.321 if it decides that it can determine, without a full or simplified report, the reasonable cost of covered services provided during that period.

(2) If a full or simplified cost report is waived, the provider must submit within the same time period required for full or simplified cost reports:

(i) The cost reporting forms prescribed by HCFA for this situation; and

(ii) Any other financial and statistical data the intermediary requires.

[51 FR 34793, Sept. 30, 1986, as amended at 57 FR 33829, Sept. 1, 1992; 59 FR 26964, May 25, 1994; 60 FR 33125, 33136, 33143, June 27, 1995; 60 FR 37594, July 21, 1995]

## Subpart C—Limits on Cost Reimbursement

### § 413.30   Limitations on reimbursable costs.

(a) *Introduction.* (1) *Scope.* This section implements section 1861(v)(1)(A) of the Act, by setting forth the general rules under which HCFA may establish limits on provider costs recognized as reasonable in determining Medicare program payments, and sections 1861(v)(7)(B) and 1886(a) of the Act, by setting forth the general rules under which HCFA may establish limits on the operating costs of inpatient hos-

387

A7

pital services that are recognized as reasonable in determining Medicare program payments. (For cost reporting periods beginning on or after October 1, 1983, the operating costs incurred in furnishing inpatient hospital services are not subject to the provisions of this section.) This section also sets forth rules governing exemptions, exceptions, and adjustments to limits established under this section that HCFA may make as appropriate in consideration of special needs or situations of particular providers.

(2) *General principle.* Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for the efficient delivery of needed health services. HCFA may establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups of items or services. These limits will be imposed prospectively and may be calculated on a per admission, per discharge, per diem, per visit, or other basis.

(b) *Procedure for establishing limits.* (1) In establishing limits under this section, HCFA may classify providers by type of provider (for example, hospitals, SNFs, and HHAs) and by other factors HCFA finds appropriate and practical, including—

(i) Type of services furnished;

(ii) Geographical area where services are furnished, allowing for grouping of noncontiguous areas having similar demographic and economic characteristics;

(iii) Size of institution;

(iv) Nature and mix of services furnished; or

(v) Type and mix of patients treated.

(2) Estimates of the costs necessary for efficient delivery of health services may be based on cost reports or other data providing indicators of current costs. Current and past period data will be adjusted to arrive at estimated costs for the prospective periods to which limits are being applied.

(3) Prior to the beginning of a cost period to which revised limits will be applied, HCFA will publish a notice in the FEDERAL REGISTER, establishing cost limits and explaining the basis on which they were calculated.

(4) In establishing limits under paragraph (b)(1) of this section, HCFA may find it inappropriate to apply particular limits to a class of providers due to the characteristics of the provider class, the data on which those limits are based, or the method by which the limits are determined. In such cases, HCFA may exclude that class of providers from the limits, explaining the basis of the exclusion in the notice setting forth the limits for the appropriate cost reporting periods.

(c) *Provider requests regarding applicability of cost limits.* A provider may request a reclassification, exception, or exemption from the cost limits imposed under this section. In addition, a hospital may request an adjustment to the cost limits imposed under this section. The provider's request must be made to its fiscal intermediary within 180 days of the date on the intermediary's notice of program reimbursement. The intermediary makes a recommendation on the provider's request to HCFA, which makes the decision. HCFA responds to the request within 180 days from the date HCFA receives the request from the intermediary. The intermediary notifies the provider of HCFA's decision. The time required for HCFA to review the request is considered good cause for the granting of an extension of the time limit to apply for a Board review, as specified in § 405.1841 of this chapter. HCFA's decision is subject to review under subpart R of part 405 of this chapter.

(d) *Reclassification.* A provider may obtain a reclassification if it can show that its classification is at variance with the criteria specified in promulgating the limits.

(e) *Exemptions.* Exemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years. An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

A8

**Health Care Financing Administration, HHS** §413.35

(f) *Exceptions.* Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

(1) *Atypical services.* The provider can show that the—

(i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

(ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

(2) *Extraordinary circumstances.* The provider can show that it incurred higher costs due to extraordinary circumstances beyond its control. These circumstances include, but are not limited to, strikes, fire, earthquake, flood, or similar unusual occurrences with substantial cost effects.

(3) *Providers in areas with fluctuating populations.* (i) The provider is located in an area (for example, a resort area) that has a population that varies significantly during the year;

(ii) The appropriate health planning agency has determined that the area does not have a surplus of beds and similar services and has certified that the beds and services made available by the provider are necessary; and

(iii) The provider meets occupancy standards established by the Secretary.

