**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 13-5370**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

CANONSBURG GENERAL HOSPITAL
*Plaintiff-Appellant,*

*v.*

SYLVIA BURWELL, SECRETARY,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
*Defendant-Appellee.*
_____

On Appeal from the United States District Court
for the District of Columbia, No. 09-cv-2385 (Howell, B.)
_____

**REPLY BRIEF FOR PLAINTIFF-APPELLANT**
_____

STEPHEN P. NASH
SVEN C. COLLINS
Squire Patton Boggs (US) LLP
1801 California St. Suite 4900
Denver, CO 80202
Tel: (303) 894-6173
Fax: (303) 894-9239
stephen.nash@squirepb.com
*Attorneys for Appellant*

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | | |
|---|---|---|
| Administrator | — | Administrator, Centers for Medicare and Medicaid Services |
| APA | — | Administrative Procedure Act |
| APP. | — | Appendix |
| Canonsburg Hospital | — | Canonsburg General Hospital |
| CMS | — | Centers for Medicare and Medicaid Services |
| DEFRA | — | Deficit Reduction Act of 1984 |
| FY | — | Fiscal Year |
| HHS | — | Department of Health and Human Services |
| Intermediaries | — | Medicare administrative contractors, fiscal intermediaries |
| NPR | — | Notice of Program Reimbursement |
| PRM | — | Provider Reimbursement Manual |
| PRRB | — | Provider Reimbursement Review Board |
| RCLs | — | Reasonable Cost Limits |
| RCL Exception Reg | — | 42 C.F.R. § 413.30(e)(1) |
| Secretary | — | Secretary, U.S. Department of Health and Human Services |
| SNF | — | Skilled Nursing Facility |

4819-4091-8811.

# TABLE OF CONTENTS

GLOSSARY OF ABREVIATIONS AND ACRONYMS ........................................ i

TABLE OF CONTENTS....................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

I.     STATUTES AND REGULATIONS ............................................1

II.    REPLY CONCERNING FACTS AND PRIOR PROCEEDINGS.................1
     A.    Rebuttal re: Statutory and Regulatory Scheme .....................1
     B.    Rebuttal re: Medicare Appeals Scheme ...............................3
     C.    Rebuttal re: Proceedings........................................................3

III.    SUMMARY OF ARGUMENT....................................................5

IV.    STANDARD OF REVIEW .......................................................7

V.    ARGUMENT.........................................................................8
     A.    HHS has no excuse for its failure to assert issue preclusion during its administrative adjudications and has, thus, waived the defense....................................................................8
     B.    As did the district court below, HHS misconstrues *Chenery's* direct applicability to this case ............................15
     C.    HHS has failed to show how its assertion of issue preclusion for the first time on appeal to the district court furthers the doctrine's policy justifications ............................................18
     D.    It would be unfair to freeze the law available to Canonsburg Hospital with the *2001 Case* given the change in the legal landscape since then, a change that is confirmed by HHS's response ..............................................................21
     E.    HHS has failed to show that the district court had grounds to take judicial notice that previews of a 1985 Report were shared with Congress in connection with DEFRA ........................27

4819-4091-8811.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adirondack Med. Ctr. v. Sebelius*,
   CA No. 11-313 (RMC), 2012 U.S. Dist. LEXIS 11576 (D.D.C. Jan. 31,
   2012) ................................................................................................................10

*Aguilar v. Attorney General*,
   663 F.3d 692 (3rd Cir. 2011) ..............................................................................24

*Appalachian Reg'l Healthcare, Inc. v. Shalala*,
   131 F.3d 1050 (D.C. Cir. 1997) ..........................................................................9

*Bowden v. U.S.*,
   106 F.3d 433 (D.C. Cir. 1997) ..........................................................................14

*Clodfelter v. Republic of Sudan*,
   720 F.3d 199 (4th Cir. 2013) ..............................................................................7

*CSI v. Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
   637 F.3d 408 (D.C. Cir. 2011) ..........................................................................14

*Dismas Charities, Inc. v. United States DOJ*,
   401 F.3d 666 (6th Cir. 2005) ............................................................................23

*High Country Home Health, Inc. v. Thompson*,
   359 F.3d 1307 (10th Cir. 2004) ........................................................................12

*Manin v. NTSB*,
   627 F.3d 1239 (D.C. Cir. 2011) ........................................................................14

*Medcenter One Health Sys. v. Sebelius*,
   635 F.3d 348 (8th Cir. 2011) ..............................................................................9

*Morgan Stanley v. Public Utility District*,
   554 U.S. 527, 544-5 (2008) ........................................................................15, 17

*Morris v. Sullivan*,
   897 F.2d 553 (D.C. Cir. 1990)......................................................................11, 17

iii

*Mortgage Bankers Assoc. v. Perez*,
  720 F.3d 966 (D.C. Cir. 2013), *petition for cert. filed*, 2013 U.S. ...............22, 25

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759 (1969)................................................................................17

\* *Paralyzed Veterans of America v. D.C. Arena, L.P.*,
  117 F.3d 579 (D.C. Cir. 1997)...........................................................7, 13

*Potter v. District of Columbia*,
  558 F.3d 542 (D.C. Cir. 2009)................................................................5

\* *Poulin v. Bowen*,
  817 F.2d 865 (D.C. Cir. 1987) ..............................................................11

*Ranger Cellular v. FCC*,
  333 F.3d 255 (D.C. Cir. 2003)................................................................7

*SBC, Inc. v. FCC*,
  414 F.3d 486 (3d Cir. 2005) ...................................................21, 23, 24

\* *SEC v. Chenery*,
  332 U.S. 194 (1947)..............................................................6, 15, 16, 17

*Shea v. Director, Office of Workers' Comp. Programs*,
  929 F.2d 736 (D.C. Cir. 1991)..............................................................16

*St. Francis Health Care Center v. Shalala*,
  205 F.3d 937 (6th Cir. 2000) .................................................22, 23, 27

*Stanton v. Court of Appeals*,
  127 F.3d 72, 77 (D.C. Cir. 1997) .........................................................13

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994)................................................................15

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993)................................................................................7

*United Video, Inc. v. FCC*,
  890 F.2d 1173 (D.C. Cir. 1989).............................................................16

4819-4091-8811.