(4) *Medical and paramedical education.* The provider can demonstrate that, if compared to other providers in its group, it incurs increased costs for items or services covered by limits under this section because of its operation of an approved education program specified in §413.85.

(5) *Unusual labor costs.* The provider has a percentage of labor costs that varies more than 10 percent from that included in the promulgation of the limits.

(g) *Operational review of providers receiving an exception.* Any provider that applies for an exception to the limits established under paragraph (f) of this section must agree to an operational review at the discretion of HCFA. The findings from any such review may be the basis for recommendations for improvements in the efficiency and economy of the provider's operations. If such recommendations are made, any future exceptions shall be contingent on the provider's implementation of these recommendations.

(h) *Adjustments.* For cost reporting periods beginning on or after October 1, 1982 and before October 1, 1983, HCFA may adjust the amount of a hospital's inpatient operating costs to take into account factors that could result in a significant distortion in the operating costs of inpatient hospital services. Such factors could include a decrease in the inpatient services that a hospital provides that are customarily provided directly by similar hospitals, or the manipulation of discharges to increase reimbursement. A decrease in inpatient services could result from changes that include, but are not limited to, such actions as closing a special care unit or changing the arrangements under which such services may be furnished, such as leasing a department.

[51 FR 34793, Sept. 30, 1986, as amended at 52 FR 21225, June 4, 1987; 53 FR 38533, Sept. 30, 1988; 60 FR 45849, Sept. 1, 1995]

**§413.35  Limitations on coverage of costs: Charges to beneficiaries if cost limits are applied to services.**

(a) *Principle.* A provider of services that customarily furnishes an individual items or services that are more expensive than the items or services determined to be necessary in the efficient delivery of needed health services described in §413.30, may charge an individual entitled to benefits under Medicare for such more expensive items or services even though not requested by the individual. The charge, however, may not exceed the amount by which the cost of (or, if less, the customary charges for) such more expensive items or services furnished by such provider in the second cost reporting period immediately preceding the

389

(iii) If the lawsuit is filed before a final EJR decision is issued on the legal question, the Board may not conduct any further proceedings on the legal question or the matter at issue until the lawsuit is resolved.

[73 FR 30254, May 23, 2008; 73 FR 49356, Aug. 21, 2008]

### §405.1843 Parties to proceedings in a Board appeal.

(a) When a provider files a request for a hearing before the Board in accordance with §405.1835 or §405.1837 of this subpart, the parties to all proceedings in the Board appeal include the provider, an intermediary, and, where applicable, any other entity found by the Board to be a related organization of the provider under the principles enunciated in §413.17 of this chapter.

(b) Neither the Secretary nor CMS may be made a party to proceedings in a Board appeal.

(1) The Board may call as a witness any employee or officer of the Department of Health and Human Services or CMS having personal knowledge of the facts and the issues in controversy in an appeal.

(2) The regulations at 45 CFR Part 2 (Testimony by employees and production of documents in proceedings where the United States is not a party) apply as to whether such employee or officer will appear.

(c) An intermediary may designate a representative from the Secretary or CMS, who may be an attorney, to represent the intermediary in proceedings before the Board.

(d) Although CMS is not a party to proceedings in a Board appeal, there may be instances where CMS determines that the administrative policy implications of a case are substantial enough to warrant comment from CMS (as described in §405.1863 of this subpart). CMS—

(1) May file *amicus curiae* (friend of the court) briefing papers with the Board in accordance with a schedule to be determined by the Board.

(2) Must promptly mail copies of any documents filed with the Board to each party to the appeal.

(e) A nonparty other than CMS may seek leave from the Board to file *amicus curiae* briefing papers with the Board.

(f) The Board may exclude from the record all or part of an amicus curiae briefing paper. When the Board excludes from the record all or part of an amicus curiae briefing paper submitted by CMS, it states for the record its reason(s) in writing.

[73 FR 30256, May 23, 2008]

### §405.1845 Composition of Board; hearings, decisions, and remands.

(a) The Board will consist of five members appointed by the Secretary. All shall be knowledgeable in the field of cost reimbursement. At least one shall be a certified public accountant. Two Board members shall be representative of providers of services.