**STATUTES**

42 U.S.C. § 1395oo ................................................................24

42 U.S.C. § 1395yy .................................................................2

**OTHER AUTHORITIES**

42 C.F.R. § 405.1843 ...........................................................3, 8, 9

* 42 C.F.R. § 405.1875 ...........................................................3, 9

42 C.F.R. § 421.100 ................................................................8

18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §
    4415 (2d ed. 2009) ...........................................................24

73 Fed. Reg. 30190, 30215-6 (May 23, 2008) ...............................8

4819-4091-8811.

# I. STATUTES AND REGULATIONS

Except for 42 C.F.R. § 421.100, which is included in the addendum, all applicable statutes, etc., are contained in the Brief for the Appellant or the Appellee.

# II. REPLY CONCERNING FACTS AND PRIOR PROCEEDINGS

## A. Rebuttal re: Statutory and Regulatory Scheme

HHS's description of Medicare's payment structure for SNFs presents a misleading chronology of legislative and regulatory actions.

First, HHS downplays the facts showing that HHS's *per se* "gap" methodology materially changed HHS's longstanding interpretation of the RCL Exception Reg. HHS glosses over the fact that it implemented its RCL Exception Reg (the foundation for the payments here) in 1979, and only cites to it after having discussed the 1984 DEFRA amendments. *See* Appellee's Br. at 5. This reordering of events downplays the fact that DEFRA did not lead to promulgation of the Reg and that HHS's gap methodology was not implemented contemporaneously with either DEFRA or the Reg. HHS also omits that, starting in 1980, with its first definitive construction of the RCL Exception Reg,[1] and

---

[1] *See* DE 30 at 7 (citing *Sacramento Med. Ctr. v. Blue Cross Ass'n*, HCFA Administrator Dec., Medicare & Medicaid Guide (CCH) ¶ 30,859 (Sept. 29, 1980).

4819-4091-8811.

through 1994, the agency construed the Reg to permit recovery of <u>all</u> costs above the RCLs (without excluding any gap costs).  *See* Appellant Br. at 7-8.  This construction changed in 1994, when HHS implemented the gap methodology through PRM 2534.5, and began applying a *per se* rule to deny all gap costs, significantly lowering the amount of exception relief available to hospital-based SNF's.  *Id.* at 8-9.

Second, HHS tries to distort the fact that the "gap" methodology is not supported by the statute or any legislative history.  DEFRA's RCL for hospital-based SNFs expressly governs only ordinary costs limits and not exceptions therefrom.  42 U.S.C. § 1395yy.  Without support or analysis, HHS declares that the gap methodology "paralleled the same gap that Congress had written into [DEFRA] in 1984."  Finally, HHS asserts that there was "evidence that the gap was merited due to inefficiencies among hospital-based facilities."  However, even the report to Congress, on which HHS relies, acknowledges: "Sufficient information is currently not available to definitively quantify the proportion of the existing cost differences that can be attributed to the various factors such as unmeasured case mix, quality of care, and inefficiency"; and "it is clear that further work is required."  *See* DE 28, Ex. 10 at 26-27.

4819-4091-8811.

**B.  Rebuttal re: Medicare Appeals Scheme**

Contrary to its description, HHS is not a passive bystander during administrative adjudications of Medicare provider appeals.  Though HHS has, by regulation, declared itself a non-party in the PRRB process, the same regulations expressly permit CMS both to submit *amicus curiae* briefs for the PRRB's consideration as well as to provide counsel to the intermediary.  *See* 42 C.F.R. § 405.1843(c) & (d).  Moreover, the CMS Administrator has the option and authority to review and reverse PRRB decisions, *e.g.*, based on a preclusion defense, rather than considering the merits, a point which HHS did not dispute below and cannot dispute.  *See* 42 C.F.R. § 405.1875(a).

**C.  Rebuttal re: Proceedings**

As established, but for HHS's gap methodology set forth in PRM 2534.5, Canonsburg Hospital would have received an additional $526,293 with respect to its fiscal year ending in 1996.  Appellant Br. at 13.  The PRRB ruled on the merits that Canonsburg Hospital was entitled to such amounts.  The CMS Administrator reversed on the merits.

Canonsburg Hospital had referenced the then-pending *2001 Case* when it submitted its position paper to the PRRB in July 2000.  More than nine years later, when the PRRB scheduled a hearing and permitted supplemental position papers, the PRRB was consistently ruling that PRM 2534.5 was invalid following the lead

4819-4091-8811.

of three cases (*St. Luke's*, *Mercy Hospital*, and *Montefiore*), all decided since 2001. AR at 36, 40-44. Canonsburg Hospital updated its position paper with reference to those three decisions, and did not "carefully avoid" mention of the *2001 Case*, which was no longer at issue. The intermediary, also aware of the *2001 Case,* could have submitted a supplemental position paper addressing the *2001 Case,* but did not.

Moreover, HHS omits to mention that the CMS Administrator knew about the *2001 Case* when it reviewed the PRRB's decision. A CMS Director submitted a letter to the Administrator seeking review and reversal of the PRRB's decision and cited the *2001 Case* as one of four court decisions upholding PRM 2534.5.[2] AR at 25, 29. Even so, the CMS Administrator decided the case on the merits, never having mentioned issue preclusion.

Contrary to HHS's present argument, the district court below found that HHS had asserted the defense of preclusion, and did not apply estoppel *sua sponte*. DE 35 at 25.

---

[2] The letter seeking reversal was submitted by Laurence Wilson, Director of CMS's Chronic Care Policy Group. AR at 25-29. The CMS Administrator decision refers to the comments from Director Wilson and also relies on some of the new materials cited in the letter. AR at 2, 4-5.

4819-4091-8811.

## III.   SUMMARY OF ARGUMENT

HHS's brief misunderstands the fundamental precept that the adjudicatory process is one of narrowing of issues, pursuant to which a party arrives at successive stages of review armed with, and limited to, the issues that were presented and decided at the previous level.  *See, e.g.*, *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.") (internal citations omitted).  This misunderstanding permeates HHS's assertions that it had not waived the affirmative defense of issue preclusion and that the district court was free to affirm on grounds outside of HHS's decision. This misunderstanding also explains HHS's assertion of new arguments in this appeal which it did not present to the district court.  Not only should such arguments be disregarded (*see id.*) but they fail to persuade.