(b) The term of office for Board members shall be 3 years, except that initial appointments may be for such shorter terms as the Secretary may designate to permit staggered terms of office. No member shall serve more than two consecutive 3-year terms of office. The Secretary shall have the authority to terminate a Board member's term of office for good cause.

(c) *Composition of the Board.* The Secretary designates one member of the Board as Chairperson. The Chairperson coordinates and directs the administrative activities of the Board and the conduct of proceedings before the Board. CMS provides administrative support for the Board. Under the direction of the Chairperson, the Board is solely responsible for the content of its decisions.

(d) *Quorum.* (1) The Board must have a quorum in order to issue one of the decisions specified as final, or deemed final by the Administrator, under §405.1875(a)(2)(i), (a)(2)(iii), and (a)(2)(iv), but a quorum is not required for other Board actions.

(2) Three Board members, at least one of whom is representative of providers, are required in order to constitute a quorum.

(3) The opinion of the majority of those Board members issuing a decision specified as final, or deemed as final by the Administrator, under §405.1875(a)(2), constitutes the Board's decision.

(2) The Board's authority under this section to make the additional revisions is limited to those revisions necessary to resolve a specific matter at issue.

[73 FR 30261, May 23, 2008]

### § 405.1871  Board hearing decision.

(a)(1) If the Board finds jurisdiction over a specific matter at issue and conducts a hearing on the matter (as described in §§ 405.1840(a) and 405.1845(e) of this subpart), the Board must issue a hearing decision deciding the merits of the specific matter at issue.

(2) A Board hearing decision must be in writing and based on the admissible evidence from the Board hearing and other admissible evidence and written argument or comments as may be included in the record and accepted by the Board (as described in §§ 405.1845(g) and 405.1865 of this subpart).

(3) The decision must include findings of fact and conclusions of law regarding the Board's jurisdiction over each specific matter at issue (see § 405.1840(c)(1)), and whether the provider carried its burden of production of evidence and burden of proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on the merits of the matter at issue.

(4) The decision must include appropriate citations to the record evidence and to the applicable law, regulations, CMS Rulings, and other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS. Where the Board's decision reverses or modifies an intermediary determination on an issue for which the policy expressed in an interpretive rule (other than a regulation or a CMS Ruling), general statement of policy or rule of agency organization, procedure or practice established by CMS would be dispositive of that issue (if followed by the Board), the Board decision must explain how it gave great weight to such interpretive rule or other such instruction but did not uphold the intermediary's determination on the issue.

(5) A copy of the decision must be mailed promptly to each party to the appeal.

(b)(1) A Board hearing decision issued in accordance with paragraph (a) of this section is final and binding on the parties to the Board appeal unless the hearing decision is reversed, affirmed, modified, or remanded by the Administrator under §§ 405.1875(a)(2)(i), 405.1875(e), and 405.1875(f) of this subpart, no later than 60 days after the date of receipt by the provider of the Board's decision.

(2) A Board hearing decision is inoperative during the 60-day period for review of the decision by the Administrator, or in the event the Administrator reverses, affirms, modifies, or remands that decision within the period.

(3) A Board hearing decision that is final under paragraph (b)(1) of this section is subject to the provisions of § 405.1803(d) of this subpart, unless the decision is the subject of judicial review (as described in § 405.1877 of this subpart).

(4) A final Board decision under paragraph (a) and (b) of this section may be reopened and revised by the Board in accordance with §§ 405.1885 through 405.1889 of this subpart.

(5) When the intermediary's denial of the relief that the provider seeks before the Board is based on procedural grounds (for example, the alleged failure of the provider to satisfy a time limit) or is based on the alleged failure to supply adequate documentation to support the provider's claim, and the Board rules that the basis of the intermediary's denial is invalid, the Board remands to the intermediary for the intermediary to make a determination on the merits of the provider's claim.

[73 FR 30261, May 23, 2008]

### § 405.1873  [Reserved]

### § 405.1875  Administrator review.

(a) *Basic rule: Time limit for rendering Administrator decisions, Board decisions, and action subject to immediate review.* The Administrator, at his or her discretion, may immediately review any decision of the Board specified in paragraph (a)(2) of this section. Nonfinal decisions or actions by the Board are not immediately reviewable, except as