Hoping to avoid waiver, HHS attempts to erase itself from its agency proceedings.  HHS introduces a defined term, "Medicare Program" that includes the fiscal intermediary, the CMS Administrator, and the Medicare program which the CMS Administrator directs.  This conflation fails to disguise the fact that the CMS Administrator dictates the rationale cited for the agency's decision.  HHS had the opportunity, both before the PRRB and upon CMS Administrator review, to raise and apply issue preclusion.  It did not and waived the defense.

5

HHS has also failed to demonstrate why the district court should have affirmed the agency's final determination based on new grounds (issue preclusion) not invoked by the CMS Administrator. *SEC v. Chenery* blocks HHS from adding such new grounds for the first time in the district court. 332 U.S. 194 (1947). To avoid *Chenery*, HHS diverts attention from the decision under review, which is whether Canonsburg Hospital was entitled to additional payments, not the application of issue preclusion. The CMS Administrator's discretionary decision to hear the case on the merits, not preclusion, forecloses reaching that alternative ground now.

Next, belated application of issue preclusion in this case would not serve the defense's policy considerations. HHS's arguments – that its conduct was efficient, that it did not have the institutional wherewithal to raise the defense sooner, and that it seeks to avoid repeat litigation – defy logic and fact for many reasons. These include, especially, that (1) HHS's untimely assertion of the defense has already wasted resources (those of this Court and the district court, in addressing issues relating to an untimely defense, and those of Canonsburg Hospital and the agency, in litigating and deciding the case on the merits), (2) HHS has intentionally perpetuated repeat litigation of the underlying merits issue, and (3) HHS has the means and incentive to assert affirmative defenses at the earliest opportunity during the agency's adjudication of Medicare appeals.

4819-4091-8811.

In addition, HHS's response as to the change in law overlooks that the Third Circuit adopted the analytical paradigm of *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579 (D.C. Cir. 1997), after the *2001 Case* was decided. Thus, it is unfair to freeze the law of the Third Circuit in 2001, when multiple courts have since applied *Paralyzed Veterans* to invalidate HHS's gap methodology.

For any or all of these reasons, the judgment of the district court granting HHS's affirmative defense of issue preclusion must be reversed.

## IV.  STANDARD OF REVIEW

HHS incorrectly contends that the standard of review is abuse of discretion as to the question of waiver.  The district court below did not decide to invoke issue preclusion or raise it *sua sponte*, but held that the agency had not waived the defense.  Thus, the cases on which HHS relies are inapposite,[3] and the district court's entire ruling should be reviewed *de novo*.  Moreover, it would have been an abuse of discretion to apply issue preclusion *sua sponte*.

---

[3] *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 208 & 210 (4th Cir. 2013) (distinguishing standard of review for *sua sponte* application of *res judicata* and *de novo* standard for application of the doctrine itself); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445-48 & 453-62 (1993) (reviewing for abuse of discretion question of whether the lower court erred in raising the antecedent issue of whether a law had been repealed *sua sponte*); *Ranger Cellular v. FCC*, 333 F.3d 255, 261-2 (D.C. Cir. 2003) (discussing "abuse of discretion" regarding APA arbitrary and capricious standard of review, not regarding *sua sponte* rulings).

4819-4091-8811.

## V.    ARGUMENT

**A.  HHS has no excuse for its failure to assert issue preclusion during its administrative adjudications and has, thus, waived the defense**

HHS let two merits decisions come and go (deciding the second one itself) without asserting or applying issue preclusion.  Thus, HHS waived the defense and there was no justification for the district court to apply the defense, whether at HHS's belated request or *sua sponte*.  Defending the district court's contrary holding that no waiver occurred, HHS proffers several arguments.  These arguments amount to HHS's incorrect position that it can *never* waive the defense during the administrative adjudications of Medicare appeals and, regardless of waiver, the court should always apply the defense *sua sponte*.

HHS begins by declaring that it was not required to raise the defense of estoppel, because "the Medicare program is actually prohibited from being a party during . . . administrative proceedings . . . ."  Appellee Br. at 30.  While HHS's self-serving regulations state that "[n]either the Secretary nor CMS may be made a party to proceedings in a Board appeal," 42 C.F.R. § 405.1843(b),[4] HHS cannot dispute that the agency had ample opportunity to assert the defense during the PRRB phase of the case.  The fiscal intermediary is HHS's agent before the PRRB.  *See* 42 C.F.R. § 421.100.  Moreover, HHS gives itself discretion to provide the

_____

[4] The Medicare Act does not prevent HHS from becoming a party.  Instead, HHS amended its regulations in 2008 to restrict hospitals from obtaining discovery from the agency in PRRB appeals.  73 Fed. Reg. 30190, 30215-6 (May 23, 2008).

intermediary counsel and to submit amicus briefs in PRRB appeals. *See* 42 C.F.R.

§ 405.1843(c) & (d).[5] As issue preclusion could have been raised either by the

intermediary or, as HHS suggests, *sua sponte* by the adjudicative body, the

PRRB's position on issue preclusion is binding. Because HHS and the PRRB did

not raise issue preclusion, the defense was effectively waived.

HHS had even greater control over the preclusion defense during the CMS

Administrator's review. It was not disputed below[6] (and cannot be disputed) that

when the CMS Administrator reviews the PRRB decision, the Administrator has

the opportunity to rely on prior decisions and law even if not raised by a "party" to

the case. *See* 42 C.F.R. § 405.1875(e)(3) ("Any decision by the Administrator may

rely on . . . [p]rior decisions of the Board, the Administrator, and the courts, and

any other law that the Administrator finds applicable, whether or not cited in

---

[5] HHS selectively quotes from a case that "'the intermediary's position' during administrative proceedings 'is not the Secretary's.'" *Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997). This case is inapposite because it addresses substantive positions taken by the intermediary, as opposed to its procedural actions. Further, HHS omitted a key part of the quote: "Of course, the intermediary's position is not the Secretary's—it is the Board's interpretation that matters." *Id.* The other authority HHS has cited is similarly inapposite. *See Medcenter One Health Sys. v. Sebelius*, 635 F.3d 348, 350-51 (8th Cir. 2011) (analyzing intermediary's position on substantive reimbursement issue, not its procedural actions).