provided in paragraph (a)(3) of this section. The Administrator may exercise this discretionary review authority on his or her own motion, or in response to a request from: a party to the Board appeal; CMS; or, in the case of a matter specified in paragraph (a)(3)(i) or (a)(3)(ii) of this section, another affected nonparty to a Board appeal. All requests for Administrator review and any other submissions to the Administrator under paragraph (c) of this section must be sent to the Office of the Attorney Advisor. The Office of the Attorney Advisor must examine each Board decision specified in paragraph (a)(2) of this section, and each matter described in § 405.1845(h)(3), § 405.1853(e)(6)(ii), or § 405.1857(d)(2) of this subpart, of which it becomes aware, together with any review requests or any other submission made in accordance with the provisions of this section, in order to assist the Administrator's exercise of this discretionary review authority. The Board is required to send to the Office of the Attorney Advisor a copy of each decision specified in paragraphs (a)(2)(i) and (a)(2)(iii) of this section upon issuance of the decision.

(1) The date of rendering any decision after the review by the Administrator must be no later than 60 days after the date of receipt by the provider of a reviewable Board decision or action. For purposes of this section, the date of rendering is the date the Administrator signs the decision, and not the date the decision is mailed or otherwise transmitted to the parties.

(2) The Administrator may immediately review:

(i) A Board hearing decision (as described in § 405.1871 of this subpart).

(ii) A Board dismissal decision (as described in §§ 405.1836(e)(1) and (e)(2), 405.1840(c)(2) and (c)(3), 405.1868(d)(1) and (d)(2) of this subpart).

(iii) A Board EJR decision, but only the question of whether there is Board jurisdiction over a specific matter at issue in the decision; the Administrator may not review the Board's determination in a decision of its authority to decide a legal question relevant to the matter at issue (as described in § 405.1842(h) of this subpart).

(iv) Any other Board decision or action deemed to be final by the Administrator.

(3) Any decision or action by the Board not specified in paragraph (a)(2)(i) through (a)(2)(iii) of this section, or not deemed to be final by the Administrator under paragraph (a)(2)(iv) of this section, is nonfinal and not subject to Administrator review until the Board issues one of the decisions specified in paragraph (a)(2) of this section, except the Administrator may review immediately the following matters:

(i) A Board ruling authorizing discovery or disclosure of a matter for which an objection was made based on privilege or other protection from disclosure such as case preparation, confidentiality, or undue burden (as described in § 405.1853(e)(6)(ii) of this subpart).

(ii) A Board subpoena compelling disclosure of a matter for which an objection was made based on privilege or other protection from disclosure such as case preparation, confidentiality, or undue burden (as described in § 405.1857(d)(2) of this subpart).

(b) *Illustrative list of criteria for deciding whether to review.* In deciding whether to review a Board decision or other matter specified in paragraphs (a)(2) and (a)(3) of this section, either on his or her own motion or in response to a request for review, the Administrator considers criteria such as whether it appears that—

(1) The Board made an erroneous interpretation of law, regulation, CMS Ruling, or other interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice established by CMS.

(2) A Board hearing decision meets the requirements of § 405.1871(a) of this subpart.

(3) The Board erred in refusing to admit certain evidence or in not considering other submitted matter (as described in §§ 405.1855 and 405.1865(b) of this subpart), or in admitting certain evidence.

(4) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a CMS Ruling or

**Centers for Medicare & Medicaid Services, HHS**                    **§ 405.1875**

other directive needed to clarify a statutory or regulatory provision.

(5) The Board has incorrectly found, assumed, or denied jurisdiction over a specific matter at issue or extended its authority in a manner not provided for by statute, regulation, CMS Ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS.

(6) The decision or other action of the Board requires clarification, amplification, or an alternative legal basis.

(7) A remand to the Board may be necessary or appropriate under the criteria prescribed in paragraph (f) of this section.

(c) *Procedures*—(1) *Review requests.* (i)(A) A party to a Board appeal or CMS may request Administrator review of a Board decision specified in paragraph (a)(2) of this section or a matter described in paragraph (a)(3) of this section.

(B) A nonparty other than CMS may request Administrator review solely of a matter described in paragraph (a)(3)(i) or (a)(3)(ii) of this section.

(ii) The date of receipt by the Office of Attorney Advisor of any review request must be no later than 15 days after the date the party making the request received the Board's decision or other reviewable action.

(iii) A request for review (or a response to a request) must be submitted in writing, identify the specific issues for which review is requested, and explain why review is or is not appropriate, under the criteria specified in paragraph (b) of this section or for some other reason.

(iv) A copy of any review request (or response to a request) must be mailed promptly to each party to the appeal, the Office of the Attorney Advisor, and, as applicable, CMS, and any other affected nonparty.