[6] *See* DE 30 at 16, DE 32 at 14-15 & DE 34 at 4.

materials submitted to the Administrator.").[7]  Thus, the CMS Administrator could have invoked issue preclusion based on the *2001 Case*, which was expressly brought to the Administrator's attention during its review of the PRRB's order. *See*, *supra*, at 4. Instead, the CMS Administrator decided the case on the merits, and did not invoke issue preclusion.[8]

Thus, not only could the intermediary have asserted the preclusion defense, but HHS had the opportunities both to present the defense to the PRRB and, more importantly, as the CMS Administrator, to decide the appeal on the basis of the defense, thus preventing its waiver.  Having failed to take advantage of these opportunities, and instead acquiesced in and/or made two adjudications on the merits, HHS should not be heard to complain that it was somehow a passive

---

[7] The CMS Administrator is HHS's delegate to administer, and to make final payment determinations under, the Medicare Program as enacted by Congress. *Adirondack Med. Ctr. v. Sebelius*, CA No. 11-313 (RMC), 2012 U.S. Dist. LEXIS 11576 at *1 (D.D.C. Jan. 31, 2012).

[8] HHS's assertion that Canonsburg Hospital "shared responsibility" for the agency's failure to raise the defense of issue preclusion during the administrative phase lacks legal or factual support.  HHS has not identified any legal requirement obligating Canonsburg Hospital to assert an affirmative defense on behalf of the agency.  Canonsburg Hospital did not "delete" reference to the *2001 Case* in its supplemental position paper.  Instead, it supplemented its prior position with case law and argument reflecting the more recent favorable decisions in the D.C. District Court and *St. Luke's* on which the PRRB had relied in its provider-favorable decisions rejecting HHS's application of PRM 2534.5.  The intermediary and HHS were aware of the *2001 Case*, both as parties thereto during the administrative adjudication and court review, and through its citation during the CMS Administrator proceedings in this case.

bystander not accountable for the legal consequences of its tactical decisions. *See* DE 30 at 16 (citing CMS Administrator decision applying *res judicata*).

HHS also fails to show why this Court should not find a waiver under *Poulin v. Bowen*. 817 F.2d 865 (D.C. Cir. 1987). As in *Poulin* (where the agency waived the defense of *res judicata* by, among other reasons, hearing the plaintiff's claim on the merits), HHS here heard Canonsburg Hospital's appeal on the merits twice. Both the CMS Administrator and the PRRB, like the ALJs in *Poulin*, may decide cases based on preclusion defenses, a point which HHS never contested below.[9]

Relying on *Morris v. Sullivan*, 897 F.2d 553 (D.C. Cir. 1990), HHS attempts to distinguish *Poulin* because HHS asserted issue preclusion in its answer. However, *Morris* held that *Poulin* was "distinguishable . . . in two important ways." 897 F.2d at 557 n.8. First, in *Morris*, there was no question about waiver of a preclusion defense at the administrative level by the agency because, unlike *Poulin* (and here), the agency did not reopen and hear the plaintiff's case on the merits. *Id.* Second, *Morris* held *Poulin* was "further distinguishable" because, in *Morris*, HHS had also asserted the defense of *res judicata* in its pleadings. *Id.* Neither *Poulin* nor *Morris* holds that raising the affirmative defense in court pleadings alone is sufficient. Thus, *Poulin* and *Morris* should be read as setting forth requirements that the defense be asserted early and often. This reading is

---

[9] *See supra*, n. 6.

consistent with the adversarial nature of hospital Medicare reimbursement appeals[10] and the policy underpinnings for issue preclusion (*i.e.*, avoiding duplicative litigation and potentially inconsistent decisions). The district court's interpretation of *Poulin* (defended by HHS), on the other hand, leads to a waste of adjudicatory resources before the agency and overlooks the fact that Medicare hospital appeals comprise adjudicatory proceedings.

Canonsburg Hospital has also explained that the district court erred by distinguishing *Poulin* because the agency sought to give preclusive effect to "a prior *agency* decision." Appellant Br. at 24-25. That difference is irrelevant because preclusion can also apply to final agency decisions. HHS does not contest this point, but argues that "preclusion principles are to be applied more flexibly to administrative adjudications than to judicial proceedings." Appellee Br. at 33. This response is off point. HHS twice decided Canonsburg Hospital's appeal on the merits. HHS has not explained how any supposed additional flexibility that might apply with respect to the finality of administrative determinations excuses its failure to assert the defense of preclusion with respect to a final judicial

---

[10] During the PRRB appeal, both sides were represented by counsel. AR at 1. Further, the PRRB adjudication process is designed to provide "the Board the benefit of adversarial testing to expose flaws in superficially sound arguments on either side of the controversy." *High Country Home Health, Inc. v. Thompson*, 359 F.3d 1307, 1313 (10th Cir. 2004).

4819-4091-8811.

determination.[11]  Indeed, that HHSs used its discretion to decide this case on the merits, and to not invoke preclusion, makes *Poulin* all the more applicable.

HHS also tries to distinguish *Poulin* by contending the district court "expressly concluded that it would *sua sponte* raise preclusion as a defense" if HHS had waived it administratively.  However, though the district court stated that it "could nonetheless take notice" of the preclusion defense, it did not rule on *sua sponte* application of the defense.  *See* DE 35 at 26 & 27.

Further, HHS has not demonstrated why applying issue preclusion *sua sponte* would have been justified*,* given the appellate role the court serves in Medicare appeals.  *See* Appellant Br. at 26.  HHS merely repeats its arguments (which Canonsburg Hospital has already shown above to be unpersuasive) as to why, despite having twice decided the case on the merits, HHS has not waived the defense.

HHS does not point to any factor that would have justified the district court applying issue preclusion *sua sponte* after the trial phase had come and gone. Unlike the defendant in *Stanton* (which did not involve a question of waiver), HHS would not have been free to assert the preclusion defense on remand.  *See Stanton v. Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997).  If this Court finds that HHS

---

[11] HHS did not dispute below that the PRRB and the CMS Administrator may also apply *res judicata* in hospital reimbursement appeals.  *See* DE 30 at 16, DE 32 at 14-15 & DE 34 at 4.

has waived the defense, the proper course is to remand to the district court for consideration of the merits, not remand to the agency. *See Bowden v. U.S.*, 106 F.3d 433 (D.C. Cir. 1997) (reversing district court's holding that appellant failed to exhaust administrative remedies and remanding to the district court for consideration of the merits, holding that the agency waived the affirmative defense by, among other reasons, addressing the administrative complaint on the merits). None of the cases HHS cites involves remand to the agency after finding the agency has waived an affirmative defense. Rather, in each, this Court invalidated the agency action for failure to properly explain its actions under the APA and remanded to the agency for further investigation or explanation, allowing for the possibility that the same substantive result could be reached on different basis. *See, CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011) (remanding to agency for additional investigation or explanation, after APA review, because agency did not address a critical issue by failing to explain its reading of the statute); *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011) (finding that agency decision departed from its precedent without explanation and remanding to agency for reconsideration noting that the same conclusion could be reached on different basis.).