(2) *Exception to time for requesting review.* If a party, or nonparty, as applicable, seeks immediate review of a matter described in § 405.1875(a)(3)(1) or (a)(3)(ii) of this subpart, the request for review must be made as soon as practicable, but in no event later than 5 business days after the day the party or nonparty seeking review received notice of the ruling or subpoena. The

request must state the reason(s) why the ruling was in error and the potential harm that may be caused if immediate review is not granted.

(3) *Notice of review.* (i) When the Administrator decides to review a Board decision or other matter specified in paragraphs (a)(2) or (a)(3) of this section, respectively, whether on his or her own motion or upon request, the Administrator must send a written notice to the parties, CMS, and any other affected nonparty stating that the Board's decision is under review, and indicating the specific issues that are being considered.

(ii) The Administrator may decline to review a Board decision or other matter, or any issue in a decision or matter, even if a request for review is submitted in accordance with paragraph (c)(1) or (c)(2) of this section.

(4) *Written submissions on review.* If the Administrator accepts review of the Board's decision or other reviewable action, a party, CMS, or, another affected nonparty that requested review solely of a matter described in paragraph (a)(3)(i) or (a) (3)(ii) of this section, may tender written submissions regarding the review.

(i) The date of receipt by the Office of the Attorney Advisor of any material must be no later than 15 days after the date the party, CMS or other affected nonparty submitting comments received the Administrator's notice under paragraph (c)(3) of this section, taking review of the Board decision or other reviewable matter.

(ii) Any submission must be limited to the issues accepted for Administrator review (as identified in the notice) and be confined to the record of Board proceedings (as described in § 405.1865 of this subpart). The submission may include—

(A) Argument and analysis supporting or taking exception to the Board's decision or other reviewable action;

(B) Supporting reasons, including legal citations and excerpts of record evidence, for any argument and analysis submitted under paragraph (c)(4)(ii)(A) of this section;

(C) Proposed findings of fact and conclusions of law;

251

A13

(D) Rebuttal to any written submission filed previously with the Administrator in accordance with paragraph (c)(4) of this section; or

(E) A request, with supporting reasons, that the decision or other reviewable action be remanded to the Board.

(d) *Ex parte communications prohibited.* The Administrator does not consider any communication that does not meet the following requirements or is not submitted within the required time limits. All communications from any party, CMS, or other affected nonparty, concerning a Board decision (or other reviewable action) that is being reviewed or may be reviewed by the Administrator must—

(1) Be in writing.

(2) Contain a certification that copies were served on all other parties, CMS, and any other affected nonparty, as applicable.

(3) Include, but are not limited to—

(i) Requests for review and responses to requests for review submitted under paragraph (c)(1) or (c)(2) of this section; and

(ii) Written submissions regarding review submitted under paragraph (c)(4) of this section.

(e) *Administrator's decision.* (1) Upon completion of any review, the Administrator may render a written decision that—

(i) For purposes of review of a Board decision specified in paragraph (a)(2) of this section, affirms, reverses, or modifies the Board's decision, or vacates that decision and remands the case to the Board for further proceedings in accordance with paragraph (f)(1)(i) of this section; or

(ii) For purposes of review of a matter described in paragraph (a)(3) of this section, affirms, reverses, modifies, or remands the Board's discovery or disclosure ruling, or subpoena, as applicable, and remands the case to the Board for further proceedings in accordance with paragraph (f)(1)(ii) of this section.

(2) The date of rendering of any decision by the Administrator must be no later than 60 days after the date of receipt by the provider of the Board's decision or other reviewable action. The Administrator must promptly mail a copy of his or her decision to the Board, to each party to the appeal, to CMS, and, if applicable, to any other affected nonparty.

(3) Any decision by the Administrator may rely on—

(i) Applicable provisions of the law, regulations, CMS Rulings, and other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS.

(ii) Prior decisions of the Board, the Administrator, and the courts, and any other law that the Administrator finds applicable, whether or not cited in materials submitted to the Administrator.

(iii) The administrative record for the case (as described in § 405.1865 of this subpart).

(iv) Generally known facts that are not subject to reasonable dispute.

(4) A timely decision by the Administrator that affirms, reverses, or modifies one of the Board decisions specified in paragraph (a)(2) of this section is final and binding on each party to the Board appeal (as described in § 405.1877(a)(4) of this subpart).