Thus, *sua sponte* application of the defense by the district court, where it had been waived during the trial phase of the case, would have been contrary to this

Court's precedent, *e.g.*, *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 150 n.1 (D.C. Cir. 1994), and an abuse of discretion.

   **B.   As did the district court below, HHS misconstrues *Chenery's* direct applicability to this case**

   Canonsburg Hospital has shown the district court erred by reviewing HHS's final determination on grounds (issue preclusion) not invoked by HHS in its final determination, contrary to *SEC v. Chenery Corporation*.  *See* Appellant Br. at 28-32.  HHS agrees *Chenery* provides that a court may uphold an agency adjudication (or rule) only on the basis of the <u>reasons given</u> by the agency at the time of its decision.  Appellee Br. at 36.  *Chenery* also provides for a narrow exception – where the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason.  In such a circumstance, the court may uphold the agency's adjudication on the basis of the right reason – the reason that compels the conclusion as a matter of law.  Examples of such reasons have, in this Circuit, included a clear statute or a prior Supreme Court decision, as the cases on which HHS relies demonstrate.

   For example, in *Morgan Stanley v. Public Utility District*, the agency applied a presumption in reviewing a type of rate contract, but did so under an invalid rationale.  554 U.S. 527, 544-5 (2008).  However, regardless of the rationale actually set forth, in the words of the Court, the agency "lucked out" because the same presumption was mandated by Supreme Court precedent and, in

such circumstances, *Chenery* does not bar affirming on the alternative, mandated grounds.[12]

HHS attempts to diminish *Chenery* by asserting that the district court may sustain an agency decision (whether or not correct as reasoned) on the basis of reasons not given, even if they are not mandated by law, if such reasons do not intrude on agency discretion or expertise.

HHS posits that "issue preclusion" is a matter of federal common law and, as such, does not require agency expertise. Not only is this contrary to HHS's position that agencies have special flexibility regarding preclusion, it is beside the point. With the narrow exception noted, *Chenery* precludes a court from substituting its judgment for that of the agency when the agency has exercised its discretion. Here, HHS exercised its discretion, twice, by choosing to decide Canonsburg Hospital's claims on the merits, rather than by invoking preclusion.

_____

[12] Similarly, in the other two cases cited by HHS, the *Chenery* exception applied because the agency reached the correct determination, as mandated by the law and not subject to agency discretion, albeit for the wrong reason. *See United Video, Inc. v. FCC*, 890 F.2d 1173, 1189-90 & n.15 (D.C. Cir. 1989) (holding "the commission was correct . . . but not precisely for the reasons it gave" and affirming on alternative grounds, where agency had "come to a conclusion it was bound [by a clear statutory provision] to come to as a matter of law"); *Shea v. Director, Office of Workers' Comp. Programs*, 929 F.2d 736, 739 n.4 (D.C. Cir. 1991) (holding the agency's decision that it had jurisdiction over a benefit claim could be affirmed on alternative statutory grounds because such a determination was "within the power of the appellate court to formulate" and involved interpretation of a statute with respect to which the agency was not accorded deference).

16

Having so exercised its discretion, HHS does not "luck out" here because there is no statute or Supreme Court decision, disregarded by HHS, mandating that HHS reach the same conclusion through invoking issue preclusion. In other words, unlike the cases on which HHS relies, it cannot be said here that HHS reached a correct conclusion, which was mandated under the law, about the validity of PRM 2534.5, but simply did so for the wrong reasons. Thus, to rule on preclusion now would, in violation of *Chenery*, disregard both HHS's discretionary choice to adjudicate the case on the merits and HHS's actual agency determination under review.

Finally, because issue preclusion is an affirmative defense that has been waived, applying *Chenery* here would not "convert judicial review of agency action into a ping-pong game." *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969); *Morgan Stanley*, 554 U.S. at 545. Following review of the determination on the merits, HHS should not be able to assert issue preclusion because it has been waived and a final determination has been made on the merits. HHS should not be permitted to "sleep on its rights," through two administrative adjudications, until a hospital ultimately pursues its appeal in court, only then to assert a defense that was available from the beginning. The district court below erred in failing to limit its review of HHS's final determination to the justifications

upon which the agency actually relied, at that time – these justifications did not include issue preclusion.

### C. **HHS has failed to show how its assertion of issue preclusion for the first time on appeal to the district court furthers the doctrine's policy justifications**

Canonsburg Hospital has explained that allowing HHS's untimely assertion of the affirmative defense of issue preclusion is contrary to each of its three principal policy underpinnings (*i.e.*, conserving adjudicatory resources, avoiding repeat litigation, and fostering reliance on judicial decisions by minimizing the possibility of inconsistent decisions).

HHS now responds with several arguments which it did not make before the district court. While these arguments should be disregarded as untimely, they also fail to persuade.

To begin, HHS now argues (for the first time) that it was more efficient first to decide the case on the merits, saving issue preclusion for the court appeal. This argument ignores the fact that the defense is justified, in significant part, as a means for avoiding unnecessary re-adjudication of the merits. When the merits have been re-adjudicated (here twice), a key purpose of the defense is lost. Further, HHS's delay has abrogated a second justification for the affirmative defense – avoiding inefficient use of resources. Here, HHS's unwarranted delay has introduced unnecessary complications (*e.g.*, the need for the lower court and

now this Court to consider arguments on waiver and *Chenery*). Moreover, HHS's delay indisputably wasted the agency's administrative adjudicative resources and the financial assets of Canonsburg Hospital.[13] It simply defies logic for HHS to assert that its conduct has somehow been efficient.