(i) If the final Administrator decision follows review of a Board hearing decision, the Administrator's decision is subject to the provisions of § 405.1803(d) of this subpart, unless that final decision is the subject of judicial review (as described in § 405.1877 of this subpart).

(ii) The Administrator, in accordance with §§ 405.1885 through 405.1889 of this subpart, may reopen and revise a final Administrator decision.

(iii) A decision by the Administrator remanding a matter to the Board for further proceedings in accordance with paragraph (f) of this section is not a final decision for purposes of judicial review (as described in § 405.1877(a)(4) of this subpart) or the provisions of § 405.1803(d).

(f) *Remand.* (1) A remand to the Board by the Administrator has the effect for purposes of review—

(i) With respect to a Board decision specified in paragraph (a)(2) of this section, vacating the Board's decision and requiring further proceedings in accordance with the Administrator's decision and this subpart; or

(ii) With respect to a matter described in paragraph (a)(3) of this section, affirming, reversing, modifying, or remanding the Board's remand

A14

**Centers for Medicare & Medicaid Services, HHS**    **§ 405.1877**

order, discovery ruling, or subpoena, as applicable, and returning the case to the Board for further proceedings in accordance with the Administrator's decision and this subpart.

(2) The Administrator may direct the Board to take further action for the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand:

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably may be known.

(ii) Introduction of a favorable court ruling, regardless of whether the ruling was made or was available at the time of the Board hearing or at the time the Board issued its decision.

(iii) Change in a party's representation, regardless when made.

(iv) Presentation of an alternative legal basis concerning an issue in dispute.

(v) Attempted retraction of a waiver of a right, regardless when made.

(3) After remand, the Board must take the actions required in the Administrator's remand order and issue a new decision in accordance with paragraph (f)(1)(i) of this section, or issue under paragraph (f)(1)(ii) of this section an initial decision or a further remand order, discovery ruling, or subpoena ruling, as applicable.

(4) Administrator review of any decision or other action by the Board after remand is, to the extent applicable, subject to the provisions of paragraphs (a)(2) or (a)(3) of this section.

(5) In addition to ordering a remand to the Board, the Administrator may order a remand to any component of HHS or CMS or to an intermediary under appropriate circumstances, including, but not limited to, for the purpose of effectuating a court order (as described in § 405.1877(g)(2) of this subpart). When the intermediary's denial of the relief, that the provider sought before the Board and that is under review by the Administrator, was based on procedural grounds (such as the alleged failure of the provider to satisfy a time limit) or was based on the alleged failure to supply adequate documentation to support the provider's

claim, and the Administrator rules that the basis of the intermediary's denial is invalid, the Administrator remands to the intermediary for the intermediary to make a determination on the merits of the provider's claim.

[73 FR 30262, May 23, 2008; 73 FR 49356, 49357, Aug. 21, 2008]

**§ 405.1877  Judicial review.**

(a) *Basis and scope.* (1) Notwithstanding the provisions of 5 U.S.C. 704 or any other provision of law, sections 205(h) and 1872 of the Act provide that a decision or other action by a reviewing entity is subject to judicial review solely to the extent authorized by section 1878(f)(1) of the Act. This section, along with the EJR provisions of § 405.1842 of this subpart, implements section 1878(f)(1) of the Act.

(2) Section 1878(f)(1) of the Act provides that a provider has a right to obtain judicial review of a final decision of the Board, or of a timely reversal, affirmation, or modification by the Administrator of a final Board decision, by filing a civil action in accordance with the Federal Rules of Civil Procedure in a Federal district court with venue no later than 60 days after the date of receipt by the provider of a final Board decision or a reversal, affirmation, or modification by the Administrator. The Secretary (and not the Administrator or CMS itself, or the intermediary) is the only proper defendant in a civil action brought under section 1878(f)(1) of the Act.

(3) A Board decision is final and subject to judicial review under section 1878(f)(1) of the Act only if the decision—

(i) Is one of the Board decisions specified in § 405.1875(a)(2)(i) through (a)(2)(iii) of this subpart or, in a particular case, is deemed to be final by the Administrator under § 405.1875(a)(2)(iv) of this subpart; and

(ii) Is not reversed, affirmed, modified, or remanded by the Administrator under §§ 405.1875(e) and 405.1875(f) of this subpart within 60 days of the date of receipt by the provider of the Board's decision. A provider is not required to seek Administrator review under § 405.1875(c) first in order to seek judicial review of a Board decision that is