Next, although here advocating the potential benefits of issue preclusion, HHS has taken a different path with respect to litigation over its gap methodology. HHS's litigation strategy has burdened the district court below and this Court with three separate cases (and the PRRB with at least ten more cases), each addressing the validity of HHS's gap methodology, an issue that this Court could have definitively resolved in 2004, had HHS not withdrawn its appeal in *Mercy Medical*. In light of HHS's strategy, the argument that preclusion should apply here to avoid repeat litigation makes no sense.[14] In the instant case alone, the repeat litigation has already occurred twice.

---

[13] HHS's observation (yet again absent from its briefs below) that final position papers were already filed before the *2001 Case* was decided ignores the fact that significant additional proceedings on the merits occurred after 2001 (*e.g.*, the parties' stipulations submitted to the PRRB, preparation of Canonsburg Hospital's supplemental position paper, the intermediary's decision not to supplement, the PRRB's decision, submissions to the CMS Administrator and the CMS Administrator's decision).

[14] HHS's argument as to the policy favoring settlements misses the point. It is not accurate that HHS settled to "put to rest an issue," given that HHS began this strategy in 2004 (with settlement of the *Mercy Medical* case), which yielded at least three more hospital appeals, and continued the strategy in 2009 and beyond (with settlement of the *Montefiore* case). These settlements are not offered by

HHS's final argument is that requiring the agency to assert affirmative defenses at either level of its administrative adjudications would be impractical and unduly burdensome because the agency does not have its house in order. Aside from citing support that the PRRB had a large backlog of cases, this section of HHS's brief relies mainly on the assertions of counsel, and should be disregarded for that reason alone. Furthermore, this "too much to ask" argument is an indictment of the agency, not a rationale for penalizing Canonsburg Hospital.

The PRRB's large backlog of cases should incent HHS to seek the earliest legitimate disposition of cases, especially where dispositive "silver bullet" defenses are potentially available. HHS's counsel now claims (for the first time) that the agency is unaware of any PRRB or CMS Administrator cases decided on preclusion grounds, a point it did not contest below. In fact, Canonsburg Hospital cited such a decision in its summary judgment brief. *See* DE 30 at 16 (citing *Baptist Mem. Hosp. v. BlueCross BlueShield Assoc./Riverbend Gov. Benefits*, CMS Administrator Decision (2007)).[15]

---

Canonsburg Hospital as admission of guilt. Rather, HHS's settlements and "ping pong" strategy belie its present litigating position that it is merely seeking orderly disposition of the issue of the validity of its gap methodology in a good faith effort to avoid duplicative litigation of that same issue.

[15] There is an imbalance of information between providers and HHS. The PRRB has only published its jurisdictional and other decisions not reaching the merits since 2013. *See* List of PRRB Jurisdictional Decisions, https://www.cms.gov/Regulations-and-Guidance/Review-

HHS's suggestion that the agency does not track court wins is surprising and, if accurate, inexcusable. Intermediaries are represented by sophisticated, regionally coordinated counsel (here, Blue Cross/Blue Shield Association). *See* AR at 30. Thus, the intermediary here had ample means to know the outcome of the limited number of cases appealed to court.

Moreover, HHS's suggestion that *ex parte* contact rules hampered its ability to inform the PRRB or the CMS Administrator about the *2001 Case* overlooks that HHS gives itself the right to provide the intermediary counsel and to submit *amicus* briefs to the PRRB. *See supra*, at 3. Finally, no arguments on burden or impracticality can negate the fact that both the PRRB and the CMS Administrator were aware of the *2001 Case* when they issued decisions on the merits.

**D. It would be unfair to freeze the law available to Canonsburg Hospital with the *2001 Case* given the change in the legal landscape since then, a change that is confirmed by HHS's response**

In its brief, Canonsburg Hospital showed that the district court erred by failing to acknowledge that the legal principles behind the *2001 Case* had materially changed when the district court ruled below. However, the district court misapprehended the import of the Third Circuit's decision in *SBC, Inc. v. FCC*,

---

Boards/PRRBReview/List-of-PRRB-Jurisdictional-Decisions.html (last visited June 11, 2014). In contrast, HHS has access to all such decisions (after all, the PRRB is its administrative hearing board and HHS employs the PRRB's staff). Accordingly, HHS should not be permitted to rest behind its vague and unattributed assertion.

414 F.3d 486 (3d Cir. 2005), which adopted the *Paralyzed Veterans* line of authority, as well as the continuing vitality of *Paralyzed Veterans*. HHS's response mainly attacks *Paralyzed Veterans*[16] and argues (on the merits) that the gap methodology is not invalid under the *Paralyzed Veterans* analytical framework. These arguments fail.

HHS begins by arguing that the *2001 Case,* and the Sixth Circuit's *St. Francis* decision on which it exclusively relied, rejected Canonsburg Hospital's claim that HHS's gap methodology violated *Paralyzed Veterans*. However, as Canonsburg Hospital has shown in its opening brief, those cases are silent on the *Paralyzed Veterans* analytical paradigm. The Sixth Circuit appears to have misunderstood the issue. It responded to the plaintiff's "argument regarding the Secretary's 'inconsistent' interpretation of its regulations" with the statement that "agencies are not bound by their own prior construction of a <u>statute</u> . . . ." *See St.*

---

[16] *Paralyzed Veterans* has been the subject of agency challenge for years because the case (properly) imposes limits on an agency's ability to avoid notice and comment rule-making by denominating something a mere "interpretive" ruling. The most recent of these attacks is the currently pending Petition for Certiorari in the case *Mortgage Bankers Assoc. v. Perez*, 720 F.3d 966 (D.C. Cir. 2013), *petition for cert. filed*, 2013 U.S. Briefs 1041 (U.S. Feb. 28, 2014) (No. 13-1041). As of the date of submission of this Reply, the Court has not yet ruled on this heavily opposed Cert. Petition.

*Francis Health Care Center v. Shalala*, 205 F.3d 937, 947 n.11 (6th Cir. 2000)

(emphasis added).[17]

The *2001 Case* (based on its wholesale adoption of *St. Francis*) rests on a

shaky foundation which overlooked *Paralyzed Veterans'* analytical framework–

*i.e.*, treating an agency's change in the interpretation of regulations as akin to a

change in the interpretation of a statute.  Had *SBC* already been decided at that

time, however, the Western District of Pennsylvania would not have been able to

pass on reviewing Canonsburg Hospital's claims under *Paralyzed Veterans*. Thus,

*SBC* comprised a substantial change in the law of the Third Circuit since the *2001*

*Case* was decided.

HHS is also incorrect that *SBC* did not adopt, but instead "simply cited[]

*Paralyzed Veterans* favorably before holding that the agency had never changed its

interpretation."  Appellee Br. at 21.  In fact, the Third Circuit expressly analyzed

the *SBC* plaintiff's claim – that the agency had changed its prior interpretation –

under *Paralyzed Veterans*.  After a detailed comparison of the agency

interpretation, the court ruled on the facts against that claim.  414 F.3d at 498-501.

Thus, the *Paralyzed Veterans* analytic paradigm, even though not ultimately

---

[17] The Sixth Circuit has since acknowledged the analytical paradigm of *Paralyzed Veterans*, but has continued to characterize the issue the *St. Francis* court analyzed as one of differing interpretations of a statute.  *See Dismas Charities, Inc. v. United States DOJ*, 401 F.3d 666, 681-682 (6th Cir. 2005).

4819-4091-8811.

resulting in overturning the agency's interpretations in question, was central to the court's analysis of one of the claims and its holding.[18]

While *SBC* did not overrule prior Third Circuit precedent, *SBC* did adopt an analytical model using legal principles which the court in the *2001 Case* did not appear to recognize as applicable in the Third Circuit. Had the Western District of Pennsylvania decided the *2001 Case* after *SBC*, it would have been required to apply the *Paralyzed Veterans* analysis.[19]

---

[18] HHS mistakenly relies on *Aguilar v. Attorney General*, 663 F.3d 692, 699 (3rd Cir. 2011), arguing that the portion of *SBC* addressing the *Paralyzed Veterans* analytic paradigm was nonbinding dicta. In *Aguilar*, the court held that a prior court's discussion of a *mens rea* standard under a concededly inapplicable criminal statute was "not essential to the decision" and, thus, dicta. *Id.* Here, as shown, the *SBC* court ruled on a claim under the analytic paradigm it deemed applicable in reaching a conclusion.

[19] HHS also contends that Canonsburg Hospital should be forever bound by its decision not to appeal the *2001 Case*. The authority HHS cites, however, does not involve issue preclusion, but instead claim preclusion. *See* Resp. at 22 (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 400-401 (1981). Moreover, that authority does not address the exception to issue preclusion where, such as here, there has been a change in the legal context. *See* 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4415 (2d ed. 2009) ("Change in the controlling principles of law ordinarily does not warrant denial of claim preclusion."). Similarly, HHS argues that Canonsburg Hospital should be stuck with the law of the Third Circuit with respect to all of its court appeals because it filed the *2001 Case* there. This argument is not only new (and should be rejected), but it ignores providers' statutory rights to file suit either in the District of Columbia or in their home districts. That statutory right to sue in alternative districts exists for each appeal from a separate final agency decision. *See* 42 U.S.C. § 1395oo(f). Moreover, because the law of the D.C. Circuit governs the Medicare rights of all other hospitals in the country, it would be inequitable to

4819-4091-8811.

HHS's next group of arguments is a direct challenge to the vitality of the *Paralyzed Veterans* line of authority, asserting that the rule of *Paralyzed Veterans* is unstable. *Paralyzed Veterans* is the law of both this Circuit and the Third Circuit, which govern Canonsburg Hospital's rights and are, thus, the only Circuits relevant to this case. *Paralyzed Veterans* is presently the law and will remain so unless and until reversed by the Supreme Court, if it grants *certiorari* in *Mortgage Bankers Ass'n v. Perez*.[20] Again, because all providers may appeal in the District of Columbia, the law of this Circuit, where *Paralyzed Veterans* is binding precedent, applies to them uniformly. But HHS argues that Canonsburg Hospital should be subject to a different rule of law, due to the district court's application of issue preclusion to freeze the law governing its rights as of 2001.

HHS concedes that Canonsburg Hospital's arguments relating to the change in legal circumstances do not hinge on proving that it would succeed on its claim under *Paralyzed Veterans*. Nevertheless, HHS next makes several arguments relating to the merits of that claim, suggesting that Canonsburg Hospital would not necessarily prevail. This line of arguments not only misses the point – as the district court would have to address the claim under *Paralyzed Veterans* – but each of the arguments fails in its own right.

---

deny Canonsburg Hospital the benefits of its statutory right to access the law of the D.C. Circuit – in this case as interpreted by *Paralyzed Veterans*.

[20] *See supra* n.16.

4819-4091-8811.

HHS starts with a belated contention that HHS never made a definitive interpretation of the RCL Exception Reg. This contention fails because the district court below held to the contrary, and Canonsburg Hospital cited HHS's definitive interpretation (first made by the CMS Administrator in 1980) in its summary judgment briefs below, which went uncontested. *See* DE 30 at 23 (*citing Sacramento Med. Ctr. v. Blue Cross and Blue Shield Assoc.*, HCFA Admin. Dec., September 29, 1980, Medicare & Medicaid Guide (CCH) ¶ 30,859)). Moreover, HHS cannot take issue with the findings of the *Mercy* and *Montefiore* district courts as to the same definitive interpretation, having voluntarily withdrawn its own appeals of those decisions.

HHS also contends that it had "a documented history" of applying its gap methodology before 1994. As rebutted in the summary judgment pleadings, Canonsburg Hospital established that the factual support offered by HHS at most revealed an isolated handful of instances where the gap methodology was applied on the eve of its official rollout in PRM 2534.5. *See* DE 34 at 13 - 14.

HHS also argues that the gap methodology of PRM 2534.5 was just a new application of its RCL Reg to a "new environment" post-DEFRA. Any "new environment" actually arose in 1984, not in 1994 when PRM 2534.5 was implemented. For almost 10 years under the "new environment," HHS continued to interpret the RCL Exception Reg to permit recovery of all costs above the RCL.

4819-4091-8811.

In summary, Canonsburg Hospital has shown that the changes in the legal context since the *2001 Case* – especially with the Third Circuit's intervening adoption of the analytical model established by *Paralyzed Veterans* – make it unfair to freeze Canonsburg Hospital's access to the law of the D.C. and Third Circuits to that of the Third Circuit as of 2001.

**E. HHS has failed to show that the district court had grounds to take judicial notice that previews of a 1985 Report were shared with Congress in connection with DEFRA**

As shown, the district court improperly took judicial notice of "previews" of the 1985 Report to Congress based on conclusory references in the *San Joaquin* and *St. Francis* cases.[21] HHS did not even respond to this argument, thus implicitly conceding the point. Instead, HHS has referenced material that was added to the administrative record, during the review before the CMS Administrator, over Canonsburg Hospital's objection, and has defended the CMS Administrator's conclusions based on same. This whole line of argument is not ripe for review, as the district court did not reach it, and should be reserved for the case on remand.

---

[21] Canonsburg Hospital agrees with HHS that the statutory interpretation issue potentially implicated by the 1985 Report goes to the merits and is, thus, irrelevant to the question of whether the district court's application of collateral estoppel was appropriate. Nevertheless, on remand, Canonsburg Hospital does not want to be accused of having acquiesced in the district court's findings of regulatory facts.

In any event, as Canonsburg Hospital demonstrated below, there was no record evidence supporting the CMS Administrator's findings that Congress considered previews of the 1985 Report when enacting DEFRA in 1984. DE 34 at 18-19. HHS also did not rebut below the fact that the 1985 Report expressly states that "important issues need to be considered before specific options for reimbursement reform of the Medicare SNF benefit can be addressed." DE 28, Ex. 10 at p. 27. As such, even after its release, there were no definitive findings from the 1985 Report for Congress to consider.

## CONCLUSION

For the foregoing reasons, and those set forth in the opening brief, Canonsburg Hospital respectfully requests that this Court enter an order vacating the district court's decision and remanding to the district court for proceedings on the merits.

4819-4091-8811.

Dated: June 13, 2014

Respectfully submitted,

*/s/ Stephen P. Nash*
Stephen P. Nash (D.C. Bar No. PA0037)
Sven Collins*
*Admitted Pro Hac Vice
Squire Patton Boggs (US) LLP
1801 California St., Ste 4900
Denver, CO 80202
Tel: (303) 894-6173
Fax: (303) 894-9239
E-mail: Stephen.Nash@squirepb.com

Attorneys for Appellant

4819-4091-8811.

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Federal Rule of Appellate Procedure

32(a)(7)(C) that the foregoing Brief complies with the type-volume limitation of

7,000 words set forth in Rule 32(a)(7)(B), in that it contains 6,985 words in

content.

*/s/ Stephen P. Nash*
Stephen P. Nash
Attorney for Appellant

4819-4091-8811.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 13th day of June, 2014, I served the foregoing Appellant's Reply Brief and Addendum electronically upon the following counsel of record for Appellee:

Benjamin M. Shultz
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 514-3518
Fax: (202) 514-9405
Email: benjamin.shultz@usdoj.gov
*Counsel for Appellee*

Michael S. Raab
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., NW
Washington, DC  20530
Tel: (202) 514-4053
Fax: (202) 514-7964
Email: michael.raab@usdoj.gov
*Counsel for Appellee*

*/s/ Stephen P. Nash*
Stephen P. Nash
Attorney for Appellant

4819-4091-8811.

# **ADDENDUM**

## **Table of Contents**

**Page**

42 C.F.R. § 421.100 ...............................................................................A030

taken on behalf of CMS and CMS is the real party of interest in any litigation involving the administration of the program.

(c) *Use of intermediaries to perform carrier functions.* CMS may contract with an intermediary to perform carrier functions with respect to services for which Part B payment is made to a provider.

(d) *Nonrenewal of agreement or contract.* Notwithstanding any of the provisions of this part, CMS has the authority not to renew an agreement or contract when its term expires.

(e) *Intermediary availability in an area.* For more effective and efficient administration of the program, CMS retains the right to expand or diminish the geographical area in which an intermediary is available to serve providers.

(f) *Provision for automatic renewal.* Agreements and contracts under this part may contain automatic renewal clauses for continuation from term to term unless either party gives notice, within timeframes specified in the agreement or contract, of its intention not to renew.

[45 FR 42179, June 23, 1980, as amended at 54 FR 4026, Jan. 27, 1989]

## Subpart B—Intermediaries

### § 421.100  Intermediary functions.

An agreement between CMS and an intermediary specifies the functions to be performed by the intermediary.

(a) *Mandatory functions.* The contract must include the following functions:

(1) Determining the amount of payments to be made to providers for covered services furnished to Medicare beneficiaries.

(2) Making the payments.

(b) *Additional functions.* The contract may include any or all of the following functions:

(1) Any or all of the program integrity functions described in § 421.304, provided the intermediary is continuing those functions under an agreement entered into under section 1816 of the Act that was in effect on August 21, 1996, and they do not duplicate work being performed under a Medicare integrity program contract.

(2) Undertaking to adjust incorrect payments and recover overpayments

when it is determined that an overpayment was made.

(3) Furnishing to CMS timely information and reports that CMS requests in order to carry out its responsibilities in the administration of the Medicare program.

(4) Establishing and maintaining procedures as approved by CMS for the redetermination of payment determinations.

(5) Maintaining records and making available to CMS the records necessary for verification of payments and for other related purposes.

(6) Upon inquiry, assisting individuals for matters pertaining to an intermediary agreement.

(7) Serving as a channel of communication to and from CMS of information, instructions, and other material as necessary for the effective and efficient performance of an intermediary agreement.

(8) Undertaking other functions as mutually agreed to by CMS and the intermediary.

(c) *Dual intermediary responsibilities.* Regarding the responsibility for service to provider-based HHAs and provider-based hospices, where the HHA or the hospice and its parent provider will be served by different intermediaries, the designated regional intermediary will process bills, make coverage determinations, and make payments to the HHAs and the hospices. The intermediary or Medicare integrity program contractor serving the parent provider will perform all fiscal functions, including audits and settlement of the Medicare cost reports and the HHA and hospice supplement worksheets.

[72 FR 48886, Aug. 24, 2007]

### § 421.103  Payment to providers.

Providers are assigned to intermediaries in accordance with § 421.104. As the Medicare Administrative Contractors (MACs) are implemented, providers are reassigned from intermediaries to MACs in accordance with § 412.404 of this chapter.

[71 FR 68228, Nov. 24, 2006]

A030